IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

JERRY ALLEN MARK,

       Petitioner,

vs.

KEN BURGER,

       Respondent.

No. 97CV4059

ORDER

_____

## TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND . . . . . . . 2
   A. Events Preceding the § 2254 Motion . . . . . . . 2
      1. A Synopsis Of The Ruling This Court Has
         Made . . . . . . . . . . . . . . . . 3
   B. Facts "Found" by the Jury . . . . . . . . . . . 10

II. CLAIMS RAISED IN THE § 2254 PETITION . . . . . . . 13

III. STANDARDS OF REVIEW . . . . . . . . . . . . . . . . 13
   A. Standard Applicable to § 2254 Petitions . . . . 13
   B. Standard for Brady violation . . . . . . . . . . 15

IV. THE HISTORY OF BRADY OVER THE YEARS . . . . . . . 18
   A. Evaluation of the Evidence . . . . . . . . . . 20
   B. The Test . . . . . . . . . . . . . . . . . . . 21

V. HOW THIS CASE WAS HANDLED . . . . . . . . . . . . . 22

VI. KNEW OR SHOULD HAVE KNOWN DEFENSE . . . . . . . . . 47

VII. MARK'S BRADY CLAIMS . . . . . . . . . . . . . . . . 55
   A. Blood-Saliva Tests On Cigarettes . . . . . . . 55
   B. Post Trial DNA Cigarette Butt Process . . . . . 67
   C. Witness Leslie Warren . . . . . . . . . . . . . 72
   D. Jean Doyle, Potential Alibi Witness . . . . . . 108

  E. Identification Witnesses along Route of Travel
   . . . . . . . . . . . . . . . . . . . 135
    1. Donald Shearer . . . . . . . . . . 136
    2. Karelyn Kemp and Mary Stinson . . . . . 138
    3. Barbara Ann Smith . . . . . . . . . 140
    4. Delbert Van Hauen . . . . . . . . . 142
    5. Jayathan Hurd . . . . . . . . . . . 145
    6. Rosalie McGinnis . . . . . . . . . 155
    7. Summation . . . . . . . . . . . 159
  F. Shoeprint evidence . . . . . . . . . . . 164
  G. Bullet evidence . . . . . . . . . . . . 178

VIII. HOW THE IOWA COURT OF APPEALS SHOULD HAVE
  CONSIDERED THE LAW AS TO <u>BRADY</u> REQUIREMENTS AND THE
  DUTIES OF THE PROSECUTION . . . . . . . . . . 181
  A. The Iowa Supreme Court Made Adjudications Of Claims
   Which Resulted In A Decision That Was Contrary To
   And Involved An Unreasonable Application Of Clearly
   Established Federal Law As Determined By The Supreme
   Court Of The United States . . . . . . . . 190
  B. Prosecutor's Duties . . . . . . . . . . . 193
    1. Result of the failure of the prosecution to
     follow their duty . . . . . . . . . . 193

IX. WHERE DOES ALL THIS LEAVE US? . . . . . . . . 196
  A. Standard for Proving Suggestive Photo . . . . 200
  B. Comments by the Court . . . . . . . . . . 206

X. CONCLUSION . . . . . . . . . . . . . . . 209
  A. Lead Control Analysis . . . . . . . . . . 214
  B. DNA Testing . . . . . . . . . . . . . 214

XI. ORDER . . . . . . . . . . . . . . . . . 214

This ruling is lengthy, therefore we have inserted the following list of suppressed exhibits to be helpful in reviewing this ruling.

**There were ten (10) exhibits totaling twenty-one (21) pages that the prosecution never gave to the trial judge, which of course he never saw despite his clear Orders that he see the entire file.** These exhibits have no judge's check marks on them. The record is clear that the prosecution for reasons not satisfactorily explained, never did show these exhibits to the judge. They were never mentioned during the trial and were only found by diligent discovery by the petitioner's lawyers years later.

The Iowa Court of Appeals in its opinion on pages 823, 824 and 825 discusses most, if not each, of these ten (10) exhibits as exhibits the defense either knew or should have known about which, of course, is premised on the admission that they were not turned over.

1. **Exhibit 107** is one (1) page; re saliva testing results; discussed on pages 6, 57, 58, 59, 60, 64 of this Order.

2. **Exhibit 20** is two (2) pages; Les Warren's medical records; discussed on pages 76, 77, 78, 80, 86, 88, 89, 90, 91, 92, 97, 98, 100, 101, 102, 106 of this Order.

3. **Exhibit 26** is one (1) page; re Les Warren work schedule on 11-1-1975; discussed on page 85 of this Order.

4. **Exhibit 27** is one (1) page; re Les Warren work schedule on 11-1-1975; discussed on page 85 of this Order.

5. **Exhibit 128** is one (1) page; re interview of Les Warren's doctor, Dr. Cutright; discussed on pages 76, 77, 78, 80, 86, 88, 89, 90, 91, 92, 97, 98, 99, 100, 101, 102, 106 of this Order.

6. **Exhibit 132** is one (1) page; re Les Warren's doctor's appointment on 11-1-1975 [interviews with Millie Wagner (Dr. Cutright's receptionist) and Almeron Steele (Warren's

maintenance foreman)]; discussed on pages 76, 77, 78, 80, 86, 88, 89, 90, 91, 92, 96, 97, 98, 99, 100, 101, 102, 106 of this Order.

7.  **Exhibit 134** is six pages (6) pages (the entire exhibit is actually 24 pages, but the court finds that pgs 14-16 and 20-22 contain the exculpatory information); transcript of a taped conversation between agents Forrest and Gallardo re Mark identification involving Jean Doyle and a conversation about Warren, the attendant at the Chappell rest stop who says he cannot make a positive identification; discussed on pages 73, 90, 110, 112, 118, 123, 133, 135 of this Order.  Ex. 134 was not disclosed to the defense until 6-4-1992, sixteen years after the trial was over.  The trial judge never saw it.

8.  **Exhibit 33** is one (1) page; re "messy" condition of the murder scene and the presence of cigarette butts; discussed on pages 62, 63 of this Order.

9.  **Exhibit 90** is four (4) pages; The very messy crime scene regarding cigarette butts found at murder scene and blood type testing of five (5) individuals including deputies and secretaries; discussed on pages 63 of this Order.

10. **Exhibit 101** is three (3) pages; re interview of Rosalie McGinnis and Karelyn Kemp; discussed on pages 155, 157, 158, 161 of this Order.

Additionally, after two or three in camera reviews by the trial judge of the "entire" case file, Judge Englekes ordered that a number of exhibits be given to the defense.  Those exhibits were provided to the defense.  However, the judge ruled that some exhibits need not be given to the defense. This Court finds that out of the numerous materials reviewed by Judge Englekes that were not turned over to the defense, **a total of fourteen (14) exhibits containing thirty-two (32) total pages were exculpatory and material and should have been turned over to the defense by the judge.**

**Exhibit 21** is one (1) page; Les Warren's medical records; discussed on pages 75, 76, 77, 78, 80, 86, 87, 88, 89, 90, 91, 92, 97, 98, 100, 101, 102, 106 of this Order.

**Exhibit 29** is two (2) pages; re footprints found at the murder scene; discussed on pages 166, 169, 170, 173, 176, 178 of this Order.

**Exhibit 31** is two (2) pages; re shoes that correspond with the footprints; discussed on pages 166, 169, 170, 171, 175, 176, 178 of this Order.

**Exhibit 32** is three (3) pages; re interview of Jean Doyle on 11-6-75; discussed on pages 108, 109, 118, 123, 133, 134, 135 of this Order.

**Exhibit 37** is one (1) page; re Jean Doyle interview on 11-7-1975; discussed on pages 109, 113, 115, 117, 118, 123, 133, 134, 135 of this Order.

**Exhibit 45** is three (3) pages; re interview of Jean Doyle on 11-6-1975; discussed on pages 109, 118, 123, 133, 134, 135 of this Order.

**Exhibit 53** is two (2) pages; re Mark identification by witness Smith; discussed on page 140, 141, 142 of this Order.

**Exhibit 64** is one (1) page; re Mark identification; discussed on pages 136, 137, 138, 159 of this Order. The record is not real clear as to whether or not the trial judge saw Ex. 64, so it has not been included in the "never saw" category.

**Exhibit 71** is seven (7) pages; re the entire investigation, but particularly for this analysis, shoes and shoeprints; discussed on pages 164, 166, 168, 169, 170, 171, 172, 176, 178 of this Order.

**Exhibit 77** is one (1) page; re interview of Jayathan Hurd re Mark identification; discussed on pages 145, 146, 148, 149, 151, 153, 154, 160, 208 of this Order.

**Exhibit 82** is one (1) page; re Mark identification; discussed on pages 39, 145, 146, 147, 148, 149, 151, 152, 154, 160, 208 of this Order.

**Exhibit 85** is five (5) pages; re 12-5-1975 witness line-up, specifically page 5 where Barbara Ann Smith is qualifying her identification; discussed on pages 141, 142, 145, 153, 160, 203, 208 of this Order.

**Exhibit 86** is two (2) pages; re 12-5-1975 witness line-up; discussed on pages 155, 158, 161 of this Order.

**Exhibit 97** is one (1) page; re Mark identification; discussed on pages 145, 148, 149, 151, 153, 154, 160, 208 of this Order.

There are a number of other exhibits that the defense never saw including, for example, the bullet exhibits that this court is persuaded were suppressed, but have not been included in arriving at the cumulative effect of the improper suppressions.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

JERRY ALLEN MARK,

      Petitioner,

vs.

KEN BURGER,

      Respondent.

**No. 97CV4059**

**ORDER**

_____

    This matter comes before the Court on petitioner Jerry
Allen Mark's Petition for a Writ of Habeas Corpus by a Person
in State Custody, pursuant to 28 U.S.C. § 2254. The State of
Iowa resisted the petition. Numerous briefs were filed and
oral arguments held. The case is now ready to be decided[1].
The list of suppressed exhibits, listed on pages iii-vi, are
by reference hereby made a part of this ruling.

_____

    [1]On two or more occasions, after the case had been fully
presented to the Court, Petitioner filed voluminous new
pleadings and requested that the Court not rule until the
Court fully considered those pleadings. The respondent asked
for, and received, lengthy time to respond. Additionally,
this case was filed in this Court in 1997, after it had spent
twenty-one years in State courts. (See Mark v. Iowa, 568
N.W.2d 820 (Iowa Ct. App. 1997)).

1

## I.  INTRODUCTION AND PROCEDURAL BACKGROUND

### A.  Events Preceding the § 2254 Motion

On November 1, 1975, Leslie Mark, his wife Jorjean, and their two children Julie, age 5, and Jeffrey, age eighteen months, were found murdered in their farmhouse in Black Hawk County, Iowa.  Leslie Mark had been shot four times in the head and once in the stomach.  Jorjean had been shot twice in the head, once in the back and another shot grazed her skin. Julie had been shot once through the heart and once through her right eye.  Jeffrey had been shot once in the left chest and once above the right eye.  Investigators determined that the family had been killed between 1:00 a.m. and 3:00 a.m.

The petitioner, Jerry Allen Mark (hereinafter "Mark") is the older brother of one of the victims, Leslie Mark.  In 1976, Mark was convicted by a jury on four counts of first degree murder.  The reviewing Iowa Supreme Court found that Mark's conviction for murder was based entirely on circumstantial evidence, including witness testimony[2] placing him at various places along the route of travel from his home

_____

[2]The witnesses did not see the murder occur, rather they placed him at various places on a route from California to Iowa.

in California to his brother's farm in Iowa, cigarette butts found at the scene, and bullets found at the scene. State v. Mark, 286 N.W.2d 397 (Iowa 1979). Mark appealed, and his conviction was affirmed on appeal in Mark v. State, 568 N.W.2d 820 (Iowa Ct. App. 1997).

In l987, Mark filed an application for post-conviction relief in the Iowa State Court. Due to a lengthy discovery process, the matter was not heard in the State Court until September 1994. On February 3, 1995, the State District Court denied post-conviction relief. (Findings of Fact and Conclusions of Law, Post Conviction Relief ("hereinafter P.C.R.") Appx. Vol. I, p. 1). In April 1997, the Iowa Court of Appeals affirmed the District Court's denial of post conviction relief. Mark v. State, 568 N.W.2d 820 (Iowa Ct. App. 1997). On July 8, 1997, Mark initiated his habeas corpus proceedings with this Court.

**1. A Synopsis Of The Ruling This Court Has Made**

This Court, because of the length of this ruling, is persuaded that it should, up front, set out what has been done in the ruling in this case. It should be understood this ruling is not about guilt or innocence. Counsel for the

respondent has clearly stated, "I agree that his guilt or innocence is not an issue here." He also stated, "The bottom line is the Brady issues, which I think are the crux of this case. . ." (Hearing of 11/19/99; Tr. 131 and 124).

The Court has granted the Writ of Habeas Corpus. The primary reasons, although the entire ruling is incorporated herein as though completely set out, is that the prosecution did not even let the judge see ten (10) exhibits that they suppressed; that the trial judge suppressed fourteen (14) exhibits that should not have been suppressed; that the prosecution failed to perform their exclusive duty to process exculpatory evidence; and the Iowa Court of Appeals did not consider the cumulative effect of the documents that were suppressed that should not have been suppressed. This Court is persuaded that there is at a minimum of twenty-four (24) material exhibits, covering fifty-three (53) pages that were never seen by the defendant before or during the original murder trial.

These exhibits were, of course, not seen by the Supreme Court of Iowa when reviewing the appeal. This Court has no problem with what the Supreme Court of Iowa concluded from the

evidence then before them, but is persuaded that there were many pages of evidence that they never got to consider that were first brought up as evidence at the P.C.R. trial and before the Iowa Court of Appeals some fifteen (15) years later.

This Court is persuaded that these twenty-four (24) exhibits were material exhibits.

There is a set of circumstances that should be explained up front. As mentioned, ten (10) of twenty-four (24) of these exhibits were never given to the trial judge for his perusal, despite the fact that the trial court had definitely ordered that the prosecution's "entire file" be submitted to him. (Order, February 6, 1976, Exh. 148). There has been no satisfactory explanation of why they were not turned over.

This trial judge had a system to keep track of the exhibits, reports and related papers he was given. He put a checkmark on any documents he had seen, that is, what he looked at in camera to determine whether that document should be given to the defense. The trial judge testified, sixteen (16) years later, as follows: "I don't have any explanation as to why some don't have my checks on them. I tried hard to

accomplish that. I put that duty on myself and I cannot explain why they [checkmarks] are not there." P.C.R. Tr. p. 973. The defense counsel testified they did not get these twenty-four (24) exhibits. There is no satisfactory explanation by the prosecution as to what happened. There is only one conclusion that can be reached. The trial judge never saw ten (10) of them. For example, he is shown Exhibit 107 (re: cigarette tests). The trial judge says, "I don't have any memory of it. I don't ever remember seeing it." P.C.R. Tr. p. 951. Prosecutor Zanville in relation to Exhibit 107 stated, "I never gave Exhibit 107 to the defense." P.C.R. Tr. p. 1040.

Fourteen (14) of the twenty-four (24) suppressed exhibits were probably sent to the trial judge and if so he reviewed them. The Court here says probably because as set out above, several of them do not have the checkmark that the trial judge said he attempted to put on every exhibit he saw. This Court is persuaded that neither trial judge nor the post-conviction relief judge followed the mandate of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its successor cases, nor did they follow the Iowa Supreme Court

directions in <u>State v. Peterson</u> (citing <u>Brady)</u>, 219 N.W.2d 665 (Iowa 1974).

The Court has set out in a section of this Order commencing at page ?, exactly what the prosecution and the judge did in relation to the exhibits that the judge saw and then this Court further sets out, beginning on page 181 of this Order, how they should have handled it according to the <u>then</u> very recent case of <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) which clearly told prosecutors and judges how <u>Brady</u> matters should be handled in those years. Circa 1997.

This Court is not in any way reflecting on the manner in which the trial judge tried the case. He just did not get to see these twenty-one (21) pages from ten (10) exhibits that diligent work by the appellant team of lawyers uncovered and presented to the post-conviction relief court. The judge in the post-conviction relief court is a fine judge who enjoyed a good reputation for handling complicated matters. The Court of Appeals judge and the panel that heard the P.C.R. appeal are fine judges. However, respectfully, it is this Court's opinion that their understanding of how to review <u>Brady</u>

matters was not in accord with the <u>Brady</u>, <u>Kyles</u>, and <u>Peterson</u> (citing <u>Brady</u>) cases. These cases are discussed in this ruling commencing on pages 15 and 18, and again on page 181, and again on page 196.

The trial was well tried by the lawyers, each of whom had been in many tough lawsuits and knew the rules and regulations on how to proceed very well. These were lawyers who seldom lost trials, and they conducted themselves well during the trial. There are allegations that the prosecution intentionally withheld evidence and misled the defense. In its consideration of the cumulative effect of the suppression of the ten (10) exhibits that the trial judge did not see, this Court is not adding any of said contentions into its conclusion. It makes no difference whether the failure to disclose is in good faith or bad faith. See <u>Brady</u>, 373 U.S. at 87, 83 S. Ct. at 1196-97.

This Court has also found that the theory of "should have known" by the defense does not fit the facts in this lawsuit. The facts and legal issues in both the cases of <u>Cornell v. State of Iowa</u>, 430 N.W.2d 384, at 385, (citing <u>United States v. LeRoy</u>, 687 F.2d 610, 618) (2d Cir. 1982, cert. denied, 459

U.S. 1174 (1983)) are miles apart from the factual situations where the Iowa Post-Conviction Court found that the defense counsel and the defendant knew or should have known certain things, all as explained commencing on page 47 of this Order.

This Court is well aware that this case has been in the courts far too long. As mentioned, the <u>Mark</u> case was in the state courts twenty-one (21) years before the petition for writ for a habeas corpus was filed in this Court. It has been in our Court for too many years. The Court was ready to rule much earlier in these proceedings; but additional, extensive pleadings were filed bringing up matters that were contended to be outside of the perimeters of the original petition. Hearings were held. The Court was persuaded that denying the request to review those new approaches, would, down the line, result in new, unresolved issues coming back before this Court.

An additional reason for the delay is that there are several hundred pages of trial transcripts and many, many pages of exhibits, briefs, and transcripts of hearings. This Court was persuaded that it had to make a serious attempt to cover each and every position or claim of either party so that

it could not be concluded that something was overlooked.  This
Court apologizes for the time it has taken, but it is
persuaded that under the circumstances, there was not a better
approach.

## B.  Facts "Found" by the Jury[3]

The Leslie Mark family was murdered on November 1, 1975.
Following is a summary of what the Iowa Supreme Court found
the trial jury "could have found" from the circumstantial
evidence produced at trial.  <u>Mark</u>, 286 N.W.2d 386.  On October
3, 1975, Mark purchased a white helmet and a used 450 cc Honda
motorcycle in Berkeley, California.  The motorcycle was dark
brown with a windshield, leg protectors and a luggage box on
the back.  At the time, Mark also owned a smaller 100 cc Honda
motorcycle that had an Iowa license plate.  Sometime prior to
November 1, 1975, Mark removed the Iowa plate from the smaller
bike and put it on the larger bike.

On October 20, 1975, Mark bought a box of fifty .38
caliber Winchester Western Long Colt bullets that were

_____

[3]These "facts" are a summary of what the State Court held
a reasonable jury <u>could</u> have found and are included here so
that the "whole picture" will be in one place.  <u>State v. Mark</u>,
286 N.W.2d 386 (Iowa 1979).

10

manufactured in 1975, from Ken's Sport Shop in Paso Robles, California, while using his Iowa driver's license for identification. Mark had access to a pistol capable of firing these bullets.

On October 28, 1975, Mark bought a Belstaff riding suit and a pair of motorcycle gloves from a Honda dealership in Berkeley, California. He left his apartment on the morning of October 29, riding his 450 cc Honda motorcycle. He traveled through Lovelock, Nevada, on Interstate 80. He continued east on I-80 going through Cheyenne, Wyoming, to Chappell, Nebraska, arriving there on the morning of October 31. He continued on to Brady, Nebraska, where he stopped at a Stuckey's Pecan Shoppe. Then he went on to Atlantic, Iowa, stopping at the Shamrock Café. Mark proceeded on to Newton, Iowa, where he was again seen in a Stuckey's Pecan Shoppe. After Newton, Mark was next seen at a Holiday gas station in Ackley, Iowa, at about 8:00 p.m. Ackley is approximately 36 miles from the Leslie Mark farm.

Mark then moved on to the farm, where sometime in the early morning hours he cut the wires in the telephone terminal box located across the road from the Leslie Mark farmhouse.

In the process, he dropped two .38 caliber Long Colt bullets on the ground. He walked up the driveway, past the house to a camper (where Leslie Mark occasionally slept after unloading corn into his storage bin). Mark then walked back to the house and, using the key that normally hung by the back door, he entered the house.

At some point he went into the basement, turned off the power, and smoked two Marlboro cigarettes. He then went to Leslie and Jorjean's bedroom, located on the main floor of the house, where he shot Leslie and Jorjean. After that, Mark went upstairs to Julie's bedroom where he shot her. While there, he smoked another Marlboro cigarette. Mark then moved on to Jeffrey's bedroom where he shot him.

Mark was next seen about 66 miles west of the Mark farm in Williams, Iowa, at about 5:00 a.m. on November 1. At 7:30, he was seen in Stuart, Iowa, and between 3:00 p.m. and 4:00 p.m., he called to his home in California from Alda, Nebraska.

The Supreme Court of Iowa held the facts, set out on pages 10 through 13, could have been found by a reasonable jury based on the evidence presented at trial. <u>Mark</u>, 286 N.W.2d 386. In all of his statements to police, Mark has

12

always denied these "conclusions" and maintained that he only went as far as Nebraska and that he never went into the State of Iowa.

## II.  CLAIMS RAISED IN THE § 2254 PETITION

Mark raises two primary issues in his § 2254 petition. His first claim is that the State failed to disclose exculpatory evidence in violation of <u>Brady</u>, 373 U.S. 83.  His second centers around the "unduly and impermissibly suggestive" photo usage, which violated his due process rights.

The Court will first set out the standard of review for habeas corpus petitions.  Next, because most of Mark's claim is based on <u>Brady</u> violations, the Court will set out the standard for proving such a claim.  The Court will also set out the standard for determining when the use of a single photo, versus a "photo pack," is impermissible.  The Court will also address the merits of each of Mark's claims.

## III.  STANDARDS OF REVIEW

### A.  Standard Applicable to § 2254 Petitions

Mark's habeas case was filed on July 8, 1997.  It is agreed that it must be reviewed by this Court under the "new"

standard, Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). (28 U.S.C. §2254).

There are two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 404-05, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (quoting 28 U.S.C. § 2254(d)(1)).

The Eighth Circuit, in Odem v. Hopkins, 192 F.3d 772, 774 (8th Cir. 1999) (after the passage of AEDPA), discussed the standard of review for state habeas cases:

> In a habeas case, the central question is whether the conviction and sentence are consistent with the dictates of the Constitution. See Smith v. Armontrout, 888 F.2d 530, 539 (8th Cir. 1989). Only those constitutional errors that have a substantial and injurious effect or influence in determining a jury's verdict warrant relief under a 28 U.S.C. § 2254 petition. See Brecht v. Abrahamson, 507

U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed.
2d 353 (1993).  (Emphasis added).

Under this standard, "a court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent."  <u>Long v. Humphrey</u>, 184 F.3d 758, 760 (8th Cir. 1999).  Pursuant to 28 U.S.C. § 2254(e)(1), State court factual determinations are presumed correct unless rebutted by clear and convincing evidence.

**B.  Standard for <u>Brady</u> violation**

"Suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  "[T]here are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without specific request."  <u>United States v. Agurs</u>, 427 U.S. 97, 110, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).  The <u>Agurs</u> Court delineated three situations in which a <u>Brady</u> claim might arise: 1) where previously undisclosed evidence revealed

that the prosecution introduced trial testimony that it knew or should have known was perjured, 2) where the prosecution failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence, and 3) where the prosecution failed to volunteer evidence never requested, or requested only in a general way.  <u>Id</u>., at 103-08.

In <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), the Supreme Court extended the <u>Brady</u> doctrine to include impeachment evidence.  They also explained that it was no longer necessary to request <u>Brady</u> evidence at all, instead stating that constitutional error results if the favorable and material evidence is suppressed and "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Id</u>. at 682.

However, exculpatory evidence is not suppressed "if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence. <u>Cornell v. State</u>, 430 N.W.2d 384, 385 (Iowa 1988) (citing <u>United States v. LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982)). This Court will, in this Order, at page 47, further discuss

how the Iowa Court of Appeals ruled on the propositions of "knew or should have known."

In Bagley, 473 U.S. 667 (1985), the Court says:

> [T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

Bagley, 473 U.S. 667, at 682-83.

To establish a Brady violation, the defendant must prove (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material. The Supreme Court found that evidence is material if it is exculpatory or has impeachment value. Id. at 682. The respondent also cites, State v. Romeo, 542 N.W.2d 543, 551 (Iowa 1996) for this test. Materiality turns on the "reasonable probability" test as established in Bagley, 473 U.S. 667, 682 (1985). In Bagley, the Supreme Court stated that undisclosed evidence is material for Brady purposes only

17

if the defendant can show a reasonable probability that had the evidence been disclosed the trial outcome would have been different.  Id. at 682.  This is revised in Kyles where the Court says, "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  514 U.S. at 435.  The materiality depends on the cumulative effect of the suppressed evidence.  Id. at 421.

## IV.  THE HISTORY OF BRADY OVER THE YEARS

While this Court has, over the last few pages, outlined the "development" or changes in Brady and its successive cases, this Court is persuaded that the history of such developments, as set out by the Eighth Circuit, is informative.

In the recent case of Liggins v. Burger, 422 F.3d 642 (8th Cir. 2005)[4], the Eighth Circuit reviewed the line of cases that have interpreted Brady and their application to § 2254 petitions, in the following manner:

---

[4]This Court is not implying that the Iowa courts should have complied with Liggins twenty or thirty years before it was written, but it is included to show Brady refinements over the years.

A state court decision is "contrary to" clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."

Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable. 532 U.S. at 792-93 [citations omitted].

Id.

Under <u>Brady</u>, the government must disclose any evidence both "favorable to an accused" and "material either to guilt or to punishment." 373 U.S. at 87. <u>Brady</u> applies to exculpatory and impeachment evidence, <u>United States v. Bagley</u>, 473 U.S.667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), whether or not the accused has specifically requested the information, <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Evidence favorable to the accused is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." Id.
at 433-34, 115 S. Ct. 1555 (quoting Bagley,
473 U.S. at 682, 105 S. Ct. 3375). "The
question is not whether the defendant would
more likely than not have received a
different verdict with the evidence, but
whether in its absence he received a fair
trial, understood as a trial resulting in
a verdict worthy of confidence." Id. at
434, 115 S. Ct. 1555. When analyzing a
Brady claim, we do not consider the items
of suppressed evidence individually, but
rather collectively to determine whether
they undermine confidence in the verdict.
United States v. Gonzales, 90 F.3d 1363,
1368 (8th Cir. 1996) (citing Kyles, 514
U.S. at 436, 115 S. Ct. 1555).

Id. at 651-52. [Emphasis added].

## A. Evaluation of the Evidence

The reviewing court must objectively evaluate all the
evidence and, "evidence tenably claimed to have been
wrongfully excluded" and determine how the absence of the
evidence might have affected the outcome of the case. Schlup
v. Delo, 513 U.S. 298, 328, n. 46, 115 S. Ct. 851, 868-869,
130 L. Ed. 2d 808 (1995). The factual finding arising out of
the state court's post-trial hearings are entitled to a
presumption of correctness. See Sumner v. Mata, 449 U.S. 539,
101 S. Ct. 764, 66 L. Ed. 2d 722 (1981); 28 U.S.C. 2254(d).
In order for this Court to find that the factual findings made

20

by the State are not "fairly supported by the record, the burden shall rest upon the applicant to establish by **convincing evidence** that the factual determination by the State court was erroneous." Mata, 449 U.S. at 550 (emphasis in the original).

**B.  The Test**

As heretofore mentioned, in 1963, the Brady court held, "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  See also Kyles v. Whitley, 514 U.S. 419, 432 (1995).

As heretofore mentioned, in 1985, the Supreme Court in the Bagley case disavowed any difference between exculpatory and impeachment evidence and held that favorable evidence is material and constitutional error results from the suppression "if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different.  United States v. Bagley, 473 U.S.

667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (cited in
<u>Kyles</u>, 514 U.S. at 433 (1995)).

**V. HOW THIS CASE WAS HANDLED**?

This Court will now discuss how the trial court and the
prosecution handled the Mark case.

This case, in this Court's opinion, must be decided up or
down on the matter of <u>Brady v. Maryland</u> and its progeny in
relation to exculpatory evidence.[5]   These cases include:
<u>United States v. Bagley</u>, <u>United States v. Agurs</u>, <u>Kyles v.
Whitney</u>, <u>Liggens v. Burger</u>, and some other cases that were
used by the Iowa state courts including <u>LeRoy</u> and <u>Cornell</u>.
<u>Peterson</u> citing <u>Brady</u> is also important here.

The Mark trial judge and the prosecution were aware
(P.C.R. Trial Tr. p. 947-48, and 1376) of the fact that in the
case of <u>State v. Peterson</u>, 219 N.W.2d 665 (Iowa 1974), decided
a few months before the Mark trial started, that the defense
attorneys, in the <u>Mark</u> case, the firm of Scalise and Sandre,
had filed an appeal and that the Supreme Court of Iowa had
reversed and remanded a conviction of Peterson because of

---

[5]Counsel for the respondent agreed, saying the crux of
this case are the <u>Brady</u> issues. (Hearing of 11/19/99, Tr. p.
124).

failure to alert the defense to exculpatory matters. In a nutshell, a witness, Mr. Briggs, had gone to the authorities and reported the activities of one Bruce Grieme that were very revealing as to a woman that he had been with who later died. The prosecution knew of this report but charged Peterson and never told him about Bruce Grieme's admission that he had been with the deceased and "may have harmed" her at about the time she died. Prior to the trial, the defendant, Peterson, moved for a bill of particulars in which he requested any exculpatory evidence known to the state and the state said that they had no such evidence. Id. Peterson clearly holds that:

> The State may not suppress requested statements which are materially exculpatory. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215. . .
>
> The county attorney is charged with the responsibility of seeing important evidence is not suppressed so as to deny a fair trial. . .Prosecutors are also cautioned that suppression of exculpatory material is reversible error.
>
> The State argues Mr. Briggs' testimony was not exculpatory because the State produced rebutting evidence in the nature of an alibi for Mr. Grieme. The State also argues the testimony of Mr. Briggs was hearsay. Both defenses miss the point.

> Under our cases the defense was entitled to
> the exculpatory evidence in order to
> investigate it and to use it both in trial
> preparation and in the trial itself. It is
> no answer that the State does not believe
> the evidence to be true or believes it
> could object to it when offered. The
> failure to furnish this information to the
> defendant constituted grounds which
> demanded the sustaining of defendant's
> motion for a new trial. The denial of that
> motion was reversible error.

Id. at 674.

The Mark trial judge said that he was well aware of the Peterson case and that he was determined that the same mistake would not be made. He testified that prior to trial, he urged the prosecution "to make their files completely available to the defense, that they give serious consideration to this Court's suggestion to voluntarily produce statements and police reports." (P.C.R. Tr. p. 934). This recommendation by the Court was not accepted by the prosecution.

On February 6, 1976, a pretrial hearing took place wherein a discovery order was completed. A court order was entered on February 6, directing that the "entire file" be submitted to the trial judge for an in camera inspection so he could determine what the State had to disclose as exculpatory evidence under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194,

10 L. Ed. 2d 215 (1963).[6] Counsel for the petitioner, whether he is right or wrong, says that, "the process was Dutton's [the prosecutor's] idea." This contention is supported by the first words set out in the Zanville letter of February 17, 1976, set out in full in footnote 7 on page 26 of this Order in the words "pursuant to the suggestion of the state." (Exhibit 146).

On February 17, in response to this order of court, the prosecution sent a letter to the trial judge enclosing a list of physical evidence and copies of potentially exculpatory evidence. Exhibit 146. The defense got a copy of the letter to the judge but did not get the evidence enclosed. As mentioned, the text of this February 17 letter is set out

---

[6]This Order, included in Exhibit 146, was entered on February 6, 1976. In pertinent part, it states as follows:

> the State agrees to provide defendant with a list of all physical evidence and a statement of all matters which the State deems to be in the nature of exculpatory information and evidence contained in the State's file. On or before said date the State also shall furnish to the Trial Judge a true and complete copy of its file for an in camera inspection by the Court to enable the Court to make an independent determination of any exculpatory maters that may be contained therein.

below.[7]   The trial judge performed this in camera initial

review during the days between February 23, 1976, to March 1,

1976, and ordered that a number of exhibits be given to the

defendants.  (Exhibit 146).  On March 10, the court entered an

order setting out that he had reviewed additional evidence and

that none of what he had seen should be given to the defense.

On March 16, 1976, in response to a broad motion by the

defense, the trial judge ordered that the statements made by

---

[7]The text of the letter, in full, states as follows:
>       Pursuant to suggestion of the State
> and embodied in the Pre-trial Order of the
> Court in the case of State v. Jerry Allen
> Mark,    we    are    submitting    for   your
> information a list of physical evidence and
> a list of potentially exculpatory evidence.
>       As you know, we do not wish to be
> involved in the quagmire set out in <u>State
> v. Hall</u>, 235 N.W.2d 702 ([Iowa] 1975), and
> therefore    the    State    is    waiving    that
> requirement of <u>Moore v. Illinois</u>, 408 U.S.
> 786 (1972) which requires production of
> exculpatory    evidence    only    after    the
> defendant's demand.
>       You   will   find   enclosed   a   list   of
> apparently exculpatory material which may
> aid     you     in     the     investigation     and
> preparation of a defense.  We believe this
> list  is  consistent  with  <u>Moore</u>  and  the
> dictates of <u>State v. Fryer</u>, 226 N.W.2d 36
> ([Iowa]  1975),  <u>State  v.  Peterson</u>,  219
> N.W.2d  665  ([Iowa]  1974),  and  <u>State  v.
> Aossey</u>, 201 N.W.2d 731 ([Iowa] 1972).
Exhibit 146.

Mark be turned over to the defense. (Exhibit 146). Since the judge's checkmark on exhibits is not always clear as to exactly what he had seen, this Court has concluded that Mark's statements, Exhibits 91 and N, were not read by the court before he ordered them turned over because he has clearly said, "I had no idea what the defense was when I was going thru the prosecution's file. I had no idea." P.C.R. Tr. p. 959.

Later, on March 26, 1976, and on April 2, 1976, the balance of the State's "entire" file, as updated, about 83 pages, was reviewed by the trial court.

On April 5, 1976, the trial court entered an order directing that sixty-seven pages of the Bureau of Criminal Investigation (BCI) file be turned over to the defendant, further that twenty-four pages of the Sheriff's file also be turned over to the defendant. (See court order dated April 5, 1976, included in Exhibit 146).

Around May 6, 1976, another 68 pages were submitted to, and reviewed by the trial judge. The judge ordered that none of these 68 pages be given to the defense. This was the last order on this issue. On May 25, 1976, the trial began.

Counsel for the petitioner argues that the prosecution did not show several exhibits to the judge and that the judge ruled improperly to suppress some of the exhibits he was given. (Hearing of 11/19/1999, Tr. p. 118).

The trial judge, many years later, at the post conviction relief trial said, "I put out an order that directed that I should make an in camera inspection of all of the exhibits." (P.C.R. Tr. p. 969). (See text of his February 6 order (Exh. 146) in footnote 6 on page 25 of this Order).

The trial judge at the P.C.R. trial stated that he had never in his many years as a trial judge done a similar in camera inspection of the exhibits. (P.C.R. Tr. p. 956). He stated that his, "role in doing this in camera inspection was to be an independent, impartial reviewer of the State's file and to order the disclosure of those items found in the State file that would be required to be disclosed to aid the defendant and the defendant's defense of the case." (P.C.R. Tr. p. 956). The trial judge said that he was looking for information that might clear Mark or point to somebody else. He further said that, "if I had seen a clearly contradictory statement, I might have ordered disclosure, but that wasn't my

first priority of an in camera inspection." He further stated, "I may be wrong about my analysis and recollection of the import of <u>State v. Peterson</u>, but, in that case, as I remember the factual situation, the state had within its file evidence that clearly led the trier of fact to conclude the defendant could not have committed the crime." (P.C.R. Tr. p. 957). The judge, in effect, stated that that was the kind of information that he was looking for. Such a procedure does not, of course, comply with federal law.[8]

The trial judge, eighteen (18) years after the trial, is understandably not remembering precisely what the <u>Peterson</u> case held (see excerpts from <u>Peterson</u> on pages 23 and 187, et seq.). There is nothing in that case that says the trier of fact concluded Peterson could not have committed the crime. As set out above, what that court really said was, "the defense was entitled to know about what Grieme had said in

---

[8]James Cleary, one of the counsel for the petitioner, summed up what the judge was doing as follows, "when the judge was doing his in camera inspection, I think he thought exculpatory meant any documents that point to, say, Jim Cleary as the murderer, you know, like Jim Cleary was seen walking down such and such a road with a gun that said .38 Long Colt on it. If there was a document in there like that, which there were not any, he would turn that over to the defense. (Court hearing, November 18, 1999, p. 53).

order to investigate it and use to it both in trial preparation and in the trial itself." Peterson, 219 N.W.2d at 674.

A little later in his testimony, the judge, in considering what he had done, said, "I had State v. Peterson in the back of my mind. I am satisfied I went far beyond that strict rule and tried to lean over backwards to try to give the defense anything that tended to be exculpatory." (P.C.R. Tr. p. 945). He further stated, "I really don't know that I ever attempted to evaluate the credibility of what the exhibit stated when I was making decisions as to what should be turned over and not turned over." (P.C.R. Tr. p. 946).

Prosecutor Dutton in discussing this procedure stated, "We were abiding by the law making sure that any exculpatory evidence was identified and turned over to the defense or the judge or both." (P.C.R. Tr. p. 1375). He stated, "what is exculpatory to me would be evidence that would show that the defendant did not or could not have committed the crime." (P.C.R. Tr. p. 1375). Dutton testified that, "when we made decisions as to exculpatory evidence, we did it in the light of all of the information that we had. We made it because

exculpatory statements were something that we should carefully

consider." (P.C.R. Tr. p. 1458).

In answer to a question, Dutton stated:

> Obviously we were trying to err on the side
> of giving them things that would arguably
> be exculpatory. We also realized that the
> line between what was merely impeachable
> kind of information evidence would tend to
> contradict the testimony that could be used
> for impeachment. We were pretty much
> following the State v. Mayhew guidelines in
> that respect, knowing that the defense
> could obtain that information after the
> witness had testified.

P.C.R. Tr. p. 1458.

Dutton said in response to a question,

> It wasn't a matter of us trying to provide
> the information but find the information
> they already had and were hiding from us so
> as to try to prevent us from knowing he is
> the one that committed the crimes. We did
> not have to, under Brady, tell the defense
> where the defense was. We would have loved
> to do so if we could have found out, but we
> had to do it the hard way.

P.C.R. Tr. p. 1461.

Prosecutor Dutton said that his assistant, Mr. Zanville,

had the job of assembling a list of possible exculpatory

evidence. (P.C.R. Tr. p. 1405).

Assistant Prosecutor Zanville agreed that he was assigned to take care of possible exculpatory evidence. He said that there was a point (well before the trial commenced) when the trial judge entered an order setting out that he wanted to review the files, and so they arranged to deliver those files to him and repeated that procedure on at least one other later occasion, by delivering additional files to him. All of these files were provided for the judge to look at in camera. (P.C.R. Tr. p. 1029). Mr. Zanville talks about Exhibit 146 which included documents that were turned over to the judge. He says that he sent a letter to the judge and to defense counsel concerning this procedure. The defense did not receive the exhibits that were sent to the judge. These letters, set out on page 26 in footnote 7, were dated February 17, 1976. In the letters, Zanville made reference to legal citations as to certain authorities relevant to the examination of these files. This Court has no argument with his legal citations, but will not discuss them here as there is nothing in any of them that changes the way exculpatory matters must be handled under Brady, Bagley, Kyles, Liggins, and Peterson citing Brady all as set out in this decision.

(P.C.R. Tr. p. 1029).  Zanville further stated, "We were working in an effort to make sure matters that could be used by the defendant were provided.  That was our goal." (P.C.R. Tr. p. 1031).

In response to a question as to whether or not some exhibit might be exculpatory, Zanville responds, "if you can't be at two places at any one time, I would grant that that's possibly exculpatory." (P.C.R. Tr. p. 1034).  He goes on to say, "we did look at the exhibits cumulatively when we were reviewing whether or not they were exculpatory."  <u>Id</u>.  He further stated, "I can think of no instance in which there was a question in my mind whether it should be turned over that we didn't turn it over." (P.C.R. Tr. p. 1037).

Zanville in response to a question answered,

> We were trying to be helpful.  We knew about the cases.  We knew about the <u>Peterson</u> case and we didn't want to have any troubles like that. . . we knew he had a lot of money and there was probably going to be an appeal.  Therefore, we wanted to make sure we did everything right.

P.C.R. Tr. p. 1043.

Another assistant for the prosecutor was Mr. Correll.  In answer to a question, Mr. Correll said, "I don't recall this

particular incident, but I am well aware that all reports that were covered [sic] to be remotely exculpatory were furnished." He is asked, "remotely?" And he says, "yes." (P.C.R. Tr. p. 992). Mr. Correll in answer to a question said, "I would characterize what we did was a conservative approach. We were also mindful of legal and moral obligations to turn it over, and I believe we adhered to that fact." (P.C.R. Tr. p. 998).

Correll further stated, "We anticipated that there would be an appeal, so we were always conscious of the record from November 1, that would include exculpatory evidence." Id. He was asked if he analyzed the reports in light of the other reports so that they were reviewed cumulatively. He stated that, "all three of us [Dutton, Zanville, and Correll], were aware of the totality of the reports. We all looked them over and we were careful to keep that in mind." (P.C.R. Tr. p. 999).

Correll further stated, "We looked at these exhibits in the totality and considered them exculpatory, together. We all had input in relation thereto." (P.C.R. Tr. p. 1000).

The Court has included these self-serving statements by counsel on the previous three pages of this Order to show that

they were well aware of their duty under <u>Brady</u> and that they, all three [Dutton, Zanville, and Correll], claimed to have turned over everything that was "even remotely possible" exculpatory evidence. The evidence, as will be set out herein, shows that they did not actually do what they swear they did.

The defense counsel had a very different remembrance of this "turn over to the defense" procedure. Defense counsel Sandre testified, "we were never provided with these by the County Attorney's Office. They are wonderful people, but it was like tooth and nail. You couldn't get anything out of them. Nobody volunteered anything. There was none of (sic) cooperation with these (Sic) prosecution team." (sic). (P.C.R. Trial Tr. p. 1107).

Sandre, when asked why the defense did not ask for copies of reports at the end of the direct examination of a prosecution witness, answered, "We were told that all of those reports were in the <u>Mayhew</u> files which we had access to. However, we now know that many of these 'reports' were not put in the <u>Mayhew</u> file." (Sandre, P.C.R. Trial Tr. p. 1177).

The respondent's brief is based in part on the statement that the Iowa courts did not unreasonably apply <u>Brady v. Maryland</u> in holding that the petitioner's due process rights were not involved. (Respondent's Brief p. 1). The respondent's brief in response to the petitioner's amended and substituted pro se brief is based in part on the premise that that <u>United States v. Bagley</u> and <u>Kyles v. Whitley</u> apply to the Iowa Court's rulings in <u>Mark v. State</u>, and were reasonably applied in the State courts. The respondent's brief (74 pages) from page 26 through 62, discusses the <u>Brady</u> factors as to each undisclosed (suppressed) exhibit. In almost every instance, the respondent's brief admits the first <u>Brady</u> factor, "that exhibit was not disclosed" (presented to the defense). They then admit the second <u>Brady</u> factor, that exhibit had "some exculpatory value." Then in discussing the third <u>Brady</u> factor (which under the law should be, "was it material?"), the respondent instead says, "There is no reasonable probability that disclosure would have affected the verdict." A good example of this approach is set out on pages 57 and 58 of said brief. By weighing each exhibit individually, rather than cumulatively, the State's conclusion

as to the third <u>Brady</u> factor specifically ignores what the <u>Peterson</u> case (citing <u>Brady</u>) clearly says, "the defense [is] entitled to the exculpatory evidence in order to investigate it and to use it both in trial preparation and in the trial itself." <u>State v. Peterson</u>, 219 N.W.2d 665, 674 (Iowa 1974).

This Court will now discuss how this unique process worked the first time the trial judge had ever tried such a procedure. (P.C.R. Trial Tr. p. 956).

The trial judge was asked a question in relation to exculpatory matters about whether his definition of the operating premise of exculpatory (evidence) referred to other individuals that may have been responsible for the homicide only. His answer was, "I don't think it- - I guess my answer is no." He went on to say, "I looked at the files and on the page-by-page response basis or item-by-item basis made a determination whether I felt that it was the type of material that, that should be turned over to the defendants (sic) in light of its nature. And I don't think I in advance at all tried to determine specifically what [it was] I was looking for." (P.C.R. Tr. p. 937).

The trial judge was asked the question, "Did you ask yourself whether somebody was accurate or true about the facts that they had asserted in a report?  Were these reports accurate did you test that?"  He said, "I don't think I made that kind of assessment.  I don't think I tried to make that kind of assessment as I went along.  I didn't check or dispute that a report might not have been accurate.  No, I didn't do that."  (P.C.R. Tr. p. 946-48).

The judge was asked a question about what he had called, "minor inconsistencies," which in effect were matters that might well be appropriate for cross-examination.  The judge stated, "I didn't really sense that my in camera inspection would extend to that kind of a review.  I was keeping in mind, I think, the decision of <u>State v. Peterson</u> where the information/evidence that the State had was clearly exculpatory.  That is what I was doing.  Looking for clearly exculpatory matters."  He then said, "the defense knew of these witnesses."  (P.C.R. Tr. p. 954).  But, the facts are that the defense did not know of "these witnesses" because they had no access to any exhibit that the judge was not allowing them to see.

For example, the defense did not know of Mr. Draves who also worked the same shift at the Boondocks where witness Hurd had made some strong statements about Mark including reference to Draves, where supposedly the cyclist called Hurd and Draves S.O.B.'s (Exhibit 76). Draves denied the whole incident. Draves said he did not see or notice the cyclist Hurd was testifying about. See Exhibit 82. A diligent search of the record cannot provide this Court with any indication that the defense ever heard of Draves. The bottom line is that the trial court was wrong when they said that the defense counsel knew of the witness. This is just a single example; there are many others. The trial judge goes on to say that they (the defense) had an opportunity to ask the witnesses questions at the time of their testimony. (P.C.R. Tr. p. 954). Of course, these undisclosed witnesses never testified because they said things that were contrary to what the State witness was saying, their names and/or statements were suppressed so the defense had no chance to question them. Then, the trial judge said the defense had a right to review the undisclosed witnesses' statements. (P.C.R. Tr. p. 954). This, of course, was not true because the defense was not getting to see those

statements. The judge was ruling, "don't turn that over." The judge goes on to say, "I just don't see that my role had to do with these kinds of matters." Then he sums it up by saying, "I didn't see my in camera inspection of those documents as being <u>thorough</u> or <u>intensive</u>." (P.C.R. Tr. p. 954). (Emphasis added).

In answer to a question, the judge is asked again how he construed <u>State v. Peterson</u> and he repeated that, "in <u>Peterson</u>, the state had, within its file, evidence that clearly led to the trier of fact to conclude the defendant could not have committed the crime. That was a clear example of the type of the thing I certainly felt was in my province to require the disclosure of other items." (P.C.R. Tr. p. 957). Again, as earlier discussed in this Order, the <u>Peterson</u> court did not say this. This, of course, is not really what the trial judge was doing because he never found a single instance of where, as he says, the defendant could not have committed the act. However, that is not the test for <u>Brady</u>; and <u>Brady</u>, of course, cannot be changed by anything that the State Court said in its <u>Peterson</u> case or any other case. The judge, in response to a question, said that he had not looked

over the files that he had previously looked over after he became aware of the fact that the defense was going to use an alibi defense. (P.C.R. Tr. p. 966).

This Court has gone through all of this to show that while the judge and the prosecution said that they were abiding by the Peterson case (citing Brady), they were not. This was a process that neither entity had been through before, and there was not, and is not now, any precedent in Iowa for using such a procedure. It was commendable of the judge to try to make sure that the error of the Peterson case was not repeated. He had spent three days from 8:00 to 5:00 looking over these exhibits, P.C.R. Tr. 959 [reports].

He says that he proceeded in the following way:

> I don't think I went so far as to try to include everything that might have been helpful to the defense. I had no way of knowing what they would consider helpful. I didn't believe and I don't believe now that the exculpatory law with the respect to the requirement to the State to divulge exculpatory evidence was a broad paintbrush but narrow. It had to strike me as being clearly exculpatory in nature.

(emphasis added). P.C.R. Tr. p. 944.

When the judge says (above), "I had no way of knowing what they (the defense counsel) would consider helpful" is, of

course, very true. He had given himself an impossible assignment. He had not been given, and of course had not read, two initial statements the defendant had given to the prosecution. (Exhibits 91 and N).[9] He states that he had no real understanding of what the defense was. The attorneys for the prosecution and the defense spent many, many days getting ready for this trial over a period of several months. With all due respect to the trial judge, there is no way, several weeks before the trial, that he could make any meaningful Brady rulings even though he spent three days looking at the State's exhibits (file).[10] It, of course, turned out that the prosecution did not ever give the judge some of the important exhibits; and of course, he did not "see" what he did not

_____

[9]Exhibits N and 91 have no checkmarks on them. This Court must assume that the trial judge did not get them from the prosecution. However, Exhibit 91 is a letter from Mark to his lawyers so they saw it. Exhibit N is a sworn, typed statement which this Court believes, but from the records it is not crystal clear, that the defense had a copy of. It was taken on November 7, 1975, just a week after the murders and does not show Mark had a lawyer present.

[10]These files are voluminous making it hard to cover during the three days the judge spent going through them. (P.C.R. Tr. p. 959).

receive.  We will discuss specific exhibits later, as the Court discusses witnesses and the categories of evidence.

This Court respectfully is persuaded, after over fifty years in the trial of cases, that no judge could know enough about either side of the case so that he could make, prior to the trial, and without any input from the defense, very serious decisions as to what might help the defendant and what would not help the defendant.  The whole process was faulty.[11] The procedure had no way of satisfying the prosecution's duties, as set out in Brady and Bagley and Peterson and others.  Remember, as set out above, the Peterson case clearly states, "the county attorney is charged with the responsibility of seeing important evidence is not suppressed. . . [and] Prosecutors [who do not so act are creating] reversible error."  State v. Peterson, 219 N.W.2d 665, 674 (Iowa 1974).  The Brady decisions, under these cases, was not to be made by the trial judge but by the county prosecutor and

---

[11]This will be discussed more fully in the section entitled, "The Iowa Supreme Court Made Adjudications Of Claims Which Resulted In A Decision That Was Contrary To And Involved An Unreasonable Application Of Clearly Established Federal Law As Determined By The Supreme Court Of The United States" commencing on page 190 of this ruling.

it was not sufficient that the prosecution stood back and stated, "whatever the judge did was okay with us." (P.C.R. Tr. p. 943).

It also should be remembered that in response to a question the judge said, "I had no idea what the defense was when I was going through the prosecution's file. I had no idea." P.C.R. Tr. p. 959.

As previously mentioned, it also should be remembered that Mark, early on, gave two statements to the prosecution. (Exh. N and 91). Dutton said, "These were very helpful to us, that was his alibi so we had to work with that. It gave us some parameters to work with in terms of what was exculpatory and what was not." P.C.R. Tr. p. 1378. In those statements, Mark maintained he was never east of Chappell, Nebraska. This was false as Doyle saw him at North Platte and Van Housen saw him at Aurora, and he made a phone call from Alda; all well east of Chappell. Dutton was asked if those incidents could be exculpatory or beneficial to Mark. Dutton answered, "Absolutely not." When asked why not, he answered, "based on his story it would show his story was a lie." P.C.R. Tr. p. 1379. Dutton's position was we do not need to

tell the defense about anything we know that occurred east of Chappell. It is not uncommon in a criminal case for defendants to tell a lie in a statement. This Court is well aware that Mark in his two statements (Exhibits 91 and N) told some lies. His guilt or innocence is not an issue before this Court. There is no exception to <u>Brady</u> and its updated cases that exempt suppression because of a lie. Defense attorney Sandre, when asked about Dutton's position as set out above, said, "We are looking for the truth here, we are not trying to refute Mark's story. We are looking for what really happened and not what the best judgment of Mark had been shortly after the murders but as to exactly where he was. If the prosecution comes across a witness that does support a position contrary, that becomes exculpatory and it should be turned over." P.C.R. Tr. p. 1116.

This position is strongly supported by the case of <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 60, 107 S. Ct. 989, 1003 (1987), where the Court said,

> Moreover, the duty to disclose is ongoing, information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release

> information material to the fairness of the
> trial.

It should be remembered that Deputy Prosecutor Correll stated that he did not remember that defendant's attorneys had requested production of documents or statements of State witnesses. (P.C.R. Tr. p. 982). The record shows to the contrary. In fact, the defense did so request. See Exhibit 146.

It should be remembered that counsel for the respondent, in reference to many of the exhibits that are discussed herein, has admitted that most exhibits met the first of the <u>Brady</u> "factors" that, "we admit this exhibit was not disclosed to the defendant," then they admit the second <u>Brady</u> factor, "this exhibit had some exculpatory value" and then, in discussing the third <u>Brady</u> factor states, "There is no reasonable probability that disclosure would have affected the verdict." (Respondent's Brief, p. 55). Again, <u>Brady</u> and <u>Peterson</u> say the defense is entitled to know about this exculpatory evidence in order to investigate it and use it both in trial preparation and in the trial itself. It is no answer that the State (here the Court and the State) does not believe the evidence to be true or believes it could object to

it when offered– – to deny the turn over (of such evidence) is "reversible error."  State v. Peterson, 219 N.W.2d 665, 674 (Iowa 1974).

## VI.   KNEW OR SHOULD HAVE KNOWN DEFENSE

Another category of the respondent's defense involves "knew or should have known" which boils down to the position, "Okay, that exhibit should have been turned over.  We made a mistake, but the defense should have known that anyway."

On the issue of suppression,

> [T]he Brady rule applies when information is discovered, after trial, "which had been known to the prosecution but unknown to the defense."

Cornell v. State, 430 N.W.2d 384, 385 (Iowa 1988), (citing United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976).

> Exculpatory evidence is not "suppressed" if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence. (emphasis added).

Cornell, 430 N.W.2d at 385, (citing United States v. LeRoy, 687 F.2d 610, 618 (1982), cert. denied 103 S. Ct. 823).

In Cornell, the two items in question (are they or are they not exculpatory) were:

> 1.  A statement taken from Jodie Seidenkranz on October 6, 1976, in which

she said she was at her mother's residence
when Cornell and Albert returned home.
Cornell said Crow got out of his car at Mt.
Ayr and stole his gun.  Jody said Albert
agreed with Cornell's statement.

2.  A September 29, 1976, statement in
which Bryce admitted taking a razor scraper
from his pocket during a fight with Crow.
The fight occurred about four days before
Crow left for Texas.

The question, said to be one of materiality
in accordance with the third <u>Brady</u> test, is
whether the claimed violation can be said
to have probably changed the outcome of the
case. . .

[I]n <u>United States v. Bagley</u>, 473 U.S. 667,
105 S. Ct. 3375, 87 L. Ed. 2d 481
(1985)[][,] [t]he <u>Bagley</u> court applied the
same test of materiality to the <u>Brady</u> rule
which it had  applied to test prejudice
resulting from ineffective assistance of
counsel in <u>Strickland v. Washington</u>. . .
<u>Bagley</u> holds that a defendant is entitled
to a new trial where "there is a reasonable
probability that, had the evidence been
disclosed to the defense, the result of the
proceeding would have been different."
(Citation omitted).  A "reasonable
probability" is "a probability sufficient
to undermine confidence in the outcome."
(Citation omitted).  The <u>Bagley</u> inquiry
requires consideration of the totality of
the circumstances, including the possible
effects of nondisclosure on defense
counsel's trial preparation.

We find no reasonable probability that
disclosure of this testimony would have led
to a different result.

<u>Cornell</u>, 430 N.W.2d at 386.

In <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), the United States Supreme Court refined the materiality definition used in <u>Bagley</u>. The <u>Kyles</u> court said:

> a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . .

<u>Id</u>. at 434.

Therefore, under <u>Kyles</u>, it was no longer the test that disclosure of this testimony would have led to a different result, an acquittal.

The <u>Bagley</u> court had ruled that they would not require a sufficiency of the evidence test. <u>Kyles</u> contains other pertinent rulings in relation to the sufficiency of evidence test:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.

<u>Id</u>., at 434-35.

> We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative

> effect for purposes of materiality
> separately. . .

Id., at 437, n. 10.

In addition to citing Agurs as they do on page 385, the Supreme Court of Iowa in the Cornell case, cites LeRoy, 687 F.2d 610, 618 (2d Cir. 1982). In LeRoy, several defendants were tried after being charged with violating the Racketeer Influence And Corrupt Organization Act and Embezzlement of a Labor Union. This is a complicated situation where several people testified before a grand jury and a defendant, Hitchings, was convicted. Hitchings had been the employer of four people who had been allegedly involved in the racketeering charges. Hitchings knew that a man named Carr had testified in the grand jury. Hitchings also knew that another person, Seaccia, had instructed Carr, Wilson, Alton and Mayes to lie to the grand jury. Hitchings was on notice that these men had testified before the grand jury. The question was whether or not the evidence as to what the four men may have testified about before the grand jury was known only to the government and not to Hitchings. The court states:

> Here Hitchings clearly was on notice of the
> facts necessary for him to take advantage
> of such exculpatory testimony as Wilson,
> Alton, and Mays might conceivably furnish.
> . . Hitchings however failed to act when he
> first received a copy of Carr's grand jury
> testimony. . .
>
> Accordingly, we conclude the Government was
> under no duty to advise Hitchings of the
> allegedly exculpatory grand jury testimony
> of Wilson, Alton and Mays.
>
> Even if the Government had improperly
> failed to disclose this evidence, the grand
> jury testimony of the three men was not
> material within the meaning of the Brady
> rule.

Id. at 619.

In United States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), supra, the Supreme Court adopted guidelines for determining whether evidence is to be considered material under Brady.

The LeRoy case went on to say:

> [I]n cases where the defendant [here
> Hitchings] makes no request or only a
> general request for evidence that is then
> not disclosed, he has a right to a new
> trial only if the undisclosed evidence,
> evaluated in the context of the entire
> record, creates a reasonable doubt that
> otherwise would not exist. (citation
> omitted).

> Since no request was made in this case. .
> . Hitchings has failed to meet this
> burden.

<u>United States v. LeRoy</u>, 687 F.2d 610, 619 (2nd Cir. 1982),
cert. denied, 103 S. Ct. 823 (1983).

As you can see from the above citations from the <u>LeRoy</u>
case, that court was dealing with a complicated matter that
the defendant Hitchings knew a lot about. This set of
circumstances is easily distinguishable from the facts where
the Iowa Court of Appeals has found Mark <u>knew or should have
known</u> in relation to witnesses Doyle, Harvey, Warren, Dr.
Cutright, and McGinnis. In <u>Mark</u>, there is no gross inside
information or relationship as Hitchings had as an employer of
those who testified in the Grand Jury or no awareness that
those same witnesses were involved in possible perjury. Mark
did not really know any of the witnesses or possible witnesses
set out above. He had met Doyle and Warren, never saw Harvey
and Dr. Cutright, and denies he ever saw McGinnis. Mark never
had any opportunity to go and find any of them after he was
charged. This is especially true when the trial judge gave
the defense just three days to go to Nebraska and return to
Iowa. It took almost a day to get to western Nebraska and a
day to get back to Iowa. He had no time to track down much

evidence or attempt to find witnesses. P.C.R. Tr. p. 1071 and 1182. This Court is persuaded, for all the reasons set out herein, that as to each of the witnesses listed on the previous page, the <u>LeRoy</u> case is distinguishable. In the <u>LeRoy</u> case, all the participants knew and had worked with each other. Mark really knew none of these witnesses.

Another matter involved in the <u>Cornell</u> case is set out on page 386 of the opinion as follows:

> We are far from convinced that trial counsel would have used Seidenkranz's statement if it had been disclosed. This is because it would have emphasized Cornell's threats against Albert in his attempt to keep Albert quiet.

<u>Cornell v. State</u>, 430 N.W.2d 384, 386 (Iowa 1988).

There is nothing in the <u>Brady</u> case or its follow up cases or in Iowa's <u>Peterson</u> citing <u>Brady</u> case that allows evidence to be suppressed because the reviewing Court does not believe it would help or might hurt the defendant's case. This conclusion by the Iowa Supreme Court in <u>Cornell</u> flies in the face of the <u>Peterson</u> citing <u>Brady</u> case mentioned in other portions of this Order, the case that the trial judge and the prosecutor said that they were well aware of and were following. P.C.R. Tr. p. 947, 954 and 1376. In <u>State v.</u>

<u>Peterson</u>, 219 N.W.2d 665 (Iowa 1974), as mentioned, the Court said:

> [T]he defense was entitled to the exculpatory evidence in order to investigate it and to use it both in trial preparation and in the trial itself. It is no answer that the State does not believe the evidence to be true or believes it could object to it when offered. The failure to furnish this information to the defendant constituted grounds which demanded the sustaining of defendant's motion for a new trial. The denial of that motion was reversible error.

<u>Id</u>. at 674.

The bottom line is that the case that the Iowa Court of Appeals is relying on, <u>Cornell v. Iowa</u>, 430 N.W.2d 384 (Iowa 1988), clearly did not follow the mandate of <u>Peterson</u> (citing <u>Brady</u>) as set out just above. As set out in <u>Kyles</u>, the "prosecutor's responsibility for failing to disclose known favorable evidence rising to a material level of importance is <u>inescapable</u>." <u>Kyles</u>, 514 U.S. 419, 438 (1995) (Emphasis added).

Another flaw with the "knew or should have known" issue is explained by defense counsel Sandre. "The prosecution had added fifty to seventy-five witnesses. We couldn't get a continuance, so we didn't do everything just as we might have

had we more time." P.C.R. Tr. p. 1149. This Court is persuaded that none of the conclusions by the Iowa courts that denied any <u>Brady</u> violations because of the "knew or should have known" doctrine was in accordance with prevailing law.

## VII.  MARK'S <u>BRADY</u> CLAIMS

Mark alleges that the State of Iowa did not disclose many reports[12] and other exculpatory evidence that he was entitled to receive under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). Below the Court will discuss each item, and how it is implicated by <u>Brady</u>.

### A.  Blood-Saliva Tests On Cigarettes

The Court will first discuss the situation involving the blood saliva tests on cigarettes made by an expert on the subject, Mr. Harvey.

The defense counsel took Mr. Harvey's deposition prior to trial. Defense counsel admits that they studied up on the issue and had pertinent questions to help them attempt to discredit Harvey's expert testimony. At trial, Harvey's testimony was elicited to show that Mark smoked Marlboro

---

[12]These reports show that the Black Hawk County Attorney received a copy of all of them. The prosecutor admitted he did. (P.C.R. Tr. Vol. VIII, p. 1374).

cigarettes, that he had blood type O and because of this his saliva on cigarettes he smoked showed he was an O secreter. There was little or no evidence that put Mark inside the house except these Marlboro cigarette butts which expert Harvey said were Marlboro smoked by an "O" type secreter (person).  One of these butts was on the floor of the bedroom where the young girl had been killed.  This, said the prosecution, put Mark in her bedroom.  Two other Marlboro cigarette butts were found in the basement.  The killer had to have been in the basement because the electricity had been turned off down there.  The Iowa Supreme Court in its original decision had concluded that the jury could have found:

> At sometime he [Mark] went to the basement,
> turned off the power and while there smoked
> two Marlboro cigarettes.

State v. Mark, 286 N.W.2d 396, 401 (Iowa 1979).

Prosecutor Dutton in his opening statement to the jury said:

> [T]he evidence will show that in the
> basement by the furnace, there were
> cigarette butts, Marlboro cigarettes, that
> were stamped out on the floor.  And the
> Defendant smokes Marlboro cigarettes.  And
> in checking the saliva on the filter of
> that cigarette, it was determined that
> whoever smoked it had Type O blood and was

> a secreter.  Many people have Type O blood
> and are secreters, and so does the
> Defendant.  . . .
>
> There was, on the floor of that bedroom
> near the dresser, a Marlboro cigarette that
> had been stamped out, with an O-Type blood
> indication from the saliva on the cigarette
> filter.

Trial Tr. p. 81-82.

The prosecution, right from the start, as set out above, was telling the jury that the killer smoked Marlboros, inside the house, at places where the facts show he had to be. Further, that Mark had Type "O" blood and was a Type "O" secreter, therefore he was the killer.

That scenario, however, was not a fair and full picture that the jury should have had before it.

The expert, Mr. Harvey, called assistant prosecutor Mr. Zanville prior to the trial, on or about March 22, 1976, and told him: It is not uncommon for a small saliva sample taken from a Type-A secreter to have a Type "O" test result.

After receiving this call from the expert, the assistant prosecutor wrote a "Memo" to Mr. Dutton (Petitioner's Exhibit No. 107) setting out the precise information set out above. This, of course, was an admission by the expert that you did

not have to be an "O" secreter for his tests to show that an "O" secreter had smoked that Marlboro cigarette.

Mr. Dutton admitted that he was aware of Exhibit 107, dated March 22, 1976, shortly after he reviewed it, 64 days before the trial started. P.C.R. Tr. p. 1442.

Mr. Zanville flatly states, "I never gave Exhibit 107 to the defense." P.C.R. Tr. p. 1040. This also discloses that under the format of giving "all remotely possible exculpatory evidence" to the judge for his consideration (P.C.R. Tr. 992), that the judge never saw or had a chance to consider Exhibit 107 because the exhibit has no judge's checkmark on it even though, as mentioned, the prosecution had the exhibit 64 days before the trial started. (P.C.R. Tr. p. 1442). The trial judge says, "I don't have any memory of it. I don't ever remember seeing it [Re: Exh. 107]." P.C.R. Tr. p. 951. This was in direct violation of the Court order to turn over to the judge the "entire file."

During the trial, expert Harvey took the stand and on direct examination said that the Marlboro cigarette butts at key places at the murder site showed that an "O" secreter had smoked them. On cross examination, defense counsel asked the

expert, Mr. Harvey, "Well, then, will you please explain to us how a man who has Type A blood, who puts a cigarette out in U-7 (a room at the murder site), a Marlboro cigarette, ends up, according to your reliable test, with Type O blood?"  Dutton objected telling the judge the question was argumentative. The judge sustained the objection.  He would not let the expert answer.  Trial Tr. p. 2561.

A few minutes later, Mr. Scalise, the cross examiner, again asks the expert, "Well now, then can you explain to us how that reliable, accepted and functioning-properly test came up with Type O?"  Again, Dutton objected.  Again, the court sustained the objection.  Trial Tr. p. 2562.  Dutton knew what he was doing.  He did not want the jury to hear what Mr. Harvey had told the prosecutor as set out in Exhibit 107:

> It is not uncommon for a small saliva
> sample taken from a Type "A" secreter to
> have a Type "O" test result.

The trial court in sustaining the objection agreed with Dutton that the question was argumentative.  Trial Tr. p. 2562.[13]  Remember, of course, the trial judge never did see

---

[13]The Court has not forgotten that expert Harvey, during examination by defense counsel at his deposition in effect
(continued...)

Exhibit 107.  He made these two rulings barring the jury from hearing what Exhibit 107 said without having seen said exhibit.

At the post conviction trial, Dutton was a witness.  He was asked about his objections as set out above.  Dutton answered that he did recall the cross examination of Harvey and his two objections.

Dutton said, "Scalise was obviously manhandling the witness."[14]  Dutton then says, "I unfortunately made an objection.  It was sustained and prevented Harvey from explaining when this phenomenon occurs."  P.C.R. Tr. p. 1442.

---

[13](...continued)
said, "the "A" to "O" secreter issue is complicated, I can go to the blackboard and explain it."  The cross examiner did not take him up on his offer.  This was not a waiver by the defense kicking in a "should have known" objection.  First, the data was not that complicated.  Mr. Zanville clearly set it out in twenty-two words in Exhibit 107 as set out in on page 59 (above) of this ruling.  A cross examiner does not have to permit a witness to go to the "blackboard" when he has no assurance of whether he is hurting or helping his client.  See Exhibit "Q," p. 19.

[14]A reading of that portion of the cross examination does not reveal any manhandling of Harvey by Scalise.

Dutton discusses the situation a moment later saying, "Unfortunately, I could have kept my mouth shut and he (Harvey) would have explained it." P.C.R. Tr. p. 1443.

The opinion of the Iowa Supreme Court, 286 N.W.2d 396, 411-12, discusses cigarette butt evidence and acknowledges that the expert Harvey admitted there was a possibility of error in the interpretation of the tests and that Harvey had no explanation why his tests revealed that the person who smoked the four cigarettes had Type "O" blood.

As prosecutor Dutton had made sure that Harvey's statement was not heard by the jury, therefore there was no evidence before the Supreme Court that an "A" blood type could test as an "O" blood type. This Court has, line by line, read all of expert Harvey's testimony. He does admit the possibility of error, but nothing that would allow the prosecutor, in his opening statement to the jury, to flatly say, "These cigarettes were all smoked by an "O" secreter, that's what the defendant is." Trial Tr. p. 81.

Based on all that is set out above, this Court has concluded that the prosecutor had decided that the defense should not know that an "A" secreter could test as an "O"

61

secreter. That conclusion made expert Harvey's testimony as to the test procedure worthless.

The Iowa Supreme Court supports it position that the defendant's contention that these cigarettes could have been smoked by others, could not have happened by concluding that the murder site premises were secured by the police and no one but the murderer could have smoked these cigarettes. <u>State v. Mark</u>, 286 N.W.2d 396, 411-12 (Iowa 1979). However, that was not true. Exhibit 33 is a report by Captain Dolan, an officer working for the prosecution, wherein he reports on the integrity of the premises. "It was a mess, trash all over. There were cigarette butts of numerous brands and burned matches found on the floor and in makeshift ashtrays in the living room, dining room, kitchen and front foyer and cigarette butts in a plastic waste basket in the kitchen." See Exhibit 33.

At least 4 other persons who smoked Marlboros had smoked in the house. These 4 persons all had Type "A" blood, but as is now known, this makes no difference; other officers smoked in the house but they were not checked because they had a blood type other than "O". Again, this increased the number

of smokers who could have tested as "O" secreters.   See Exhibit 90.

The prosecution, in an attempt to tie hair evidence to the crime scene, had 13 people who had been all over the crime scene give samples of their hair for testing to eliminate the 13 from being the owners of hair they were trying to tie to the killer.   The premises had not been "secured" by the police.   P.C.R. Tr. p. 1444.   It is not surprising that the Iowa Supreme Court did not know of this "mess" because the prosecution did <u>not</u> give Exhibits 33 or 90 to the trial judge to review and did not give those exhibits to the defendant who found out about them just prior to the post-conviction relief hearing, 17 years later.[15]

The Iowa Court of Appeals decision (<u>Mark v. State</u>, 568 N.W.2d 820, 823 (Iowa Ct. App. 1997)), discusses the cigarette butt evidence relying on the fact that "the defense knew, before trial, that Deputy Weiser had smoked in the upstairs room and that the defense knew the integrity of the crime

---

[15]This important conclusion by the Iowa Supreme Court, i.e., the evidence is clear that the cigarette butts found at the scene could not have been smoked by others (than the defendant) was wrong because the prosecution had hid exhibits 33 and 90.   <u>State v. Mark</u>, 286 N.W.2d 396 at 412 (1979).

scene had been compromised."[16] That court further concluded that, "Mark had been alerted to potential blood test errors during expert Harvey's pretrial deposition." <u>Id</u>. at 823. That court also said that expert Harvey had been vigorously cross examined by the defense on the blood typing issue and concludes therefore that the "information in the Zanville "memo" (Exhibit 107) was cumulative of other testimony informing the jury that the cigarette butt evidence had questionable probative value and that Mark has not shown a reasonable probability that the outcome of the trial would have been different had any of these reports been disclosed."

The short, clear message contained in Exhibit 107, "An 'A' secreter may test as an 'O' secreter," was not cumulative of any possible errors expert Harvey admitted at his deposition or at trial.

---

[16]This Court had seen Exhibit 90 which said the premises were a mess, Deputy Weiser's cigarette butt was a small part of the "mess." It is a minor matter and certainly can not rise to the level the Iowa Supreme Court gave it saying the premises were secured. This Court is not belittling that, but merely pointing out that the prosecution wrongfully suppressed things that the jury and the **Iowa Supreme Court** <u>should</u> have seen.

As set out above, the prosecution hid Exhibit 107, nobody saw it. Further, as set out above, the prosecutor deliberately blocked the defense from getting this same information to the jury during the trial by Dutton's "unfortunate" objections which he admits prevented expert Harvey's testimony as to the precise conclusion that in using my test it is not uncommon for a small saliva sample taking from a type "A" secreter to have a type "O" test result. (P.C.R. Tr. p. 1443 as set out in Exhibit 107).

Not turning Exhibit 107 over to the judge for his consideration was a flagrant violation of the self-serving conclusion by prosecutor Correll who testified that all reports that were "remotely exculpatory" were furnished. P.C.R. Tr. p. 992. The failure of the prosecution to carry out its duty to turn over exculpatory evidence[17] was a direct violation of the <u>Peterson</u> (citing <u>Brady</u>) mandate, "to be given the exculpatory evidence in order to investigate it and to use

---

[17]As mentioned in this ruling, the prosecutor has a continuing, ongoing duty to turn over exculpatory evidence. Dutton admitted this. P.C.R. Tr. p. 1376, 1422. See, <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 60, 107 S. Ct. 989, 1003 (1987).

it both in trial preparation and in the trial itself. It is no answer that the State does not believe the evidence to be true or believes it could object to it when offered." <u>State v. Peterson</u>, 219 N.W.2d 665, 674 (Iowa 1974). It is also no answer to make "unfortunate objections," as Dutton admits, which barred the jury from hearing the bottom line truth from expert Harvey "an 'A' secreter may be found to be an 'O' secreter." In addition to <u>Peterson</u> citing <u>Brady</u>, the <u>Kyles</u> case states, "whether. . .a failure to disclose is in good faith or bad faith, (see <u>Brady</u>, 373 U.S. at 87), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." [Whenever it arises.] <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38, 115 S. Ct. 1555, 1567-68, 131 L. Ed. 2d 490 (1995).

During his post conviction testimony, prosecutor Dutton said that, "the cigarette butts in the basement and one cigarette butt found in the girl's room, strike me as the <u>most significant evidence</u> at the trial." P.C.R. Tr. p. 1393, 1394, 1397. There is no doubt that this "most significant evidence in the trial" was evidence that the jury was entitled to know

the entire truth about.  See Giglio v. U.S., 405 U.S. 150, 155, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972).

**B.  Post Trial DNA Cigarette Butt Process.**

This Court has decided not to consider any DNA evidence in this ruling.  However, what has occurred in the record of this case will now be discussed.

On appeal, after trial, the Iowa Supreme Court made a finding of fact in their decision that the evidence, including those two cigarette butts in the basement (DNA Exhibit "DM-1" and DNA Exhibit "DM-2"), could support a finding by the jury that Mark had done exactly as the State prosecutors theorized. See State v. Mark, 286 N.W.2d 396, 401 (Iowa 1979) ("At sometime he went to the basement, turned off the power and while there smoked two Marlboro cigarettes.") That court also said "The cigarette butts evidence was obviously material, in that it was offered to prove the identity of the murderer. The identity of the murderer was clearly at issue during defendant's trial." Id. at 412.

The petitioner here filed a motion for discovery requesting DNA testing for physical evidence.  The evidence to be tested were the four cigarettes that had been found inside

the murder site. On October 19, 2004, this Court held a telephonic hearing with all counsel and the defendant present on the line. The matter was fully discussed.

This Court raised the question of whether or not it would be an exhaustion problem if the Court were to rule on the DNA without having given the Iowa Supreme Court the chance to consider the matter. The argument was made by the petitioner that whatever the DNA results turned out to be, it would be a conclusion that the Iowa Supreme Court would have to adopt whatever the results were. The petitioner also argued that the Iowa Supreme Court had, earlier on in these proceedings, the chance to rule on DNA and had not done so and therefore it would not be required to have this matter sent back to them.

Counsel for the respondent was put on a committee of two by this Court to make sure that the very best scientists were found to conduct the tests and that all proceedings as to how this should be tested or exactly what should be tested had to be approved by both the petitioner and the respondent. This was all done.

The respondent's counsel stated:

> I agree there is no problem with the DNA testing, and I haven't resisted that; but

> I do think it may be a mistake for the
> Court to formally enter this as evidence in
> a thirty year old case than just read it
> [the decision] after the testing, for what
> it is worth and use it in making any
> decisions that the Court has to make.

Tr. of October 19, 2004, hearing, p. 43.

Four cigarette butts were sent to the laboratory for
testing. In this Court's Order of May 4, 2005, on pages 2 and
3, this Court sets out the results:

> The first was Exhibit "AJ" which was found
> in Julie's (the daughter's) room. This
> cigarette butt was important to the State's
> case because it was stamped out with a shoe
> that left a footprint that matched the
> footprints that were left outside of the
> house and were assumed to be the killer's.
> The results were that Exhibit "AJ" did not
> have enough DNA to test– this does not
> eliminate Mark as the person who smoked it
> but it also doesn't positively place him in
> that room as had been strenuously argued.
>
> The next was Exhibit "CO" which was found
> in an ashtray in "another room, put out in
> a silver ashtray." See State v. Mark, 286
> N.W.2d 396, at 411 (Iowa 1979). Deputy
> Weiser admitted to smoking this butt, so
> the fact that the DNA results showed that
> the DNA on this cigarette butt did not
> match Mark is of no consequence. The butts
> found in the basement were designated as
> Exhibits "DM-1" and "DM-2". The State used
> these butts to place the murderer in the
> basement as part of their theory that the
> murderer smoked them while contemplating

the murders, that while he was down there
he switched off the power in the house.

Exhibit "DM-1" (found in the basement) did
not have enough DNA to test– this does not
help Mark but it also does not hurt him by
showing he was ever in the basement; and,
Exhibit "DM-2" (the other butt found in the
basement) was found not to have come from
Mark.  It was argued by Mark that this was
a big plus because the Iowa Supreme Court
had found as a fact that Mark had been
downstairs and had smoked Exhibit "DM-2."
See State v. Mark, 286 N.W.2d 396, 401
(Iowa 1979) ("At sometime he went to the
basement, turned off the power and while
there smoked two Marlboro cigarettes.")
Clearly, the DNA results showing that Mark
did not smoke DM-2 is proof that the Iowa
Court was wrong when they made the above
set out conclusion.

As mentioned in the paragraph set out above, the 2005
results from laboratory testing clearly found that the
conclusions of the Supreme Court of Iowa, as to precisely what
happened in relation to these cigarette butts, had to be wrong
and inconclusive.  See page 12 of this Order.

In that same ruling of May 4, 2005, this Court decided
that the DNA results could be used in this case.  There are
good, solid reasons and legal precedents for such a ruling all
as set out in that Order which is part of the record in this
case.

It is true that the DNA results are favorable to Mark, but they do not involve erroneously applied legal precedent by the court and prosecution to suppress material, <u>Brady</u>-type (exculpatory) evidence.

This Court, based on all the reasons set out in this Order, is persuaded that a writ of habeas corpus should be granted. The appellate process should not be complicated by the reviewing court concluding that there is an exhaustion problem. This Court hereby reverses its earlier Order. The DNA results will not be considered by this Court. That issue is not part of the cumulative review process as to all of the erroneously suppressed evidence.

## C. Witness Leslie Warren

One of the most important witnesses in the State's case was Mr. Leslie Warren. The Mark court discussed his participation as follows:

> Both the defense and the State agreed at trial that Leslie Warren, a maintenance employee at an eastbound rest area in Chappell, Nebraska, saw Mark at the rest area. However, the parties dispute whether Warren saw Mark on October 31 or on November 1. The murders took place on November 1 between 1:00 and 3:00 a.m. If Mark was seen in Chappell on the morning of Friday, October 31, he could have traveled further east and arrived at the Leslie Mark farm by the time of the murders. Thus, this fact would be consistent with guilt. If Warren saw Mark the morning of November 1, this information would have established an alibi for Mark given the time of the murders and the distance, approximately 684 miles, between the Leslie Mark farm and Chappell.

> Warren testified he did not work on Saturday morning from 9:00 a.m. until noon because he had an appointment with Dr. Calvin Cutright in Sidney, Nebraska. However, Mark asserts postconviction discovery uncovered medical records from Dr. Cutright with a stamp date noting Warren's appointment was October 31, rather than November 1. Mark argues there is a reasonable probability that had the information been disclosed, the result of the trial would have been different. Mark also claims the State failed to obtain work-related documents and Warren's diary

establishing the date of Warren's
appointment even though the State knew of
their existence.

The postconviction depositions of Mark's
trial counsel reveal that the defense
received something from "the government"
that "proved to [their] satisfaction" that
Warren's version of the events "hurt us."
We, like the postconviction court, find
that the defense knew or should have known
about the existence of the medical report.
There is no indication that the defense
could not have obtained this information
from Dr. Cutright's office. Furthermore,
we reject Mark's suggestion the State
failed to secure certain documents that may
have shown Warren saw Dr. Cutright on
October 31. The weight of the evidence
indicates the work records support the
State's position that the appointment
actually took place on Saturday, November
1, despite the date noted in the medical
record. We conclude these materials would
not have had an impact on the outcome of
the trial.

Mark v. State, 568 N.W.2d 820 at 824 (Iowa Ct. App. 1997).

When Mr. Warren was first interviewed in November, he

talked to an investigator, Ron Forrest. He told Forrest, "I

remember a guy who kind of resembles who you are asking about,

but I can't make a positive identification of him." (Exh.

134, p. 22). Warren also told Forrest, "there were no

73

motorcycles around here when I saw him."[18]  Warren admitted
that he was confused about whether he had seen Mark on Friday
(October 31) or Saturday morning (November 1).  (Exh. O, p.46,
App. Vol. V, p. 591, Tr. 2132, App. Vol. IX p. 1080).  In his
deposition, Mr. Warren says, "I had a hard time trying to get
the two days separated from each other because I was just
nervous.  It is hard to remember things when you are nervous,
and I just had a hard time keeping the two days separate – –
I had both of these days confused.  I couldn't remember
whether I saw the van and those two guys on Friday or Saturday
or whether I saw this other guy [Mark?] on Friday or Saturday.
I had to think about it real hard for awhile before I could
finally get it straightened out."  (Warren Depo. Exh. O, p.
46-47).  On that same page, Mr. Warren again states that he
was confused as to what date he saw various individuals.

Later, he was "sure" though, that he had not worked on
Saturday morning because he had a doctor's appointment in
Sidney, Nebraska.  (Tr. 2106, App. Vol. IX p. 1066).  By

---

[18]Mark was out in the middle of nowhere at a rest area.
If Mark was there, there had to be a motorcycle.

74

deduction then, he concluded that he must have seen Mark on Friday.

It should be remembered that Judy Warren, wife of witness Warren, was with him when he went to the doctor. In Exhibit 126/127, she told a prosecution investigator that she could not state whether it was Friday or Saturday that they went to see the doctor. At the original trial, Warren testified that he saw Mark around 9:45 a.m., on the morning of Friday, October 31. (Tr. 2112, App. 1066-67, 1079-80).

This Court will first discuss the Warren medical records evidence as they were argued before the P.C.R. court in briefs and oral arguments and then these medical exhibits will be discussed again as to this Court's comments on the P.C.R. Judge's discretion of the same exhibits in his ruling. This will entail some duplication and repetition but this Court is persuaded that it's the only way to present the whole picture in this order. Leslie Warren's medical record from his doctor's appointment has a date stamp of Friday, October 31, 1975, and his blood pressure reading is handwritten in. (Exh. 21). Agent Lang of the Iowa Division of Criminal Investigation phoned Dr. Cutright on May 13, 1976, just a few

days before the trial started. (Exh. 128). Both Dr. Cutright and his receptionist, Mrs. Millie Wagner, stated the date stamp on Warren's record would have been correct, thus they were in agreement that Warren had been in the doctor's office on Friday, October 31 (Exh. 132, 21, 128). In fact, Mrs. Wagner emphatically told Agent Lang that the date stamp was correct. (Exh. 132). (Exh. 132 and Exh. 21, 128, App. Vol. II p. 294-5). Also, Mark says that "apparently Mr. Warren had completed a DOT form in order to use sick leave, that was referred to in Agent Lang's report at Exh. 132.[19] This DOT form was not in the file and was not available at the P.C.R. hearing."

Mark contends that Mr. Warren's relevant medical records were in the possession of the prosecution prior to his trial, yet Mark did not see them or know about them until the P.C.R. hearing, approximately fifteen years after his trial when his current counsel found the documents. (See P.C.R. Exhibits 20, 21, 128 and 132). Mark urges that this is evidence that is

---

[19]This is a misstatement of that exhibit, as it says, "Mr. Steele [Warren's foreman] makes out a leave of absence slip." That report also says, "these records are in the custody of June Wallace, Department of Roads Secretary." See Ex. 132.

material, in that it either gelled with the State's theory and time/route of travel, or it provided Mark with an alibi. Mark maintains that he saw Warren on Saturday morning, November 1.

The State argues that the medical record with the date stamp is something that the defense should have known, since they knew of the issue of whether Mr. Warren had been to the doctor on either Friday, October 31, or on Saturday, November 1. Mr. Warren stated in his deposition and at trial that he had been to the doctor on Saturday, November 1. The State wrongfully suppressed the Dr. Cutright "medical exhibits" (Exhibits 20, p. 2; Exhibit 21; Exhibits 128 and 132) they had received from the doctor that showed to the contrary. Mark points out that the State *had* this information about Warren from on or about May 13, 1976, before the trial started.[20] The only one of these exhibits that has a judge's checkmark on it is Exhibit 21. Exhibits 20, 128, and 132 do not have the judge's checkmarks on them which means he never saw them.

_____

[20]Leslie Warren's deposition was taken by the defense on March 6, 1976, some 60 days before the prosecution got these exhibits and the defense had no way to ask Warren about them at the time of the deposition.

Two Warren medical exhibits were in the Mayhew file. (Exhibits 108 and 126 and/or 127).[21]  Exhibit 108, page 2, a report by Officer McDonald dated 03-26-1976, which includes the name and address of Dr. Cutright to the defense and in the same exhibit it is set out that the doctor's secretary said she would send photocopies of his records concerning Warren's medical records to the prosecution.  These records were sent. Except for Exhibit 21, they were never given to the judge. None of them were received by the defense at any time during the original trial.  At the P.C.R. trial, many years later, they were designated Exhibit 20-page 2, 21, 128, and 132.  The other Warren medical exhibit is Exhibit 126, also designated as Exhibit 127.

That exhibit is entitled, "Re interview of Leslie Warren reference doctor appointment."  Officer McDonald is the

_____

[21]Counsel for the respondent has informed the Court that this re-interview by Officer McDonald authored circa May 13, 1976, has, obviously by error, been referred to in the record as both Exhibit 126 and 127.  They are identical.  Ordinarily, this would be a situation that would not amount to much. Neither of them have the judge's mark on them.  He did not see either of them.  However, there is a big problem because Exhibit 127 is listed, by agreement of the parties, as being available as a part of the Mayhew file.  Exhibit 126 is not on that list.

author.  He sets out that on May 13, 1976, he telephonically contacted Warren and his wife Judy who told him that Warren had been to the doctor on Wednesday, October 29, 1975, for a check up.  According to Warren, the doctor told him to come back in 3 days to have his blood pressure checked.  Mrs. Warren told Officer McDonald she heard someone say come back in 3 days, but she does not know whether it was the doctor or a nurse that said it.

Officer McDonald then states in Exh. 126 and/or 127, "Mrs. Warren accompanied Mr. Warren to the doctor on Saturday, November 1, however, Mrs. Warren could not state on what particular day Leslie saw the doctor, whether it be Friday or Saturday."

Officer McDonald then, in Exhibit 126 and/or 127, quotes Warren as follows:

> Leslie Warren then stated that he will swear that it was Saturday, November 1st that he saw the doctor because he vividly recalls locking the gate where the State highway equipment is stored when he went to the doctor and unlocking the gate when he returned from the doctor at approximately 12:30 p.m. on November 1st, 1975.

Officer McDonald then states:

>Leslie stated, in Exhibit 126/127, that had that been Friday, he would not have had to lock and unlock the gate because there would have been other employees at the equipment shop. He states that he was alone working that Saturday and that is why he had to lock and unlock the gate during the period tha[t] he was to see the doctor.

These two exhibits, 108 and 126 and/or 127, were, as mentioned, in the Mayhew file which the defendants admit they had access to. It is not clear in the record just when the Mayhew file came into being and when the defense first got access to it. Exhibit 108 makes it clear that the doctor's office was to send photocopies of the dates involved and that the defense was alerted that something was to be sent to the prosecutor. These turned out to be Exhibits 20-page 2, 21, 128, and 132, each of which were wrongfully suppressed by the prosecution.

As mentioned, the judge only saw Exhibit 21 and not the others and the defense never got any of them. They were never mentioned during the original trial. The overall gist of what they emphatically say is that Warren was in the doctor's offices on Friday, October 31, not Saturday, November 1, as Warren testified.

Exhibit 105 from the Nebraska Department of Transportation does have a checkmark on it. The prosecution gave Exhibit 105 to the trial judge. It showed the other side of the controversy, that is that exhibit 105 supported the prosecution's position that Warren had seen Mark on Saturday a.m. not Friday.[22]

The P.C.R. Court held that this evidence is something Mark knew or should have known, and that his defense could have obtained a copy but *chose* not to because they were satisfied from other evidence. (His employer's work records, Exhibit 105). (P.C.R. Ruling at 32, P.C.R. App. 89). Mark argues that the State should not be able to rely on this "should have known" theory when it engaged in misleading the defense by withholding evidence. Again in <u>Kyles</u>, the Court said, "The prosecutor's responsibility for failing to disclose known favorable evidence rising to a material level of

---

[22] Remember, defense counsel Scalise and Sandre saw "something" which "changed their minds" as to what day Warren saw his doctor. Since Exhibit 105 is the only "Warren work exhibit" that had a judge's checkmark on it, it almost had to be Exhibit 105 that they saw which caused them to conclude, "it hurt us." P.C.R. Ruling, p. 30. "Joint deposition of Scalise and Sandre" (1990, pages 121-124).

importance is inescapable." <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38.

The P.C.R. judge on page 26 of his ruling of February 3, 1995, has a section entitled, "II Warren's Medical Record." This Court will now discuss that section of the P.C.R. ruling. As mentioned, the Court is aware that this area will require some repetition of what has just been discussed, but is persuaded that is the only fair way to proceed.

The P.C.R. judge on page 26 of his ruling discusses the matter of whether Mr. Warren saw Mark in the restroom at the Chappell rest area on Friday morning, October 31, 1975, or on Saturday morning, November 1, 1975, as Mark claimed. The judge, on page 28 of his P.C.R. order, quotes a joint deposition taken by Mark's post-conviction relief counsel of Mark's trial lawyers, Scalise and Sandre, on November 8, 1990. It should be remembered that this deposition was held a full four (4) years before the post-conviction relief trial which was held in middle September of 1994.

It cannot be assumed that Scalise and Sandre, before their deposition, 4 years before the P.C.R. trial, had been alerted to and have seen the twenty-four (24) exhibits that

were suppressed. The judge in the P.C.R. ruling at page 28 quotes several different pages of that joint deposition. (Depo. pp. 121-130). The first quote is that counsel Sandre said that Mr. Mark recalled being in Chappell at the rest area and if it could be shown that Mark was correct as to the fact that it was on Saturday, "that evidence would have been absolutely inconsistent with Mark being involved with the murders." (P.C.R. order, p. 28). Sandre states, however, "that it turns out that the guy [Warren] saw him one day earlier than Mark had said." Scalise then said, "Yeah, I do [remember] and that really hurt us!" (p. 28). Sandre goes on to say that the guy [Warren] at first had agreed that he had met Mark on Saturday as Mark said. Sandre then said that he [Warren] backed off, "I think he had a doctor's excuse or something and he was at the doctor at the time we originally thought saw him." (Sic). (P.C.R. order, p. 29). Scalise then states, "I think he found something that made him change his mind as to the day, and that hurt us. That's the way I remember it." Then Mr. Sandre says, "We got something. We had it proved to our satisfaction. It was either directly or somebody on behalf of the government or through whoever was

doing our investigation at the time." Id. There is further discussion and Scalise says, "The guy flipped over to a different version and was able to prove it, that the second version was the correct one, and that was the one that hurt us. That's my memory." (P.C.R. order, p. 30).

The P.C.R. judge then discusses Petitioner's Exhibit 105, mentioned above, which is an investigative report of state patrolman Stude dated March 22, 1976. The P.C.R. judge points out that the trial judge had put a checkmark on Exhibit 105 which would show that he had seen that exhibit. P.C.R. Ruling, p. 30. Scalise and Sandre said that they were not sure whether they had ever seen Petitioner's Exhibit 105. (P.C.R. Ruling p. 30). Exhibit 105 is the only exhibit that has information about Warren's work record which showed Warren had three hours sick leave on Saturday, November 1, that has a checkmark on it by the trial judge which means he saw it. There is nothing in the record that clearly shows it was given to the defense but it must have been. Remember, Scalise has said that they saw something that made Warren flip from Saturday to Friday. (P.C.R. Ruling, p. 30). There are no judge's checkmarks on the other Warren work records. Exhibits

19, 26, and 27. The defense says they did not see those exhibits. The P.C.R. judge states that defendant's counsel were well aware of what the employer's records would show, and it would have been harmful to their defense to have them brought into trial. (P.C.R. Ruling, p. 33).

This conclusion is not based on the then present situation. As mentioned, Exhibit 105 was the only exhibit relating to Warren's work records that the trial judge had seen.[23] As mentioned, there is no clear record that the trial judge ever ordered Exhibit 105 to be given to the defense. As mentioned, other exhibits relating to Warren's work records do not have the trial judge's checkmark on them. (Exhibits 19, 26, and 27). In the thousands of pages of the record, there is not a single instance where the defense saw an exhibit the judge had not seen. The P.C.R. judge's conclusion that the defense was well aware of the work records was not the

---

[23]This Court has not forgotten that Exhibits 108 and 126 and/or 127 were in the Mayhew file and that they both support Warren's claim that he was at the doctor's office on Saturday. They are not considered as Warren's "work record exhibits." These were exhibits that the trial judge must have had access to because during the original trial, the Mayhew file was in the courtroom, available to the defense, and had to be something the trial judge would have seen or at least had available to him.

situation. The only thing they probably knew, except for the date in Exhibits 108 and 126 and/or 127 discussed above, is the words in Exhibit 105, which say Warren took "three hours of sick leave" on Saturday, November 1. Scalise would have been better prepared to meet that statement if Exhibits 20, 21, 128 and 132 had not been suppressed.

The P.C.R. judge then said that Scalise indicated he felt he had sufficiently discredited Warren's testimony as to the date he had seen Mark without reference to Dr. Cutright's office records. (P.C.R. order, p. 31).

Scalise, under further questioning, sums up his position not by saying Warren was correct but by saying Warren was equivocal, i.e., "We had him impeached and I don't think that the doctor's records exhibits mean that he was there on the 31st or the 1st. It could have been a little bit more impeaching, cumulatively." (P.C.R. Tr. p. 1223).

This Court has found that there were four (4) exhibits from and/or about Dr. Cutright's office, including testimony by Dr. Cutright and his employee who was emphatic that Warren was at their office on the morning of Friday, the 31st. (Exhibits 20, 21, 128, and 132). It is clear that the trial

judge did not see any of those exhibits.  There are no judge's checkmarks on them.  Scalise, in his quote above, "I don't think the doctor's records exhibit mean that he was there on the 31st or the first" clearly demonstrates that he either had not seen or did not have the four exhibits set out above in his mind at that moment or if he did he was wrong.  In any event, he could not have had them in mind at the time of the trial as it is clear that he never had seen them at that time.

As mentioned, the only exhibits with checkmarks on them with relation to Warren are Exhibits 21 and 105, previously discussed, which shows the prosecution's version of Warren's testimony that he had to have been at the doctor's office on Saturday.  It is important in this discussion to be aware that attorney Sandre at the P.C.R. trial on page 122, says that he remembers that Warren had a "doctor's excuse" and Warren could prove that he was at the doctor's office on Saturday when Mark says he saw him.  This, however, is a misconception on Sandre's and Scalise's part.  There was no doctor's excuse, because as shown in this ruling, the doctor and his employee, did not support Warren's statement that he was not at their

office on Friday.  See Warren medical Exhibits 20, 21, 128, and 132.

As Scalise says, he did a good job of cross examining Warren in twenty-seven (27) pages, Vol. IX, Transcript p. 2121 to 2148.  During that cross examination, Mr. Warren admitted three or four times that he was confused as to the dates.  Mr. Scalise's statement, "We had him impeached."  However, this impeachment was not enough to sway any juror.

This Court will now discuss more background as to the contact Scalise and Sandre had with Warren.  The post-conviction trial judge in his Order, P.C.R. p. 32, talks about the fact that Sandre and Scalise knew or should have known about Warren's doctor and that since they had the opportunity to learn more, the exhibits such as 20, 21, 128, and 132 were not really suppressed.  P.C.R. ruling, p. 32.

If defense counsel knew about the doctor and his staff person as being emphatic that Warren had been to the their office on Friday, October 31, they certainly never used it or even mentioned it.  See Exhibit 132.

The trial transcript p. 2100-2160, in Volume IX, has the direct and cross examination of Mr. Warren.  Mr. Scalise has

27 pages of cross examination. The only mention of the doctor on direct examination (Trial Tr. p. 2106) was where Warren says, "I had an appointment Saturday a.m. with my doctor." Mr. Warren, on three or four occasions, said that he was confused as to the date that he actually went to the doctor. (Trial Tr. p. 2132-33). (See page 74 of this Order). In the entire trial testimony of Warren, both direct and cross examination, there was no mention of any of the doctor's exhibits set out above. Nor is there any evidence relating to Exhibits 108 and 126 and/or 127 which were in the Mayhew file which related to what Mr. and Mrs. Warren told Officer S.A. McDonald about their remembrance of the visit to Dr. Cutright's office. For a synopsis of what those two exhibits contain, see page 78 of this Order.

If the defense attorneys knew or should have known of the doctor and his staff being emphatic that Warren was at their office on Friday (Exhibit 132) they certainly did not know it when they took Warren's deposition. There is no mention of Exhibits 20, 21, 128, and 132 in the Warren deposition.

There is also no mention in the deposition about the exhibits concerning Warren's presence at the doctor's office. Exhibits 108 and 126.

Mr. Sandre, as mentioned, took the deposition of Warren. It is 88 pages long, taken on March 5, some two and one-half months before the trial. On page 8, Warren says, "We are not required to make any records of any kind as to what times we were at certain work areas."

If defense counsel, either during the taking of his deposition or at trial, had seen suppressed Exhibits 20, 21, 128, and 132, counsel could have considered asking multiple, damaging questions that Warren would have had real problems with. For example, on cross examination at the trial, he could have asked Warren, "Are you aware that Millie Wagner, the receptionist for Dr. Cutright, emphatically states that you were there on Friday as their records clearly show?" (See Exhibit 132).

Counsel also could have asked Warren, "Didn't you tell investigator Ron Forrest within 4 or 5 days after the murders that you couldn't make a positive identification of the man you saw?" (See Exhibit 134, page 22).

There are many other tough questions counsel could have asked if the four exhibits set out above had not been wrongfully suppressed by the prosecution. The fact that Scalise felt he did a good job on cross examination of Warren (P.C.R. Tr. p. 1223) and the court agreed with him,[24] is a credit to Scalise's expertise but it does not allow this Court to overlook the fact that he would have had the opportunity to ask more tough questions except for the inappropriate suppression of four "doctor's records". (Exhibits 20, 21, 128, and 132).

Wigmore has set it out very well:

> It is recognized that the prosecution's failure to disclose "Brady information" inhibits a criminal defendant's ability to effectively cross examine important prosecution witnesses. The denial of the "right of effective cross examination" is "constitutional error of the first magnitude", often requiring automatic reversal. Davis v. Alaska, 415 U.S. 308, 318, 94 S. Ct. 1105, 1111, 39 L. Ed. 2d 347 (1974). In fact, effective cross examination is so important in our legal system that Professor Wigmore described it as "beyond any doubt the greatest legal engine ever invented for the

---

[24]All eight (8) of the identification witnesses were thoroughly cross examined. State v. Mark, 286 N.W.2d 396, at 407 (1979).

> discovery of truth". 5 J. Wigmore,
> <u>Evidence in Trials at Common Law</u>, Section
> 1367, at 32 (Chadbourn Rev. Ed. 1974).

Final Brief of Appellant, October 1996, p. 11-12.

In the P.C.R. order at page 32, the court, in an effort to show that it was appropriate that the prosecution had not turned over to the defense medical exhibits (20, 21, 128, and 132) (that the prosecution had gotten from the doctor's office) relied on the fact that the state's investigators did not contact Dr. Cutright's office until May 13, 1976, a couple of weeks before the trial. (The prosecution received copies of the medical records shortly thereafter). The P.C.R. trial judge at page 32 implies that it is appropriate not to follow <u>Brady</u> if the trial has started and the prosecution is busy. This, of course, is not the law.

The P.C.R. judge sets out another reason why it was appropriate, in his eyes, to suppress the above listed exhibits:

> The recent case of <u>State v. Stratton</u>, 519
> N.W.2d 403 (Iowa 1994) holds that when
> evidence is equally accessible to the
> defendant and the state, the state is not
> required to produce it. Citing, <u>State v.
> Galloway</u>, 187 N.W.2d 725 at 729 (Iowa
> 1971).

P.C.R. order, p. 32.

The above two cases do not support the judge's conclusion. In <u>Stratton</u>, the documents involved "hospital records. These hospital records had not been "seized" nor were they in the state's possession, custody, or control." The <u>Stratton</u> court concluded that since the exhibits were not in the possession of the state, that the state had no duty to produce the records that was equally accessible to the defendant. In the <u>Galloway</u> case, a tape was involved and it was in the possession of a Mr. Lindberg in Chicago. The <u>Galloway</u> court stated that since the tape was not under the control of the state of Iowa nor the court, and was equally available to the defendant as to the State, it was not error for the prosecution to refuse to get the tape. Both of these cases have situations where the prosecution was not in control of certain evidence and therefore had no duty to make sure that it was turned over to the defendant. The P.C.R. court, here, overlooked the fact that the prosecution in <u>Mark</u> did have these doctor's reports in their possession and they were subject to <u>Brady</u>. The legal citations set out by the P.C.R.

court, on page 32 and as discussed above, are not controlling in this instance.

The P.C.R. court concluded (P.C.R. order, p. 33) that even if the defense had them, the medical records would have been more unfavorable than favorable to Mark's defense. That Court said that if the defense brought in the medical record to impeach Mr. Warren, the State would have then used Mr. Warren's employment records as more evidence that he had gone to the doctor on Saturday. Overall, the P.C.R. Court opined that if the defense would have introduced this additional "impeachment evidence," it would have been easily contradicted, and "would have undone what Mr. Scalise thought was a good job discrediting Warren without the document in question." The Court of Appeals agreed with the P.C.R. court. This was not just impeachment evidence. It was direct, emphatic evidence of what the doctor's office said what happened on what day.

For the Iowa Court of Appeals to say that additional impeachment evidence would be harmful is contrary to this Court's experience– whether the State had additional corroborating evidence or not. It is not up to any court to

approve the denial of <u>Brady</u> material because it finds the defendant would be better off if he did not have it. Nothing in <u>Brady</u>, <u>Bagley</u>, <u>Peterson</u>, or <u>Kyles</u> would support that procedure. This situation was precisely before the <u>Brady</u> court. The Maryland Court of Appeals attempted to justify their ruling that an undisclosed confession could not be seen by the jury because "[t]here is considerable doubt as to how much good Boblit's undisclosed confession would have done Brady if it had been before the jury." <u>Brady v. State</u>, 226 md. 422, 429, 174 A.2d 167, 171 (1961). The Brady court summarily denied that argument by saying it would be <u>'"too dogmatic' for us to say that the jury would not have attached any significance to this evidence in considering the punishment of the defendant Brady."</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 1197, 10 L. Ed. 2d 215 (1963) (emphasis added). <u>See</u> <u>State v. Peterson</u>, which says the defense has a right to see exculpatory evidence in order to investigate it and to use it both in trial preparation and in the trial itself. <u>Peterson</u>, 219 N.W.2d at 674. A jury faced with numerous inconsistent pieces of evidence will have more

to consider and could decide that the balance tips in favor of the defendant.

Exhibit 126 and/or 127 as heretofore set out on page 78, show that both Mr. and Mrs. Warren remembered visiting Dr. Cutright on October 29, and that they say he told them to come back in three days, which would have been November 1. Again, Mrs. Warren could not state on what particular day Leslie (her husband) saw the doctor, whether it was Friday or Saturday (Exhibit 126 and/or 127). She was with him. The Iowa Court of Appeals concluded that, "the weight of the evidence indicates the work records support the State's position that the appointment actually took place on Saturday, November 1, despite the date noted on the medical record." Mark, 568 N.W.2d 820 at 824 (Iowa App. 1997). Further, the P.C.R. judge concluded he should give more credence to Mr. Warren's testimony than Dr. Cutright's date stamp, which "he admitted at the P.C.R. hearing, could have been wrong." (P.C.R. Tr. p. 117-19, App. 1278-80). This conclusion is not deadly accurate. First, as heretofore mentioned, in Exhibit 132, Mrs. Mille Wagner, the doctor's receptionist, emphatically states that the date stamp on Warren's medical sheet, October

31, 1975 (Exhibit 20), is correct.[25]  In effect, "That is the date he was here."  Further, this Court reviewed the P.C.R. transcript of Dr. Cutright's testimony.  The doctor clearly says Warren's record shows he was in his office Friday, October 31, 1975, to have his blood pressure checked.  P.C.R. Tr. p. 109.  On examination, the doctor in response to the question, "Would you be willing to admit there could be a possibility of error that date; is that fair to say?"  The doctor answers, "there could be, yes, but if the date stamp was wrong, if someone had forgot to turn it but if that were true everyone who came in would have the wrong date."  P.C.R. Tr. p. 118.  On redirect examination he is asked, "Are you aware of any other errors on that chart?"  The doctor answers, "No.  It is my position that this is just a possibility of error."  (P.C.R. Tr. p. 121).[26]

---

[25]Neither Exhibit 20, 21, 128 or 132 was seen by the trial judge.  (They have no judge's checkmark on them).

[26]This Court has not forgotten that Dutton said on two occasions, "neither the doctor or his staff had any personal recollection of which day Warren was there."  (P.C.R. Tr. p. 1389 and 1425).  This is an effort to make light of the real situation.  The prosecution had exhibits that were exculpatory and for no known reason, they just did not give them to the judge and the defense did not know of them until many years
(continued...)

This Court has not forgotten that in the P.C.R. decision commencing on page 28, the court discusses a portion of a joint deposition taken on November 8, 1990, of counsel Scalise and Sandre, wherein they admit that they saw evidence (very probably any or each of Exhibits 19 page 2; 105, 108, and 126 and/or 127, Investigator Stude's report and a D.O.T. record) which <u>hurt</u> Mark's position that he had seen Warren on Saturday, November 1 in the Chappell area.

This Court remembers that the prosecution contends that defense lawyers had checked the doctor's records and were satisfied that what Mr. Warren was saying about being at the doctor's office on Saturday morning was correct. (P.C.R. Tr. p. 1222). There are a few questions in the transcript (P.C.R.) and then Mr. Scalise sums up his position not by saying Warren was correct, but by saying, "Warren was equivocal about the date he was at the doctor's office and really wasn't certain he was there on the 1st or the 31st. (P.C.R. Tr. p. 1222). We had him impeached and don't think

---

[26](...continued)
later in preparation for the P.C.R. trial. (Exhibit 19, 20, 21, 128, and 132).

the doctor's record exhibit[27] means he was there on the 31st or the 1st.  It could have been a little bit more impeaching, maybe cumulative." (P.C.R. Tr. p. 1223).  See the discussion of Scalise's statement beginning on page 83 of this Order.

The State again points out that "evidence is not suppressed if the defendant either knew or should have known of the essential facts which would permit him to take advantage of the evidence." <u>Cornell v. State</u>, 430 N.W.2d 384, 385 (Iowa 1988).  The State argues that Mark clearly knew Mr. Warren was an important witness, as he was someone Mark himself remembered seeing.  From the outset the date of the meeting was of key importance, and Mark had a "well-financed defense including the services of private investigators." (P.C.R. Tr. p. 1058-59, 1149, 1267, App. 1330-31, 1339, 1365).

The State contends, and the P.C.R. Judge agreed, that "Mark could have obtained the medical records as easily as the State could have."  The fallacy of this argument is that the defense had not received a copy of the Lang reports, exhibits 128 and 132, which set out that the doctor and his

---

[27]Scalise does not mention an exhibit number, but he had to be talking about either Exhibits 19, page 2; 105, 108, and 126 and/or 127.

receptionist emphatically said– "Our date stamp on Warren's medical sheet, that being October 31, 1975, is correct." Exhibit 128 and 132. Her conclusion is, Warren came in on Friday (October 31). The receptionist admitted that the dates are stamped ahead of time for appointments purposes, but this did not sway her from changing her emphatic conclusion that the date was correct. Exhibits 128 and 132 were received by the prosecutor after the last set of "exculpatory" materials were given to the trial judge, sometime after May 13, 1976 (See Exhibit 126/127; P.C.R. order, p. 32). The judge did not see the reports (Exhibits 20, page 2; 21 and 128). There are no judge's checkmarks on them. Whether the defendant knew or should have known, under the facts before this Court, does not relieve the prosecution of its duty to turn over those 4 exhibits to the defense. The facts as set out above are not a situation that would make it clear that the defense, "knew or should have known" would kick in. The defense had no evidence to challenge Warren's position until they discovered many years later the eight (8) "Warren exhibits" not turned over to the judge at the time of trial. See discussion of the

"knew of should have known" issue commencing on page 47 of this ruling.

The post conviction relief case made it clear that four (4) exhibits about the whereabouts of Leslie Warren on Friday and Saturday morning, and which day he went to the doctor, were inappropriately suppressed from the defendant. These included Exhibits 20-page 2, 21, 128 and 132. As mentioned, none of these exhibits, except 21, had the judge's checkmarks on them. The defense did not see them either. As set out earlier herein, Exhibit 105 did have a judge's checkmark on it. Exhibit 105, concerning Warren's work records, was seen by the judge and presumably by the defense prior to or during trial. Exhibit 21, Warren's medical record, shows that the blood pressure check took place on Friday, October 31, rather than on Saturday, November 1. (Exhibit 21; App. Vol. II, p. 157). As mentioned, Exhibit 21 was seen by the judge as it has a checkmark on it. However, it was never given to the defense prior to or during trial.

As mentioned, the prosecution had these exhibits prior to the trial which began on May 25, 1976. The P.C.R. judge's ruling states on page 32 that the State's investigators did

not contact Dr. Cutright's office until May 13, 1976. These exhibits were obtained by the prosecution after the last material had been submitted to the trial judge for in camera inspection. The petitioner, with some credence, argues that it is clear that since the prosecution had this material, it presented misleading testimony that Warren went to the doctor on Saturday (P.C.R. Tr. p. 2106; App. Vol. IX, p. 1066). The Court acknowledges, however, that in Warren's time sheets, handwritten in by the foreman, it indicates there was sick leave taken from 9 to 12:00 (Noon). This record shows that this request was for Saturday, November 1. (Exh. 19, page 2).[28]

Is this information material? The Court is persuaded that, as mentioned, the prosecution possessed specific exhibits (20, 128 and 132) not ever given to the judge. The defense never received the exhibits that showed Mr. Warren had been to the doctor on Friday and not Saturday. (Exhibits 20-page 2; 21-page 2; 128 and 132). Had the defense known this, Dr. Cutright and his receptionist might well have been

[28]Exhibit 19, page 2, is almost illegible, hard to read. Mark contends that while it shows Warren took some time off on November 1, it does not show what hours of the day those were.

considered as possible witnesses for the defense at the original trial. These exhibits clearly could have been used for impeachment. This information was critical because Mr. Warren was resolving his confusion as to those dates by remembering that he had been to the doctor on Saturday, so that he must have seen Jerry Mark on Friday. It is clear that if Warren was at the doctor on Friday, he would have been working on Saturday. If he was at the doctor on Friday, he could not have seen Jerry Mark on Friday. If he saw Jerry Mark at the Chappell, Nebraska, rest area on Saturday morning, then, as Jerry Mark had told the police in the very beginning, there was no way he could be 636 miles (Exhibit 100, est.) from the murder site and have committed the crimes a few hours earlier. This would bolster his alibi as set out by the witness Van Housen who saw Mark in Aurora, 250 miles east of Chappell, on Saturday, and the evidence in these suppressed exhibits certainly should have been heard by the trial jury. The jury could have then decided if it tied to the discussion about Mrs. Doyle commencing on page 108 of this ruling.

The State argues that the medical record is wrong, citing DOT work records. As mentioned, the actual D.O.T. work

records, Exhibit 19-page 2, shows Mr. Warren took three hours off on Saturday but, in fact, worked his full four hours at the eastbound rest area. Exhibit 19-page 2 does not actually show what hours of the day those were. (Exh. 105[29], P.C.R. Tr. 42, App. Vol. X, p. 1262, Exh. 19). At the post-conviction trial, Warren acknowledged that he would do his work at the eastbound area first, then do the work at the westbound area. (P.C.R. Tr. 43, App. Vol. X. P. 1263). The point Mark argues is that even the work records show Warren worked all morning on Saturday in the eastbound rest area. Mark argues that this corroborates his version of events, that Warren was in the eastbound rest area Saturday morning, November 1, when Jerry Mark said he talked to him.

---

[29] Exhibit 105 says that Investigator Stute spoke with June Wallace, Department of Roads Secretary, and she provided him with Warrens' time report. Exhibit 19. "This time report indicated that on October 31, 1975, Warren spent four hours at the eastbound rest area and four hours at the westbound rest area and drove a total of 46 miles. Time report for November 1, 1975, showed that Warren spent a total of four hours at the eastbound rest area and one hour at the westbound rest area, three hours sick leave and drove a total of 44 miles." What this record does not show is whether these hours were in the morning or the afternoon. As mentioned, Exhibit 19, page 2, is almost illegible, not a clear, easy to read exhibit.

Again, this Court is not deciding whose version of these facts should prevail. The gut question is as set out in <u>Giglio</u>. The jury was <u>entitled</u> to know of this factual controversy. <u>See</u> <u>Giglio v. U.S.</u>, 450 U.S. 150, 155 (1972).

The post conviction trial judge based his rejection of the claim that <u>Brady</u> material had not been properly turned over on the fact that the defense had equal access to the information about the doctor. Such a conclusion is not warranted.

As mentioned, as far as the defense knew, the prosecution and Warren had flatly stated that it was Saturday that he had gone to the doctor. The defense did not know that Warren said one thing and the doctor and his staff said another. They had no evidence to challenge Warren's position until they discovered many years later the eight (8) exhibits, that were not turned over to the trial judge at the time of trial. Had the defense had the actual medical records and reports, they certainly could have used this information during Warren's testimony and that would have been a credibility determination for the jury to make. In addition, as mentioned, both Dr. Cutright and his receptionist, because of what they said, if

it had been known by the defense, could have been considered as possible witnesses at the original trial.

This Court has not overlooked the fact that Exhibit 108-page 2, which was in the Mayhew file, says the doctor's secretary was to send medical records (Exhibit 20-page 2, 21, 128 and 132) to the prosecution.  This would alert the defense that something was coming and it could be argued that the defense then knew or should have known and by failing to directly follow up on the procurement of these doctor's records, they cannot now complain.  In this Court's opinion, that argument is not persuasive.  They were sent.  The prosecution had them.  The prosecution did not like what they said.  The prosecution did not show them to the judge.  The prosecution hid them.  You cannot get out of the prosecution's <u>Brady</u> duty by saying, "what the heck, those defense guys can get them too."  <u>Kyles</u>' court at page 437-38 very clearly said, "The duty to turn over is inescapable."

This Court is persuaded that this evidence, Exhibits 20-page 2, 21, 128, and 132 were inappropriately suppressed.  The Court finds that this "medical" evidence was favorable to the defense.  It was exculpatory.  These exhibits made it clear

there were holes in Warren's testimony as to the date he saw the doctor. As to materiality, the State again relies on the "should have known" argument, but this Court disagrees. This information was clearly in the hands of the prosecutor, who had a duty to provide it to the defense and did not. The State, however, says it was not material due to the other evidence that corroborated Warren's statement that he saw the doctor on Saturday, November 1. There is nothing in _Brady_ which says you can suppress evidence that might be corroborative because there is other evidence that is contradictory. This Court is persuaded that the "medical" records are material. It was also appropriate that they should have been turned over because it could have been used for impeachment. Credibility determinations are for the jury, who could have used this suppressed evidence when deciding the ultimate issue of when Warren saw Mark.

This Court is not deciding whose version is correct, but is deciding that the jury was entitled to hear both sides of the issue prior to the trial. Again, see _State v. Peterson_, 219 N.W.2d 665 (Iowa 1974) and _Giglio_, 450 U.S. at 155 (holding jury _entitled_ to hear it).

**D.  Jean Doyle, Potential Alibi Witness**

On November 6, 1975, while being questioned by officers, Mrs. Dolye, according to what the investigators put on their reports, said that she had seen a motorcyclist on Saturday, November 1, sometime around noon at North Platte.  (Exh. 32, App.  196,  202-203).[30]    In Officer Hermanson's <u>suppressed report</u> (Exhibit 32), she gave the following description: about 5'10", 160 pounds, and reddish colored hair.  (Exh. 32, App. Vol. II. P. 195).  At that time, she was shown a photograph of Leslie Mark, one of the deceased (the officer thought it was a photo of Jerry Mark), and she stated that the person in the photo was the motorcyclist she met on Saturday morning.  She said the reason she recognized him was because in the past she had dated a person who looked similar to him.

However, one day later, November 7, the investigators returned, after realizing that they had mistakenly showed her a photograph of Leslie Mark, and they showed Mrs. Doyle different photos.  At that time, she is quoted as saying that the motorcyclist she saw was not the same as the photo of

---

[30]She testified at the P.C.R. trial many years later that it was actually about 9 a.m.  (P.C.R. Tr. p. 66); 9 to 10 a.m. (P.C.R. Tr. p. 77); and 8:30, 9, 10 a.m. (P.C.R. Tr. p. 90).

Mark, that "he basically resembled the subject, however. . . he appeared much older." (See Exh. 45, App. Vol. II, p. 202, and P.C.R. Exh. 149, 37). Because of this "non-identification," none of these Doyle reports (Exhibits 32, 37, and 45) were given to the defense[31]. (P.C.R. Tr. p. 943, App. Vol. XI, p. 1328; P.C.R. Tr. p. 1410, App. Vol. XI, p. 1374).

On April 21, 1976, Agent Forrest was deposed, wherein he stated he was present at both interviews of Doyle and that she could not identify anyone from the photographs, indicating that "it was a younger guy, in his late teens I believe." (Forrest Dep. at 25-6, Exh. 140). He said, "when I re-interviewed her the second time, there was just no doubt, she just didn't see the man." (Forrest Dep. at 34, Exh. 140, App. Vol. III, p. 296).

The State argues that they had no obligation to tell Mark of Mrs. Doyle, other than what was said, because Agent Forrest had "eliminated that possibility" when she could not pick Mark out of a photo array. (Exh. 140 at 26). Mrs. Doyle disputes

---

[31]Agents Hermansen (Exh. 32), Gallardo (Exh. 45), and Forrest (Exh. 37) all wrote reports of this contact with Mrs. Doyle, but only Agent Forrest was identified by the State as a trial witness.

this version of the "identification session." Mrs. Doyle said she was asked to meet a second time. She said that there were three officers present at the Nebraska State Patrol Office. She said that they showed her five or six mug shots. She pushed one forward and said this is most like him, but that she did not swear it was him. At the P.C.R. trial, she is asked, "Did you ever tell them that you could never identify that person who was in there?" (Exh. 140, page 26, set out above). She answered, "No. I knew I could identify him. I told them I would be glad to pick him out of a lineup or anything else they wanted me to do." (P.C.R. p. 70). Later, they called her on two or three times and asked her if she would be available. "I told them I was available. The last time they called me, they said my testimony would be irrelevant and that I wouldn't be needed so I didn't need to worry about coming." This was in March of 1976, about two months before the trial. (P.C.R. Tr. p. 68, 69, 70, and 71).

Agent Forrest's report of November 7 (Exhibit 134) never shown to the trial judge and never seen by the defense, says Doyle told him that Mark (?) was going west. (See pages 20, 21, and 22). Mrs. Doyle disputes this. Mrs. Doyle has stated

that every time she talked with any prosecution agent, she told that person Mark was coming from the west toward the murder site on the Saturday after the murders. (P.C.R. Trial Tr. p. 66, 72, 76, 83, and 84).

Mrs. Doyle said that she saw him (Mark) come over the overpass and into her station from the west. A bit later, when he was in front of her, they conversed about an oncoming storm heading that way from the west. She asked him which way he was headed, Mark said, east. Mrs. Doyle then recalls saying, "Good, maybe you will out run the storm." (P.C.R. Trial Tr. p. 72 and 85).

Mrs. Doyle specifically told the investigators that there was no mistake about which direction Mark was traveling. The following question was asked:

Q:  Did they ever indicate to you that was accurate or inaccurate, or are you sure it was the east or the west, or anything like that?

A:  One time we were discussing and I already told them what I told you. And they said, "You said he came from the east?" I said, "Oh, no, he came from the west. It's the only thing." (P.C.R. Tr. p. 76).

This, of course, was well prior to the commencement of the trial and this evidence was never put in a report seen by

the judge and/or the defense, that any of the investigators made concerning Doyle.

The State needed to put Mark at her place on Friday, not Saturday. They asked her, "Are you sure it wasn't Friday?" And she said that she said, "No, I'm positive it was Saturday because I didn't work on Fridays." (P.C.R. Tr. p. 81).

The investigators knew of this problem with her saying Mark was going the wrong way. In exhibit 134 investigator Ron Forrest, talking on the phone with the head of the DCI, Tom Ruxwell, says we found a woman who says she saw Jerry Mark on a motorcycle. Forrest told investigator Gallardo to get Doyle to meet with Forrest at Gallardo's office in North Platte. Forrest then says, "and if with this new picture we can get more details from her we can, we want to make her a witness for us." (Exh. 134, p. 15). They talked to her. They said she said Mark was going west. (Exh. 134, p. 20, 21). She said, "No, he was going east." (P.C.R. Tr. p. 76). She was no longer possible help. At the P.C.R. trial, Dutton states, "I just didn't feel Doyle was a reliable witness." (P.C.R. Tr. p. 1416). From his point of view, it being imperative that Mark was heading west, she was not reliable.

This situation, or course, was significant. Counsel for Mark summed it up by saying, "The State knew about Mrs. Doyle. They knew if the defense found Mrs. Doyle their case was over. They kept in contact with Mrs. Doyle to make sure the defense didn't find her." (Hearing, November 19, 1999; Tr. p. 68).

This Court has not forgotten that the P.C.R. judge <u>found</u> that Mrs. Doyle was an "effusive biased" witness. (Corrected Findings of Fact, Conclusions of Law, Decision and Judgment, page 24-25). The fact that he so found is not deciding a <u>Brady</u> issue. The basic question is, "was her testimony exculpatory, should defense counsel have seen it and was the jury entitled to hear it?" (See <u>Giglio v. United States</u>, 405 U.S. 150, 155 (1972) (holding a jury entitled to hear).

Mr. Dutton argues that they did not have to turn over any Doyle exhibits because she flatly said, as set out in Exhibit 37, after looking at a recent picture of Jerry Mark, that he was not the person who was at her place of employment. As set out above, she denies making such a statement and says, "I knew I could identify him." Even if Agent Forrest intentionally (or unintentionally) misconstrued what she said, it would still be a <u>Brady</u> violation. See <u>Kyles v. Whitley</u>,

113

514 U.S. 419, 421 (1995). Which, in a nutshell says, a prosecutor cannot be relieved of a failure to turn over exculpatory evidence regardless of any failure by the police to bring favorable evidence to the prosecutor's attention.

The State concedes that Agent Forrest did not disclose during his deposition that Mrs. Doyle had originally stated, on November 6, that the photo of Leslie Mark was the motorcyclist she saw. (Resp. Br. at 30; Exh. 140 at 20, 30; App. 315, 325). The State then points to the P.C.R. court's ruling, that Mark should have known and did in fact know that Mrs. Doyle may have seen Mark at the North Platte truck stop on November 1[32]. The State also points out that if Mrs. Doyle had been called as a defense witness, she would have been subject to impeachment based on her other statements to investigators. (P.C.R. App. 80-81). Again, this reviewing

_____

[32]The testimony is that the defendant and his attorney were given three days to make a trip along the interstate route. (Sandre). P.C.R. Tr. p. 1182. Agent Baty's time and distance study, Exhibit 100, sets out that it took 11 hours and 26 minutes just to get to North Platte. Mr. Sandre stated, "We quickly went up and down the interstate trying to find a spot where someone may have recognized Mark. It was not a situation where the prosecution had a number of investigators and had time to cover every possible stop." (P.C.R. Tr. p. 1182).

Court is not deciding what might or might not be impeached but whether or not the jury was entitled to hear it. See Giglio, 450 U.S. at 155 (holding a jury entitled to hear). The P.C.R. court concluded that the Doyle evidence did not lend to a "reasonable probability that the result of the proceeding would have been different." Such a comment is discussed in this Order commencing on page 186 where it is specifically set out that the cumulative effect of all of these suppression exhibits is what is controlling.

The State also argues that the P.C.R. court was correct in its' finding, that the reports were not favorable, as they reveal Mrs. Doyle identified the person she saw as Mark's younger brother, not Mark. They urge that the person she saw resembled Mark, but was much younger, and that she "positively said that he was not the person she saw." (Exh. 37). This is an ironic argument, in that Mr. Warren was also mistakenly shown a picture of Leslie Mark first. When shown the photo of Leslie Mark on November 6, by Agent Forrest, Mr. Warren said that "it resembled the individual." Tr. p. 2661. Mr. Forrest never went back to show Warren a picture of Jerry Mark! Tr. P. 2663. On cross examination, Agent Forrest was asked to

describe how Leslie and Jerry resembled each other, to which he answered, "The hair color and the facial similarities were there." Tr. p. 2664.

The State urges that the P.C.R. court was correct in finding that there was no reasonable probability that the State's failure to disclose the Doyle reports had any effect on the verdict! If you take it as a single <u>Brady</u> violation this might well be true, but it certainly adds a factor that should be considered in the cumulative effect as set out in <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995), and discussed further in this ruling commencing on page 183.

Clearly, Mrs. Doyle would have been an important witness for Mark as she would have testified that she saw him arriving from the west, and traveling east, and she witnessed all of this on Saturday morning, November 1, after the murders had occurred 540 miles away. Also, had she so testified, she would have corroborated the testimony of Mark Van Housen, who testified that he saw Mark in Aurora, Nebraska, from about 10 a.m. to 10:45 a.m. on Saturday, November 1. Aurora is 387 miles from the murder site and 154 miles east of North Platte. (Exh. 100, p. 5, App. Vol. II, p. 262). One must travel east

from North Platte to get to Aurora later in the morning. Such
a trip is moving toward the murder site, after the murders
were committed. There is no way Mrs. Doyle could have seen
Mark around 9 a.m.,[33] some two hours earlier than Van Housen
had seen him, and for Mark to have also committed the murders.
Indeed, even if Doyle was wrong and Mark was traveling west,
it would be pretty near impossible for Mark to have committed
the murders between 3 and 4 a.m., then make it to North Platte
by 9 a.m. to be witnessed by Mrs. Doyle. Mrs. Doyle had more
extensive contact- a conversation- than many of the other
witnesses for the State. Again, this Court is not finding
that the time frame set out above makes it impossible for Mark
to have committed the crimes but only that the defense should
have been given the opportunity to investigate the facts and
use it both in trial preparation and in the trial and the jury
should have heard and been able to consider it. See State v.
Peterson (citing Brady), 219 N.W.2d 665, 674 (Iowa 1974); and

---

[33]At the P.C.R. hearing in 1994 (Tr. p. 77), Mrs. Doyle
stated she saw Mark between 9 and 10 a.m. In her statement,
at exhibit 37, taken on November 7, 1975, she stated she had
seen the motorcyclist sometime between 10 a.m. and noon.

<u>Giglio v. United States</u>, 405 U.S. 150, 155 (1972) (holding jury entitled to hear).

There was one (1) exhibit concerning the witness Jean Doyle that was not given to the judge.  (Exhibit 134).  There were three (3) exhibits concerning the witness Jean Doyle that were given to the judge but that he did not turn over to the defendant.  (Exhibits 32, 37, and 45).  Jean Doyle testified she was working on the morning of November 1, 1975, and she testified she did not work on the morning of October 31, and is not confused as to the dates.  As mentioned, during that morning sometime around 9:00 a.m., she encountered a motorcyclist whose physical description was very close to that of Jerry Mark.

As mentioned, the defense at trial argued that it would be next to impossible for Jerry Mark to have been seen at Aurora by Van Housen late in the morning of November 1 and have committed the murders between 3:00 and 5:00 a.m. in Black Hawk County.  The problem was, Van Housen was the only alibi witness for the defense at trial.

The Court will now discuss how the testimony of Doyle and Van Housen correspond.  The service station in Aurora where

Van Housen worked was not right on the Interstate, but he said that Mark's motorcycle came down from the direction of the Interstate. He could not say for certain which exit, east or west bound, he had gotten off of. (Trial Tr. Vol. XII, p. 2740). Mark, when he stopped, told Van Housen that he had filled up his tank and "Mark nodded his head back toward the west." Mark was more interested in getting some oil to take with him. (Trial Tr. p. 2732). Van Housen owned his own motorcycle. He was asked if Mark's bike was warm as it might be after long, hard driving. Van Housen's answer was, "I didn't feel any heat coming off it, no. My own Yamaha gets hot if I drive it, for an hour or two you can feel heat coming off it." (Trial Tr. p. 2733-34). When he was asked if Mark's bike appeared to be dirty he said that he had knelt down right next to it and it seemed pretty clean to him. When asked if Mark appeared tired, he said no. Did he appear grubby? "No." Did he appear as if he had been on a bike a long time? "No." "He stayed at my place for a half an hour at least." (Trial Tr. Vol. XII, p. 2737).

Van Housen said Mark did not appear to be in a hurry. (Trial Tr. p. 2758). He did not appear to be nervous. When

he left about 10:30 a.m. on November 1 (Trial Tr. p. 2739),
Van Housen said that the east bound entrance to the Interstate
was probably 100 yards away from his station and the west
bound entrance was farther away over a viaduct where you had
to go over a hill leading up to it. (Trial Tr. p. 2738). Van
Housen said that he could not absolutely tell when Mark left
whether he went to the east bound or west bound entrance to
the Interstate except that he was not going very fast, that
the east bound entrance was the first Mark could have entered,
that he saw Mark's motorcycle going toward those entrances at
a fairly slow rate of speed and that he was not speeding up to
go over the hill to the west bound entrance. (Trial Tr. Vol.
XII, p. 2739). Van Housen said that he was trying to listen
to a pre-game football program on the radio and that he (Van
Housen) was in more of a hurry than Mark was. (Trial Tr. p.
2758).

This is all complicated by the fact that Mark was at the
Alda, Nebraska, exit and made two phone calls to California
between 3 to 4 p.m. on November 1 (Vol. X, Trial Tr. p. 2387-
88. No one has really disputed this). Alda is 10 miles west
of Grand Island. Aurora is about 14 miles east of Grand

Island.  The two towns are only about 24 miles apart.  Trial
Tr. p. 2386.  If Van Housen is accurate, that Mark left his
Aurora station at about 10:30 a.m., Mark stayed in the nearby
area over 4 hours until he made the uncontroverted phone call
sometime after 3:00 p.m. at Alda only about 24 miles west from
Aurora where Mark left Van Housen.

This testimony cemented in by the time of the phone call
showed that Mark was not driving long, hard hours from the
murder scene or that he was in a hurry to get as far away as
he could as soon as he could from the murder site.

The time and distance study, Exhibit 100, showed that the
murders happened between 3:00 a.m. and 5:00 a.m.  _If a person_
_left the murder site at any time during that period heading_
_west, you might get to Aurora from the Mark farm, by about_
_11:00 a.m._  As mentioned, Van Housen said he saw Mark at about
10:00 a.m. in Aurora.

When you put Jean Doyle's testimony alongside Van Housen,
Mark's alibi is greatly strengthened.  North Platte, Nebraska,
is about 150 miles West of Aurora.  Mark would have to go east
toward the murder site to get to Aurora on Saturday morning
after the murders.  The testimony is that Jean Doyle, at North

Platte, saw Jerry Mark earlier than he was seen by Van Housen at Aurora. When Doyle states that she saw Mark traveling east, that would make two alibi witnesses that are entirely consistent with Mark having been in North Platte, around 9:00 a.m. on November 1 and being in Aurora later which would show he was going east, heading <u>toward</u> Iowa a few hours after the murders. This testimony would be strong support to strengthen the alibi that Jerry Mark was seen further west of Aurora at an earlier time. Obviously, it would be difficult for Mark to commit the murders and get to Aurora by 10:00 a.m., a distance of 387 miles (Exhibit 100), but it would be much harder for him to commit the murders and get to North Platte by 9:00 a.m. then double back east to Aurora and spend a half hour with Van Housen at about 10:00 a.m. (Trial Tr. p. 2739) and then hang around the North Platte area to make the uncontroverted phone call from Alda, 24 miles away from Aurora, about 3 p.m.; four and a half hours later. (Vol. X, Trial Tr. p. 2387-88).

This Court has carefully read the closing arguments of counsel and finds no mention in them about this phone call or

the time it was made.[34]  If Mark was fleeing, he was not fleeing too fast to only get to Alda some 411 miles in 12 hours (roughly 34 miles per hour).  Counsel in this case were seasoned, sharp lawyers.  The Court can only assume that they knew of this situation but for "tactics" did not believe it would help their theories.  This Court may be missing something that the lawyers knew, but the record before the Court does not clearly reveal what that would be.  Ordinarily, that call would not be considered while weighing <u>Brady</u> suppression matters, but if the suppressed exhibits pertaining to Warren and Doyle had been known, it might have been very important and that is why it is mentioned here.

None of the above testimony is conclusive, of course. The question is, "Is it something the jury should have heard?" (through Exhibits 32, 37, 45, and 134).  Absolutely!  See

---

[34]At a hearing before this Court on November 1999, counsel for the petitioner mentions that this call was made but he does not make any point in relation to how it might affect the case.  See page 21.  At the same hearing, counsel for the respondent mentions the same phone call but outside of saying, "That call is not in dispute," he also makes no point as how it might affect the case.  Additionally, in respondent's brief filed August 3, 1999, the author mentions the Alda phone call but makes no point as to what it showed or did not show.  (P. 23-24).

<u>Giglio v. United States</u>, 405 U.S. 150, 155 (1972) (holding jury entitled to hear it).

The defense did not know that Mrs. Doyle had said that she saw Mark heading East after the murders. If he was not going east at that moment, he had to have reversed himself soon thereafter to get to Alda, Nebraska, 130 miles to the east of Grand Island, to make the uncontroverted phone call after 3 p.m. If they knew she said he was headed east, they would have looked for her. (See Sandre testimony, P.C.R. Tr. p. 1089, App. 1, Vol. XI, p. 1337). She would not have been hard to find and she really would have bolstered Mark's alibi. There was no question that if this is factual it is crucial material testimony. This Court is not saying these facts are true, but only that the defense should have been told about it as required by <u>Peterson</u> (citing <u>Brady</u>) and the jury was "entitled to hear it" as required by <u>Giglio</u>, 405 U.S. at 155.

It is true that the P.C.R. judge rejected the claims based on the non-disclosure of the Doyle information. It has been argued with some credibility that his reasoning would not withstand scrutiny. The judge said that the defense either knew or should have known about Mrs. Doyle. According to the

judge, non-disclosure of an alibi witness is a somewhat different type of non-disclosure because, almost by definition, the defendant is in the best position to know where he actually was. The judge also pointed out that there was a reference to a lady in North Platte, Nebraska, by Agent McDonald, in a lengthy interrogation of Jerry Mark on November 7. Exhibit N at 76, 87 App. 578, 589.

Agent McDonald testified at trial about his mention of a "lady in North Platte, Nebraska" in his interview with Mark. During that trial testimony, McDonald agreed that he said, I told Jerry Mark, "[d]o you want me to talk to the lady at North Platte who remembers you because she had a boyfriend like that, who looked like you?" McDonald further said at trial, "I have no idea if there will be" any woman from North Platte that would come and testify that she saw Mark at North Platte. (Trial Tr. p. 2072). McDonald said that there was information "relayed to me" about the lady in North Platte. He later testified, "I have no personal knowledge" and I do not know (and did not know) when I was talking to Mark what was the name of the lady in North Platte was. (Trial Tr. p. 2073). The discussion of knew or should have known defense

commencing on page 47 of this ruling makes it very clear that such a "weak" mention of a possible unnamed witness would never support a suppression as controlled by <u>Cornell v. State</u>, 430 N.W.2d 384, 385 (Iowa 1988) (citing <u>U.S. v. LeRoy</u>, 687 F.2d 610 (2d Cir. 1982)). The P.C.R. judge also concluded that Agent Forrest freely and fully disclosed the existence of Jean Doyle during his deposition[35]. As to her existence, yes, but there is nothing in his deposition that sets out that Doyle said that when she saw Mark he was heading east, towards the murder site, not away from it, which was the crucial issue, or that Doyle had identified Leslie Mark's picture as the person she saw![36] If the defense had been told of those statements and then did not contact Doyle, then the defense

---

[35]Agent Forrest was not deposed until April 1976, well after Mark and his attorney were allowed to go to western Nebraska on February 14, 1976, for three (3) days.

[36]Again, the photo she identified to be of the man she saw was actually a picture of Leslie Mark. Mrs. Doyle said that the photo of Jerry Mark was not the person she saw, as she saw a younger man. Doyle is mentioned by Agent Forrest in his deposition on page 26, 28, 30, and 34, and neither one of these two "issues" was ever mentioned. As previously mentioned, the State concedes that Agent Forrest never mentions in his deposition that Doyle had originally stated that the photos of Leslie Mark was the motorcyclist she saw (Respondent's Brief, p. 30).

knew or should have known about Doyle and would have been in the position the Iowa Court of Appeals concluded they were. As mentioned, that Court concluded that Ron Forrest told Mark's attorney (Scalise) about Doyle's stated observations during an April 1976 (before trial) deposition. That court then concluded, accordingly, Mark and his attorney knew or should have known essential facts permitting them to take advantage of potential alibi evidence. (Mark, p. 823).

When Scalise was asked about this at the P.C.R. trial (Transcript p. 1195, ll. 11-24), "Why didn't you see her [Doyle]?" He answered, "No, if she couldn't identify Jerry Mark. Anyway why would I go see her?" A review of Forrest's deposition of April 21, 1976, clearly supports Scalise's position that that's what Forrest said in his deposition with Scalise present. (P. 329 of Depo.).

At a hearing before this Court, Mr. Cleary, for the petitioner, is reading to the Court and record what Mr. Scalise thought about hearing Doyle's name at the Forrest deposition. Scalise said:

> [E]ssentially the way this came about
> is we had been talking like we had been
> talking here for hours about whether Mr.
> Scalise had seen this document, whether Mr.

Forrest had lied to him about Jean Doyle,
and all these other things that we've
talked about.

And so Mr. Walton says to Mr. Scalise,
question - - this is Line 3, And you're not
saying what we're talking about here would
have made a difference, are you?  And then
Mr. Scalise said, answer, I am telling you
this, it makes a difference in the search
for the truth to have law enforcement be
truthful and to be honest and to produce
everything they have when it hurts them as
well as when it helps them.  That's the
only way this system of justice in this
country works.  If it is anything less than
that, then it doesn't work.

And what we have here in my view is
something less than what we should have
had.  We should have had every one of these
records.  Would it have made a difference?
I don't know whether or not, but it
certainly would have given us the
opportunity to present a full, complete
picture of what had occurred on the 31st of
October and the 1st of November.

That seems to me to be critical if
we're ever going to have a full expression
of justice in this state, in this country.
You can't do it, you can't have justice by
fiat or whim.  You have to do it by rule.
And I think that's what the problem is.

November 19, 1990 hearing, Transcript pp. 103-04.  Cleary
reading from P.C.R. Trial Tr. Vol VII, p. 1239.

Counsel for the respondent in discussing Ms. Doyle and

the fact that Agent Forrest had given Scalise her name argues

as follows:

However, this was never "followed up" on. And the PCR court discusses the interesting feature of this entire issue in that the defense and the defendant raised was an alibi defense, and part of his alibi and apparently the most important part was this lady in North Platte, yet even though he knows this lady in North Platte and knows her name, he doesn't do anything to try to find her himself, at least not as far as the record shows.

Hearing of November 19, 1999, Transcript p. 70. (emphasis added).

It certainly would have been stupid if the defense knew and didn't "follow up." Prosecutor Dutton said Scalise was too smart to make mistakes. P.C.R. Trial Tr. p. 1454. This Court cannot assume Scalise was too stupid to "follow up". The defense should have been told all they knew bout Doyle especially that when she saw him, he was going toward the murder site.

The reasoning, that Mark knew or should have known about Mrs. Doyle because "he was there," is not as damaging as it might be because clearly Mark had been riding a motorcycle across the country for days and requiring him to remember the details of which gas station he stopped at several months afterwards is expecting a lot more than the Cornell and LeRoy cases require to establish a knew or should have known ruling.

129

The law is quiet clear that the prosecution should not be allowed to rely on the "knew or should have known" defense where the state has participated in misleading or withholding information such as not telling the defense that Mrs. Doyle said Mark was traveling toward the murder site, not away from it.  See <u>U.S. v. Bagley</u>, 473 U.S. 667, 683 (1985).

Additionally, the P.C.R. judge discounted the Doyle information, asserting that even if she had identified Mark at trial as being in North Platte before noon, that really would not have helped the defense.  That conclusion is not sound. North Platte is 540 miles from the Mark farm.  According to the time and distance study (Exhibit 100), the murders happened between the hours of 3:00 a.m. and 5:00 a.m.  As mentioned, Mrs. Doyle testified at the post conviction hearing that she saw him between 8:30 a.m. and 10:00 a.m. heading toward the murder site.  P.C.R. Trial Tr. p. 66, 76, 90.  Even if her testimony was off, it would be very difficult for a motorcyclist to get 540 miles in nine (9) hours, especially when the prosecution has tried to put Mark in the Boondocks Café, 65 miles from the scene of the murders and there is testimony that Mark stopped there for up to 45 minutes.

Rosalie McGinnis also testified that Mark (?) stopped in Stuart, Iowa, after that. These delays would make it virtually impossible for Mark to commit the murders and be seen by Mrs. Doyle in North Platte on Saturday morning when she says she saw him. Again, this Court is not so deciding; it is only deciding that this is something the jury should have heard.

The P.C.R. judge, on page 21 of his order, held that since the defense did not file its notice of alibi until seven (7) days before the start of the trial and since the prosecution did not interview the defendant's alibi witness Mark Van Housen until May 27, 1976, that it was understandable why the prosecution did not review its files and give the defense copies of the Doyle interviews. This ruling, of course, flies in the face of <u>Pennsylvania v. Ritchie</u>, 480 U.S., 39, 60 (1987), which clearly mandates that the prosecution has an ongoing duty to turn over evidence which "may be deemed immaterial upon original examination [but] may become important as the proceedings progress."

It is important to recognize that the P.C.R. judge apparently failed to consider how the Doyle evidence might fit

in with the Van Housen evidence that Mark was in their area of Nebraska and Doyle testified that Mark was headed east on Saturday, November 1. Further, the petitioner's version of when Warren went to his doctor which they argue had to be on Friday, would put all three of these witnesses (Doyle, Van Housen, and Warren) on the record saying they saw Mark in western to central Nebraska on Saturday. Again, this Court is making no such conclusion but does conclude that it is all evidence the jury was <u>entitled</u> to hear. See <u>Giglio v. United States</u>, 405 U.S. 150, 155 (1972). Again, the case of <u>State v. Peterson</u>, 219 N.W.2d 665 (Iowa 1974), is informative. In <u>Peterson</u>, there was an interview that was not disclosed which implicated another person other than the defendant as having committed the crime. The prosecutor declined to turn over the evidence in the <u>Peterson</u> case to the defendant because they determined that the other person in fact had an alibi. The Iowa Supreme Court reversed, making it quite clear that the determination about materiality by that court was not to be dependent on whether the State had contradictory evidence which it believed negated a piece of evidence. This opinion cited <u>Brady</u> for this authority. <u>Peterson</u>, 219 N.W.2d at 674.

These exhibits, 32, 37, and 45 were wrongfully suppressed by the judge's order. (Exh. 134 was never given to the judge for his review. Of course, the defense never saw it). Remember, the <u>trial</u> judge, many years later at the P.C.R. hearing, flatly stated Exhibits 32 and 45 were exculpatory and should have been turned over to the defense. (P.C.R. Tr. p. 939-945). The State contends, and the P.C.R. court found, that they were not improperly suppressed because Mark "should have known" about Mrs. Doyle. There is nothing in <u>Brady</u>, <u>Bagley</u>, <u>Kyles</u> that cancels the duty of disclosure just because the defense "should have known."[37] As discussed herein, a number of the essential facts were hid from the defense. The answer concluded by this Court, is yes the material was suppressed. Was the evidence favorable? The State says no because Mrs. Doyle said that the picture of Jerry Mark was older than the man in the other photo (of Leslie Mark), that she had identified as the cyclist she saw. However, this

---

[37]This Court is well aware of the <u>Cornell</u> and <u>LeRoy</u> cases. This "should have known" issue is discussed commencing on page 47 of this ruling. Where it is pointed out that the "should have known" conclusions can only kick in when the <u>essential</u> facts are known or should have been known to the defense.

Court is persuaded, for all the reasons set out herein, that the answer is obviously, yes. And, the third question is, was the evidence material? Again, this Court is persuaded and finds that, for all the reasons set out above, that the evidence was certainly material.

As mentioned, the trial judge reversed himself at the P.C.R. trial many years later and concluded that some of the Doyle exhibits, 32 and 45 should have been turned over to the defense. (P.C.R. Tr. p. 939-945).

The Court has not forgotten that there is not a whole lot of exculpatory information in any one of these exhibits if they are read literally. However, for all the reasons set out above and the possibility that what Mrs. Doyle had really (?) said, should have been in one or more of these exhibits, this Court is persuaded that it should have been evidence the defense got to hear and consider. In making this decision, the Court is fully aware that Exhibit 37 clearly says, "Mrs. Doyle positively stated that this [Jerry Mark picture] was not the person she saw." But, as set out beginning on page 109 of this ruling, Mrs. Doyle has an explanation a jury should have heard in relation thereto.

Does the broad scope of <u>Brady</u> and the later updated refinements cover such a situation?  This Court says, "Yes." If this Court is wrong as to its decision as to these Doyle exhibits (32, 37, 45, and 134) or any one of them being wrongfully suppressed, the Court is persuaded and finds that the cumulative effect of the other suppressed exhibits set out in this Order is sufficient to grant the writ without considering the Doyle exhibits.

**E.   Identification Witnesses along Route of Travel**

Next, Mark says that the seven identification witnesses called by the prosecution created a false "route of travel" for him through Nebraska, to the Mark farm, then back to Nebraska.  Mark admits that some of the details of the witnesses' initial identification of him were revealed during pre-trial depositions.  However, he urges that the exact words given during the pre-adversarial stage of the proceedings would have been much more beneficial for cross-examination purposes.  (Pet. Br. at 17).  The Court will now discuss each of these witnesses.

## 1. Donald Shearer

Witness Donald Shearer identified Mark as the motorcyclist he had seen at the Brady, Nebraska, interchange about noon on the 31st of October.  In his initial statement, he did not mention that the bike had an Iowa plate, nor that the rider had red hair.  (Exh. 54, App. Vol. II, p. 215).  Exhibit 54 (which the defense was given) shows that Mr. Shearer also told agents that Larry Holmes was "helping him" that day.

The P.C.R. judge said Shearer's testimony was "devastating" because he put Mark at Brady, about 100 miles east of Chappell at noon on Friday (P.C.R. ruling p. 50).  However, Shearer's testimony which did look strong would have been "weaker" if the prosecution had not suppressed Holmes' statement Exhibit 64.  Remember, Shearer was having a wake after his son's funeral.  Holmes, in his statement, says Shearer brought 15 or 20 mourners to Stuckeys and that there were others not in that party in the store.  Shearer at his deposition said in answers to a questions about the few moments he "saw" Mark, (I was) "just walking around in a daze." (Shearer Depo., p. 27).  Again, remember that Shearer testified at his pretrial deposition and at trial that it was

not he but Mr. Holmes who was the attendant who served Mark. (Exhibit 155 at 11. Trial Transcript p. 2182-83. App. 430, 1095-96).

Mr. Holmes in suppressed Exhibit 64 stated that he did not personally remember seeing anything or viewing anyone who appeared to him to be out of the ordinary. Exhibit 64 was not given to the defense.[38] Exhibit 64 does not have a checkmark that would show the trial judge had seen it. If it had been seen by the defense, it would have been carefully considered by the defense and it may well have been used at trial.

The State responds that this information about Mr. Shearer was disclosed, and points to the stipulation of February 3, 1995, that shows Exhibit 54 was part of the <u>Mayhew</u>[39] file. This is true as to Exhibit 54, but Exhibit 64 was not in the <u>Mayhew</u> file and was not given to the defense.

---

[38]A report that was unknown to the defense until the post-conviction relief discovery process many years after the trial.

[39]<u>See</u> <u>State v. Mayhew</u>, 170 N.W.2d 608, 614 (Iowa 1969) (holding that the State must produce witness statements only after the witness has testified on direct). The defense put some such statements in a "Mayhew" file which the defense got to see.

The Iowa Court of Appeals stated that the defense learned of Holmes' identity during Shearer's pretrial deposition. This is probably true but in that deposition, Shearer said nothing about Holmes not recalling any of what Shearer said as set out in Exhibit 64. As mentioned, in Exhibit 64, Holmes said he had no recollection of anything Shearer said. Further, Holmes was shown a picture of Mark and his motorcycle and could not identify either. Exhibit 64 should not have been suppressed. This Court is not deciding what is the real truth but only that the defense was entitled to see Exhibit 64, to consider it before trial and at trial if they so choose. See U.S. v. Bagley, 473 U.S. 667-676, 105 S. Ct. 3375 (3381) (holding impeachment is included). The fact that Holmes did not corroborate anything Shearer said about the sighting of Mark should have been a reason for the trial judge if he saw Exhibit 64 to order that the report of Holmes' interview be turned over and it should not have been suppressed.

## 2. Karelyn Kemp and Mary Stinson

Karelyn Kemp and Mary Stinson both testified and identified Mark as having been in their restaurant in

Atlantic, Iowa, about 6 p.m. on Friday, October 31. In a suppressed police report (Exhibit 113), Stinson said that Mr. James Prosser had also been in the restaurant at the time that Mark supposedly had been in there eating. Mr. Prosser was interviewed in May 1976, and stated that he had been shown Mark's photo in November and knew that he had never seen Mark or talked to him. (Exh. 113, App. Vol. II p. 289).

Another report, showed that Ms. Stinson originally (in November 1975) said that Mark was in the restaurant between 7 p.m. and 8 p.m. (Exh. 70, App. Vol. II. p. 217). Then at trial, she testified that she was not sure of the time, and that it could have been as early as 5:30 p.m.[40] (Trial Tr. 2497, App. Vol. X, p. 1217). She also had originally stated that Mark had a helmet that possibly had a red color to it. (App. p. 217). At trial, she said it was white with some red in it. (Trial Tr. 2480; App. Vol. X 1210).

The State points out that Exhibit 70 was also in the Mayhew file, as stipulated by the defense in 1995. The State asserts that Mark knew or should have known about this

---

[40]This is rather convenient, given that this earlier time fit into the prosecutions' "route of travel."

evidence because Ms. Stinson testified in her pretrial deposition about two "Englund" truckers who were in the café at the same time Mark was. Mr. Prosser was an "Englund" trucker. In Exhibit 113 (in which Mr. Prosser denies he was in the restaurant when Mark was there, as Miss Stinson said), a suppressed exhibit which would directly contradict Stinson's testimony was an exhibit that should have been turned over to the defense. The Court has not included Exhibit 113 on its list of exculpatory exhibits because it does not add a lot to "educate" the defense. There is very little in it that was material to the issues at trial. The Court has not used Exhibit 113 in its search for the cumulative effect on the wrongful suppression of evidence.

### 3. Barbara Ann Smith

In Newton, Iowa, Barbara Ann Smith was interviewed on November 11, 1975. She told Deputy Myers that she saw a motorcyclist, about 6' tall, with dishwater blond hair, and carrying a blue metallic helmet. (Exh. 53, App. Vol. II, p. 213). She said this occurred between 5 and 6 p.m. on Friday evening, about the same time that Karelyn Kemp had said that Mark was in Atlantic, some 100 miles away. Later she said the

helmet was dark in color.  (Exh. 52, App. Vol. II., p. 212).

She then had trouble picking Mark out of a line-up on December

5, qualifying her identification by stating he did not look

the same as the person who came into her restaurant on October

31.  (Exh. 85-page 5, App. Vol. II. P. 238).  Mark argues that

exhibits, 53 and 85 were withheld from the defense; but agrees

that Exhibit 52 was in the <u>Mayhew</u> file which the defense saw.

Additionally, the State says that all of Ms. Smith's

inconsistent statements came out in her pretrial deposition

and at trial.  (Exh. 158, at 42-43, 47-52, 71-75; App. p. 433-

45, Trial Tr. p. 2222-23, 2238-43; App. p. 1118-19, 1127-32).

The Iowa Court of Appeals concluded there was no real

suppression of Exhibits 53 and 85-page 5 concluding that

"[T]he imprecision of Smith's identification was revealed

during her deposition and referred to at trial.  Mark was

aware Smith believed the motorcyclist had dishwater blond

hair."  The second page of Exhibit 53 has at least 450 words

about what Mrs. Smith saw and heard.  Little of this was

revealed at her deposition and the imprecision of her

identification was extensive.  Further, suppression of Exhibit

53 and the fact that she had trouble picking Mark out of the

line up (Exhibit 85-page 5) were gross violations of the standards set out herein in <u>Peterson</u> (citing <u>Brady)</u> and <u>Giglio</u>, 405 U.S. 450 at 455, that the defense should be allowed to see these exhibits and the jury is entitled to know of this evidence. Exhibits 53 and 85 were wrongfully suppressed.

### 4. Delbert Van Hauen

Delbert Van Hauen had contact with a motorcyclist at a Holiday gas station in Ackley, Iowa, which is about 100 miles from Atlantic. At least five of the reports about this contact were never disclosed to Mark, including exhibits 116, 118, 119, 124, and 129. Exhibits 102 and 119 include Frank Jaquith, another Holiday employee who stated that about six bikes came through the station that night, and that he did not remember the rider of the bike Mr. Van Hauen identified, but he remembered that the bike he saw had saddle compartments. Mark's bike did not have saddle compartments. Mr. Van Hauen stated that Mark was wearing jeans and a short jacket, and a helmet with a sun visor. Mark's helmet did not have a sun visor, and no other witness described Mark wearing jeans and a jacket. In the reports, Mr. Van Hauen also said that Mark's

bike had a screw type gas cap, when in fact it was spring loaded. It is argued that all of these inconsistencies were unknown to the defense at the time of trial.

The State responds that in Mr. Van Hauen's pretrial deposition he stated that Mr. Jaquith had seen the motorcycle and rider at the station, and he gave a description of the rider's clothing. (Van Hauen Depo., Exh. 159 at 12-14, 16-17; App. p. 446-51). At trial, the same matters were discussed. (Trial Tr. p. 2271, 2273, 2280-82; App. p. 1140, 1142, 1146-48). Also, the respondent points out that the defense asked Mr. Van Hauen if he had ever made a statement that the gas cap was the screw-type, so they knew of that information even without all the exhibits Mark has mentioned above. (Trial Tr. p. 2290; App. 1151).

The Iowa Court of Appeals in discussing the testimony of Mr. Van Hauen states as follows:

> Some of the details provided by Van Hauen and another service station employee [Mr. Jaquith] are contrary to the descriptions given by other eye witnesses and they are also contrary to the actual description of Mark's motorcycle and his attire.
>
> The record indicates Van Hauen's identification was addressed in Van Hauen's deposition and also at trial. Mark was on

143

notice of the other employee's presence and also the inconsistencies between Van Hauen's description and the other eye witnesses descriptions of Mark's motorcycle and his clothing. Accordingly, this evidence was not suppressed nor would it have influenced the verdict. (Emphasis added).

<u>Mark v. State</u>, 568 N.W.2d 820, 825 (Iowa App. 1997).

As mentioned in this Order, the directives of <u>Peterson</u> (citing <u>Brady</u>) and <u>Giglio</u> are that the defense should be made aware of the exculpatory information and the jury should have the chance to consider it. What defense counsel might have learned at the trial about a piece of evidence is way too late under <u>Peterson</u> (citing <u>Brady</u>). A review of Van Hauen's deposition does not add a lot to "educate" the defense. Exhibits 102, 116, 118, 119, 124, and 129 were suppressed. However, when this Court reviewed each of these exhibits, it had to conclude that there was very little, if anything, set out in any of them that was material to the issues that the jury really had to decide. This Court is deciding that because of their content and primarily because of their lack of content, they were not wrongfully suppressed. This Court has not used any of them in its search for the cumulative effect on the wrongful suppression of evidence.

## 5. Jayathan Hurd

Jayathan Hurd made an identification of Mark, from a line-up and at trial, as having come through his gas station in Williams, Iowa, between 3:30 and 5:00 a.m. on Saturday morning. Exhibits 74-77, 82, 83-85 and 97 all contained information about police contact with Mr. Hurd. These nine exhibits were seen by the trial judge during his in camera inspection, and none of them were ordered turned over to the defendants. However, four of them (Exhibits 75, 76, 83, and 84) were put in the Mayhew file and were seen by the defense. There are no <u>Brady</u> issues as to those four exhibits. Exhibits 74, 77, 82, 85-page 5, and 97 were not seen by the defense. Exhibit 74 and 85 have no information in them that raises any <u>Brady</u> issues. As to Hurd, that leaves three exhibits (77, 82, and 97) which were wrongfully suppressed by the trial judge with the prosecution "going along" saying whatever the judge says is okay. P.C.R. Tr. p. 943. In Exhibit 75, Mr. Hurd's statement was that Mark came into the station between 4:00 and 4:30 a.m., and then went into the café for 15 to 35 minutes. (App. Vol. II, p. 226). Hurd said that Jan and Betty were also working in the café, and that three other employees may

145

have seen Mark: Mabel (the counter worker), Brian Halgraver and Lynn Draves (other service station workers). (App. Vol. II, p. 226). In exhibit 76, Mr. Hurd said that the cyclist called he and Lynn Draves "crazy goofy S.O.B.'s" after some gas was spilled on his tank. In exhibit 82, Lynn Draves said he did not wait on the cyclist, Hurd did. Draves said nothing at all about being called a "crazy goofy S.O.B." Draves said that he did not notice the cyclist nor did he recall the time. Exh. 82. In the text of respondent's brief (page 53), it states, "the record does not show that Lynn Draves was nearby and might have heard and remembered." This comment is not accurate. The key words this Court is reviewing are those where Hurd said he called me and Lynn Draves "crazy goofy S.O.B.'s." In Exhibit 77, Hurd was interviewed again, he quoted the cyclist as saying, "Just fill the darn thing up with gas and lets go, that's all he said." This is contrary to what he claims the cyclist said in Exhibit 76 set out above.

Agent Hoil followed up, interviewing Mr. Draves. Mr. Draves said he remembered the dark colored motorcycle but did not remember the rider. Draves said that Mr. Hurd had told

him that he observed the motorcycle between 2:30 and 4:30 a.m. (Exh. 78-80, 82, App. Vol II., p. 229, 231, 232, 243). The State argues that the fact that Mr. Draves has no strong memory of Mark has no exculpatory value. (Draves was one of the "other witnesses" mentioned by the Iowa Court of Appeals on page 825). Hurd relied on Draves for support (Exhibit 76); but Draves, who like anyone else would remember such a confrontation, not only did not have a strong memory of it, he clearly said he, "did not see or notice the operator (cyclist) nor did he recall the time." (Of the incident). Exhibit 82.

Exhibit 83 was an interview of Hurd by a Deputy Sheriff Long, about 32 days after the murders. It discusses the goofy S.O.B.'s comment by the cyclist, the fact that he had a cut on his right hand and that he had a limp at that time. Hurd made a two page handwritten statement. Exhibit 84, Hurd's handwritten, hard to read, statement discusses his meeting with the cyclist. He reports that this person said attendants are a bunch of goofy S.O.B.'s. He again states the cyclist was in the café for 15 to 45 minutes, that he walked with a limp and had a cut on his right hand.

Exhibit 97 is a report, made within six days of the murders, which Hurd says, after looking at a picture of Mark, it does not look familiar to me. He did <u>not</u> identify Mark at that time.

Mabel Maakestead, the cashier on duty at the time, was also interviewed by Agent Hoil, on December 3, 1975. She said she did not have any information, and she could not identify Mark from the photographs that Agents Swaim and Jutte had shown her on November 7. (Exh. 81, App. Vol. II, p. 233). Finally, the pretrial deposition of Mr. Hurd includes mention of these other persons who were also present and were questioned by BCI agents, and that they received <u>no positive responses</u> which means none of these persons gave the BCI agents testimony to support what Hurd had said. (Hurd Depo. Exh. 160 at 30, 47; App. p. 481, 498).

Mark argues that if the above exhibits (77, 82, and 97) had been disclosed, Mr. Hurd's testimony would have been severely undermined. No other witnesses from that gas station remembered Mark. What's more, since Hurd said that the motorcyclist was there as early as 2:30 a.m., then that would

have been before the murders even happened, some 65 miles behind him. Exhibit 100.

The defense attorneys knew of Hurd's possibility of being a witness of the State, because of that they were allowed to depose him. When they deposed him, before the trial, they had not been given and did not have any of the 3 exhibits discussed above. (Exhibits 77, 82, and 97).

Prior to taking his deposition and during the trial, the defense was aware that Mr. Hurd had remembered a dark motorcycle helmet on the cyclist. (Tr. p. 2316; App. Vol. X, p. 1160). It was clear from the rest of the trial evidence that Mark had only had one helmet which was white. The defense also knew that Hurd's identification of the cyclist included the description that he was wearing dark khaki pants (Tr. p. 2316; App. Vol. X, p. 1160). No one other than Mr. Hurd ever said that the cyclist they saw and/or identified as Mark had khaki pants. Mr. Hurd also stated that the cyclist he saw walked with a limp. The prosecution tried to tie this to their theory, that the killer had stepped into a hole across the road from the house where the murders occurred.

Mr. Hurd had testified that the cyclist he saw had gone into the café. At the trial, Mr. Hurd testified that the cyclist was in the café area <u>no more than 15 minutes</u>. In his pre-trial deposition, Mr. Hurd had described the time that the cyclist was in the restaurant as being a short time. (Hurd Depo. Tr. p. 31, Exhibit 160; App. Vol. IV, p. 452). As set out in the various reports, he told investigators that Mark was inside anywhere from 15 minutes to 45 minutes. (Exhibits 75-76).

Exhibits 75 and 77 are tape recorded interviews that Hurd gave, sometime later, to a deputy sheriff with the Black Hawk County Sheriff's Office. Exhibit 75, which was in the Mayhew file and the defense saw, discloses a number of things of significance. At his interview on November 29, 1975, Mr. Hurd had put the time of the contact between 4:00 a.m. and 4:30 a.m. He said that, "the cyclist had been in the café for approximately 15 to 35 minutes." (App. Vol. II, p. 226). In the interviews of Hurd's co-workers, none of them remembered any of the particulars about the encounter, as Hurd had described it, nor could they corroborate his sighting. (See Exhibits 78, 79, 80; App. Vol. II, p. 229, 231, 232).

How could this information in these three (3) exhibits (77, 82, and 97) have helped?  The most unfair suppression of these "Hurd" exhibits was Exhibit 97 where Hurd, upon being shown a picture of Mark, said it, "didn't look familiar to him."  This was six days after the murders.  Months later, Hurd, as a star witness, testified at trial that he was sure that it was Mark who had come to the gas station between 3:30 a.m. and 5:00 a.m. on November 1.  This testimony had definitely hurt Mark's case.  If the murders had happened around 3:00 a.m. as most people have testified to, the cyclist heading West toward Nebraska could well have reached the Boondocks Café where Hurd was by 4:30 a.m.  Had the defense been provided with the police reports about Hurd and his co-workers and his failure to identify Mark six (6) days after the murders (Exhibit 97), his testimony would have been far less effective for the prosecution.  In addition, the defense would have had the names of the other people mentioned above who were right there at the time this cyclist came through whose testimony would have been different than Hurd's.  Of course, they would have had the opportunity to consider using that information at trial.

Draves' testimony would have been useful for the defense because it pushed back the time when Hurd had contact with the cyclist, whoever he was, because Hurd told Draves the contact was between 2:30 a.m. and 4:30 a.m. See Exhibit 82. This would show that Hurd' credibility as to time was shaky because it could put the cyclist at the Boondock's at 2:30 a.m., maybe a half hour before the murders occurred. The prosecution's estimates were between 3:00 a.m. and 5:00 a.m. From where Hurd was, it's a distance of 66 miles back to the murder site.

The jury was entitled to hear that other employees did not remember the cyclist even though it was testified that he supposedly spent from 15 minutes to 45 minutes inside the Boondocks (Exhibit 79 and 80; App. Vol. II, p. 231, 232). Also, as mentioned, the jury would have heard from Lynn Draves, who was the other person who was supposedly sworn at by the cyclist that evening, that he did not wait on the cyclist and did not know anything about an S.O.B. swearing incident which testimony was exactly the opposite of Hurd's. (Exh. 82, App. Vol. II, p. 234). Further, as mentioned, if the defense knew that the Boondock's cyclist was in the café for as long as 45 minutes (Hurd's high-end estimation), and he

was there as late as 5:00 a.m., it would have made it much harder to reach Aurora, Nebraska, some 321 miles west by mid-morning (about 9:45 a.m.), November 1, which is the time that Mr. Van Housen said he saw Mark in Aurora, Nebraska. Trial Transcript p. 2736. (Exhibit 100, p. 1, 5; App. Vol. II, p. 1262-65).

As mentioned, the prosecution had given these exhibits, 74-77, 83-85, and 97, to the judge for an in camera inspection. The judge discounted the Hurd information as immaterial, because he said that the defense lawyers should have known what was in the reports from the deposition they took from Hurd. Of course, as set out above, this did not include the statements of the five or six other people involved who did not remember the facts as Hurd had set them out as discussed on pages 145 through 148 of this ruling. Thus, Hurd's deposition testimony, never corrected or mentioned by the prosecutor, was highly misleading. The defense lawyers specifically asked about the S.O.B. incident and were <u>not</u> told by Hurd that the cyclist directed the comments at both Hurd and Lynn Draves. (See Exhibit 76). Had they had that information, they obviously could have checked

out Lynn Draves and would have, as mentioned above, discovered that within a few days of the alleged contact with Mark, Draves did not remember the incident at all. See Exhibit 82.

Agent Baty, who had calculated the distances, stated that Aurora, Nebraska, was 387 miles from the scene of the crime (Exhibit 100, p. 1, 5; App. Vol. II, p. 1262-65). The prosecution, in trying to refute the defendant's alibi witness, made the argument that if Van Housen had seen Jerry Mark, it was late in the morning and Mark was heading west.

The prosecution, through the trial judge, failed to disclose information that would have clearly weakened the testimony of a critical prosecution witness (Hurd). However, it is clear that the defense lawyers did not know, nor should they have known, about the contents of these police reports (Exhibit 77, 82, and 97) which would have been most helpful to them when they took Hurd's deposition before the trial. As mentioned, a most glaring example is Exhibit 97, where trial star witness Hurd could not identify Mark six days after the murders. The Court must conclude that these exhibits were wrongfully suppressed.

## 6. Rosalie McGinnis

Rosalie McGinnis testified for the State that she had seen Mark in her Conoco gas station in Stuart, Iowa, between 7:00 and 8:00 a.m. on November 1.  Stuart is 156 miles from the crime scene.  Police reports of their contact with Ms. McGinnis were contained in Exhibits 42, 86, and 101.  Exhibits 86 and 101 were not disclosed to the defense at trial.  In exhibit 86, Ms. McGinnis stated that she had had a brain tumor removed around 1965 (See P.C.R. Tr. p. 300).  Mark urges that he could have used this information on cross examination.

The State says that the report (Exhibit 86) about Ms. McGinnis stated that she had a "true photographic memory" prior to the brain surgery and afterwards she had "normal memory."  The State argues that this is not exculpatory and that a witness cannot be impeached on the ground of having a "normal memory."

The chief prosecutor, Dutton, was asked, "Why didn't you turn over Exhibit 86 to the defense?"  He responds in effect, "I didn't want Ms. McGinnis to be embarrassed."  Dutton then said, "I never told Scalise about it.  He didn't know about

it. Scalise is too smart to pick on a witness. It would have given her more credibility." (P.C.R. Tr. p. 1454, 55, 56).

This, of course, is not a decision that prosecutor Dutton can make. He cannot decide that Scalise would be better off and would not have used it anyway. Under <u>Peterson</u> (citing <u>Brady</u>), the Supreme Court of Iowa has, as has been mentioned here, several times, said that such information should be promptly given to the defense so that they can consider it and perhaps use it in preparation for the trial or at the trial.

Ms. McGinnis in discussing Mark's supposed stop at the Conoco gas station where she was an attendant said that Mark bought some milk and a cupcake type item. As shown on Exhibit 42, Ms. McGinnis did not remember whether the cyclist purchased these items with cash or with a credit card. The interviewing state officer, Kirchner, checked the records and found that during the pertinent time period, a credit card purchase for $2.26 had been made. Kirchner took down the card number (Exhibit 42, App. Vol. II, p. 200). Before the post-conviction relief hearing, the defense tracked down the credit card number to a man from St. Charles, Iowa. Clearly, that

purchase was not made by Mark. (See P.C.R. Tr. p. 347-49; App. Vol. XI, p. 1298-1300).

The P.C.R. decision on page 44 in relation to the problems with Rosalie McGinnis' testimony says, "Based on her other testimony and the testimony of other witnesses, it is unlikely that the jury would have significantly discredited her identification." Again, there is nothing in <u>Brady</u> or the cases that explain or expand it that allows exculpatory evidence to be suppressed because its unlikely the jury would buy it.

Exhibit 101 is a report by John Long, Special Agent, dated 3-12-76. It is 2 ½ pages long and contains about 1,150 words. It discusses interviews with Rosalie McGinnis and her husband, Robert, about their presence at Stuart, Iowa, when a cyclist who Rosalie later identified as Mark, came to the station sometime after 6:45 a.m. after the murders. It sets out in detail who said what and who saw what. The prosecution, of course, is trying to show Mark is within 156 miles of the murder site a few hours after the crimes. Page three of Exhibit 101 sets out that Mrs. McGinnis said Mark paid cash for what he bought. This is different than what

Exhibit 42, which was in the Mayhew file, says she said, that the cyclist made a credit card purchase. Exhibit 101-page 3, contains material evidence that should have been turned over to the defense to satisfy the <u>Brady</u>, <u>Peterson</u>, and <u>Giglio</u> cases.

This Court is aware that Exhibit 42 was in the Mayhew file, so the defense did see it on some date during the original trial. The record is not clear as to just when the Mayhew file was made available to the defense or if it was all turned over at once or was given to the defense at undated piece-meal times. The stipulation gives the Court no help in that regard. It merely says that, "as of February 3, 1995, the following exhibits were found in the Mayhew file." Exhibit 86 and 101, not in the Mayhew file, were wrongfully suppressed.

Again, the Court is not deciding who to believe. Under <u>Peterson</u> citing <u>Brady</u>, the defense should be made aware of the evidence and/or the exhibit so it can be considered and further the jury is <u>entitled</u> to hear of it as mandated by <u>Giglio</u>, 405 U.S. 150 at 155.

### 7. Summation

In summation, witness Donald Shearer's identification of Mark in Brady, Nebraska, and his statement that Larry Holmes was helping him the day he "saw" Mark and that there was a possibility that Holmes would recognize the cyclist is not deadly accurate. Holmes was interviewed later. He said, "I do not personally remember seeing anything or viewing anyone who appeared to me to be out of the ordinary." Mr. Holmes was shown a photograph (Exhibit 54) of Mark and could not identify him. Exhibit 54 and 64. Holmes' testimony was exactly the opposite of Shearer's testimony. Not turning over these exhibits is a violation of the mandate of <u>Brady</u>, as set out in this ruling.

Several inconsistencies as to what Mark was wearing are found in these suppressed exhibits. Mr. Warren, the gentlemen in Chappell, Nebraska, says Mark was wearing a one-piece snowsuit, white in color. Next, Mr. Shearer in Brady, Nebraska, identifies Mr. Mark as wearing a dark jacket. Next, Karolyn Kemp, in Atlantic, Iowa, says he is wearing a black full snowmobile suit. The next one, Barbara Smith, in Newton, Iowa, says he is wearing a motorcycle-type jacket, short and

heavy, with an opening in the sleeve and an ordinary shirt underneath. She also says his pants did not match his jacket.

The next witness (Van Hauen) in Ackley, Iowa, says he's wearing a dark-colored, waist-length coat. The next witness (Hurd) at the Boondocks says he's wearing a dark green parka jacket and dark khaki pants. The next witness in Stuart (McGinnis) says he's wearing dark, long-sleeved clothing where the top neither matched the bottom or blended in with it. Mr. Mark is on a motorcycle that at most has a little luggage carrier in the back. You cannot get that many sets of clothes into this motorcycle. To not turn over these exhibits[41] was a violation of the <u>Brady</u> rule.

As mentioned, Mr. Hurd initially failed, six (6) days after the murders, to identify Mark; saying, Mark's picture did not look familiar to him. (Exhibit 97). If these exhibits had been turned over to the defense, Hurd's testimony would be severely undermined; not to turn over these exhibits was a violation of the <u>Brady</u> rule. <u>See</u> Exhibits 77, 82, 85, and 97.

---

[41]The exhibits referred to are those set out at the end of each witnesses' section.

Rosalie McGinnis testified she had contact with Mark in Stuart, Iowa. Exhibits 42, 86, and 101 are all related to McGinnis's identification. Exhibits 86 and 101 were not turned over to the defense. Not to turn these exhibits to the defense was a violation of the <u>Brady</u> rule.

This Court is well aware that the respondent tries to minimize the helpfulness to the defense that turning the exhibits over would have made. These arguments squarely overlook the fact that the prosecution had a duty to turn them over and cannot, either through the judge or personally, decide for the defense that any one of those exhibits does not meet the "second factor" of <u>Brady</u> (favorable factor). The decision is not theirs. (See <u>Brady</u>, <u>Bagley</u>, <u>Kyles</u> and the <u>Peterson</u> cases, which they say they relied on, as discussed commencing on page 181 of this Order.

The <u>Brady</u> case and those cases which refine it since its holding was issued, clearly say that the prosecution has an affirmative duty to turn over possible <u>Brady</u> material. This Court, as mentioned above, does not know of any cases or set of circumstances, where it would be appropriate to have the prosecutor say, "Judge, we have all these papers and we wish

you would look at them and see if they should be turned over to the defendant." This is just not the way it is supposed to work. The trial judge clearly said, "I had never done this before." (P.C.R. Tr. p. 956). There is nothing in this record that would show that the prosecution team had ever used this procedure before.

As far as can be determined from the record, in the Mark trial, all of the witness reports above that Mark argues were not given to his defense team were not turned over after direct examination of the witnesses. There is not a single instance, after the direct examination of a witness where the defense team says, may I have their witness report under the Mayhew case?[42] Further, there is not a single instance in the entire record where after a prosecutor's direct examination the prosecutor says here is the report of the witness I just finished. In the P.C.R. decision, page 43, the court said, "It is significant to note that the defense did not even ask for Jenck-Mayhew (sic) rule material after the prosecution completed their direct examination." This Court is well aware

---

[42]Iowa case that holds that defense cannot get a witness's statement or report until the prosecution has completed its direct examination.

that there were 32 exhibits listed as being in the Mayhew file that was given to the defense but this was only a small part of all the exhibits mentioned in the trial transcript.

This Court can only logically presume that was because, as Sandre said, "the defense concluded that the trial judge had already reviewed all the reports and deemed them not exculpatory– and their content was in accordance with the testimony on direct there was no need to ask for them. We relied on the declarations of the prosecutors and the trial judge who assured us we had received all exculpatory evidence." (P.C.R. Tr. 1177, Sandre). Now, of course, we know from all the examples set out above that that is not true. The Mayhew case cannot be used as a way to work around Brady, Bagley, Kyles, and Peterson, which all say the prosecutor has a duty! Thus, even though the witness reports were not turned over prior to trial as Brady materials, they should have been turned over as Mayhew materials after the witnesses testified for the State if they had not been turned over earlier. Of course, the defense now contends that several of these exhibits were suppressed and not turned over to the defense.

## F. Shoeprint evidence

The next piece of <u>Brady</u> material Mark says the prosecution erroneously withheld from him is the "shoeprint evidence." Officer Robert Anton authored a report on November 21, 1975, wherein he stated the shoe size of the murderer was 12 inches. The shoes were determined to be size 11 Converse "Indy 500" tennis shoes[43]. (Trial Tr. p. 1394-97, 1494-95, App. p. 929-32, 939-40). Mr. Anton also said the prints "showed slight deformity to the outside of both heels." (Exh. 71 p. 2, App. Vol. II, p. 218). This report (Exhibit 71) was not disclosed to the defense. The report would have been helpful, because the imprints were a size 11 (as determined by the Iowa Supreme Court <u>State v. Mark</u>, 286 N.W.2d 396, 407 (Iowa 1979)), and Mark wears a 12 ½[44]. Also, Mark argues that the report implies

---

[43]At the hearing of November 19, 1999, concerning the arguments as to all issues, counsel for the petitioner pointed out that there was <u>no</u> testimony that Mark <u>ever</u> wore tennis shoes. This was not refuted by respondent's counsel (Tr. p. 89) and this Court did not find anything in the record to the contrary.

[44]It is contended by the prosecution that Mark would need a size 12 ½ in this brand and style of shoe, though the Court acknowledges that in Mark's interview with police shortly after the murders, Mark said he wears an 11 or 11 ½. (P.C.R. Appx. Vol. V, p. 545)

that the murderer was wearing old shoes with a "worn heel" deformity– but Mark states he never owned shoes that matched the imprint design, so the assumption was that he had purchased them shortly before the murders. Mark states that it is inconsistent that recently purchased shoes would also have a worn deformity in each shoe. However, this argument missed the thrust of the testimony and was in error. It was later explained that it was the gait of the person walking, not a worn shoe heel deformity, that made the mark.

The P.C.R. court held that there was no <u>Brady</u> violation because the testimony of Dr. Gronen showed that the defense was aware of the shoe information contained in the undisclosed report. The State points out, and the P.C.R. and Iowa Courts agreed, as mentioned, that the "worn heel" deformity was not in the shoe but in the print itself– meaning how the walker left the prints. In fact, it is described as a "hard heel strike" characteristic. The gait of the walker, the movement of his legs at impact with the ground, caused the indentations. Dr. Gronen makes a conclusion as to "gait" as set out on page 175 of this Order. This heel strike information was the subject of testimony at trial and in other

exhibits. (Trial Tr. p. 1538, App. 943, Exh. 154-57, Exh. G, App. p. 218).

Next, the State argues that exhibits 71 and 72 were cumulative. Exhibit 71 supported the State's case because it showed that the prints from the crime scene had similar gait characteristics as Mark. Exhibits 29 and 31 were lists of the number of sizes and brands of shoes that could have made the prints, but those exhibits "did not tend to show that anyone other than Mark made the prints."

The petitioner has shown that at least three "shoe" exhibits were not turned over to him (Exhibits 29, 31, 71) (Exhibit 72 was in the <u>Mayhew</u> file). Petitioner states that he was not made aware of these exhibits until the post conviction hearing, some twenty-one (21) years later. The Court of Appeals for the State of Iowa, in their ruling in relation to Mark's petition for post conviction relief, talked about shoe print evidence as follows:

> Mark claims the State withheld police reports indicating the prints found at the crime scene "showed slight deformity to outside rear edge of both heels." He also asserts the State failed to disclose a report indicating a pair of shoes fitting Mark properly had a sole one-half inch longer than the crime scene prints. The

record indicates the matter of the shoe print "deformity" as well as the shoe with the longer sole were known and addressed at trial.[45] This evidence was therefore not suppressed.

Mark contends other reports were suppressed that indicated several models of tennis shoes could have matched the crime scene prints. We note that these reports did not demonstrate Mark was incapable of making the prints, rather only establish several sizes and brands of shoes could have made the prints. Accordingly, the information would not have had an impact on the trial, especially in light of the other characteristics of the prints that tend to identify Mark as the person who made them.

Mark v. State, 568 N.W. 2d 820, 826 (Iowa Ct. App. 1997).

The Iowa Court is stretching their own Peterson case in concluding that even if the defendant had seen this shoe evidence, it would have no impact on the trial. Peterson does not allow that assumption. It is not the impact of a single

---

[45]This is another Peterson (citing Brady) error. A court and/or a prosecutor cannot suppress pertinent evidence and then rule that suppression is appropriate because it all came out at the trial. The rule is that it must be timely turned over so that it may be considered in the preparation for the trial and use at the trial. State v. Peterson, 219 N.W.2d, 674 (Iowa 1974).

exhibit, but the cumulative effect of all of the suppressed exhibits. Kyles v. Whitley, 514 U.S. 419, 437 (1995).[46]

The petitioner in his amended and substituted brief discusses the contention that exculpatory evidence of contradicting foot wear impression testimony was improperly withheld (Pet. Br. p. 42). The petitioner shows that the Supreme Court of Iowa in Mark, 286 N.W.2d at 407, stated as follows:

> The shoe prints were of a tennis shoe type print bearing a lateral pattern of zig-zag (alternating U type treads) measuring 9 treads to the inch with overall shoe length of 12 inches. (Exhibit 71; App. Vol. II, p. 218).

Detective Witt was given the job to determine the type and size of shoe which would produce the tread pattern observed by Office Anton. Witt contended that he found a BF Goodrich

---

[46]This Court is aware that the Supreme Court of Iowa in the State v. Mark case, 286 N.W.2d 396, 412 (Iowa 1979) discusses Peterson and states:

> Statements in Peterson concerning the probative value of such evidence are clearly dicta which we confine to the circumstances of that case and which have no application in the present case (Mark).

This comment in the Mark case, in this Court's opinion, does not include the very forceful and clear words as to the duties of the prosecution under Brady. Peterson, 219 N.W.2d at 674.

brand size 11 low-cut tennis shoe that was a perfect match for pictures of the prints that they had, Exhibit 31, App. Vol. II, p. 194. These kinds of shoes were sold and in stock at a Waterloo shoe store. (App. Vol. II, p. 192). Detective Witt revealed that a Converse "Net Star" tennis shoe, model 1-9523 in size 10 ½ would be a perfect match to the shoe prints. He also found that Converse shoes, models 1-9742 and 1-9747 also had identical tread patters providing a variety of shoe models and sizes which would match the crime scene prints. (Exhibit 31, App. Vol. II, p. 194).

The prosecution tried the BF Goodrich shoes (see Exhibit 31) on Jerry Mark under Court order and Mark said, with credence, that they were obviously too tight for walking. After that, they got another pair of tennis shoes, size 11 ½, which were obtained for the second search warrant as to Jerry Mark's feet and those fit better. The length of the shoe that fit Jerry Mark was 12 ½ inches for the left shoe (Exhibit 72, App. Vol. II, p. 223). That is a half an inch longer than the critical crime scene shoe impression. (Respondent's Exhibit Group "G" and Exhibit 29). Mark argues to the Court that none of the exhibits, just mentioned above (Exhibit 29, 31, 71, and

group "G"), were ever provided to the defense. However, this Court is aware that the parties to this action did stipulate that Exhibit 72 was actually in the Mayhew file and was therefore reviewable by the defense.

The respondent says that the contention of the petitioner that the shoes were too tight for walking was not an appropriate argument; acknowledging the fact that the right shoe was slightly short, "but did not make any particular difference." The respondent in his discussion of shoe print evidence says that Exhibits 29 and 31, (App. p. 192-94), were perhaps accurate but were not crucial to the problems involved. The P.C.R. court found no Brady violations because the testimony of Dr. Gronen, a podiatrist, during the trial, included the same shoe information as was set out in the non-disclosed reports (Exhibit 29, 31, and 71), and that this testimony made the defense aware of the above. (P.C.R. ruling at 46; P.C.R. App. 103). The Iowa State Appellate Court agreed in State v. Mark, 568 N.W.2d 820, 826 (Iowa Ct. App. 1997). Again, discussing a fact during a trial does not excuse the prosecution from complying with Brady. That is not the way Brady works. Their own Peterson case says "turn it

over" so it can be considered before and during trial. The State Appellate Court further held that this additional information would not have had an impact on the trial. <u>Id</u>. at 826.

The respondent agrees that Exhibits 31 and 71 were not turned over to the defense by the trial judge. There is no explanation for that except to say that it was merely a list of shoes that had similar treads. Of course, it would have been appropriate for the jury to know this information, i.e., that there were many such shoes out there. The respondent argues that the subject matter of Pet. Exh. 71 and 72 were known and discussed at the trial and were not suppressed and that Exh. 72 was cumulative of Exh. 71. Exhibit 71 contains a detailed discussion of all phases of the footprints' testimony. It covers 434 words. It is true that some of the same things that are mentioned in Exhibit 72 are in Exhibit 71, but Exhibit 71 discusses other "favorable evidence" in the discussion of footwear. For example, it sets out on page 2 that they, "found nothing identifiable in the way of footprints inside the house; found nothing identifiable following the probable route of the murderer" and that no

shoeprints inside the house matched those outside. Very important evidence.

As mentioned above, the Court of Appeals in its ruling, Mark, 568 N.W.2d at 820, concludes that the matter of the shoe print "deformity" (as one shoe had a longer sole than the other) was known and addressed at the trial. This is certainly true. However, the fact that defense counsel heard testimony at trial from two podiatrists about the matter of the shoe prints certainly does not satisfy the affirmative duty of the prosecution to set out, **prior** to trial, matters which have Brady-Peterson implications. That conclusion that these matters were known and addressed at the trial gives Mark no opportunity to consider the many facts set out in 435 words in Exhibit 71, and any strategic value that the exhibit may have had if obtained prior to trial. See Peterson, 219 N.W.2d 665, 674 (Iowa 1974).

This Court is not aware of any variation of Brady or Bagley or Kyles that allows a prosecutor who has two "similar exhibits" to only turn one over to the petitioner because he concludes, ahead of trial, that one is cumulative to the

other; especially when, as set out above, they were at very best, only partially cumulative.

The respondent, in discussing the second <u>Brady</u> factor, agrees that Exhibits 31 and 72 had some exculpatory value and then argues that exhibit 31 was consistent with the evidence that shows the footprints at the crime scene were made by someone whose gait characteristics were the same as the petitioner's gait characteristics. Again, this Court knows of no exceptions made by the <u>Brady</u> or <u>Bagley</u> or <u>Kyles</u> court to not turn over an exculpatory document because the prosecution was going to explain it later during the testimony of podiatrist experts during the trial. Remember, they were "relying on <u>Peterson</u>" which clearly says, "it must be turned over so the defense "can investigate and to use it both in trial preparation and in the trial itself." <u>Peterson</u>, 219 N.W.2d 665, 674 (Iowa 1974).

The respondent, in what it calls a third <u>Brady</u> factor, concludes that there is no reasonable probability that disclosure of these three exhibits (Exhibits 29, 31, and 71) would have affected the verdict. He contends again that the exhibits did not tend to show that no one other than the

petitioner had made those prints and concludes that petitioner fails to deal with the important fact that he "could have" worn shoes which were capable of producing the prints at the scene. The fact that a podiatrist testified that Mark was capable of producing the prints at the scene certainly does not excuse having the trial judge rule, before trial, without any input from the defense, that these exhibits do not need to be turned over.

Dr. Gronen, one podiatrist speaking for himself and his partner, testified: "We have not had extensive training in analyzing shoe prints." (Tr. p. 1530). While counsel for the respondent says that there were identical footprints made by Mark in the tests that they had, Dr. Gronen said they were "similar," not identical. (Tr. p. 1557). He further said, "I have no experience in determining or analyzing shoe prints." (Tr. p. 1561). The doctor testified that he cannot tell the height, weight, or sex of a person by their shoeprints. (Tr. p. 1563). He further testified that he had no training along that line; and that this was the first time he had ever been in Court as a witness. (Tr. p. 1563). He further stated at trial that if he was a shoe salesman, he would not have fit

Mark with Exhibit 87 (the supposed shoe that fit perfectly to the shoe print in the machine shed) Exhibit 31, "in terms" of the left foot. <u>The expert said he would have sold Mark a different pair, a larger size shoe</u>. (Tr. p. 1565-6). (Emphasis added). (As mentioned, Exhibit 87 was the same shoes that the prosecution, at trial, claimed made footprints identical to the ones that the murderer would make, and had identical tread as the shoe print found outside the shed at the Mark farm). This statement by Dr. Gronen, however, torpedoes the claim that Mark would have made identical prints if he was wearing shoes that fit properly. Dr. Gronen also admitted on cross-examination that he had told the county attorney; before trial, that the hospital at Iowa City had good equipment that could make more accurate tests of the shoe prints than he and his partner could make. (Tr. p. 1567). The prosecution apparently declined to use the more expert facilities at that hospital.

Dr. Gronen did conclude as follows: "The gait I saw him walk with in my office had the same characteristics of the picture that I saw, Respondent's Exhibit Group "G" and Exhibit

29, at the machine shed at the Mark farm.  However, I cannot say that that shoe print was made by Mark." (Tr. p. 1571).

This Court has set out the comments of the doctor to show that Exhibits 29, 31, and 71 all would have, if they had been turned over to the petitioner, given the petitioner a better opportunity to more effectively cross-examine the doctor all as intended by the Brady case.

Exhibit 71, page 1, as mentioned, includes a long discussion by Officer Anton in relation to footprints.  He went through the entire house and found nothing identifiable. There is no evidence of the footprints, that the State says are damaging evidence, inside of the house.

In Exhibit 31, which was not turned over to the petitioner, there is a 300 word discussion of various types of shoes that had a similar tread pattern to those that they found out at the Mark farm.  It shows that they discussed the tread and the sizes of shoes with a sporting good store shoe salesman.  This report has pertinent information which discloses that there were several models in the Converse line of tennis shoes that have the same tread panel.  This is all

information that would have been helpful to Mark at trial to show that you could buy these shoes in many places.

The opinion of the Iowa Court of Appeals states, "We note that these reports did not demonstrate Mark was incapable of making the prints, rather only establish several sizes and brands of shoes could have made the prints." Mark, 568 N.W.2d at 826. Again, the Peterson (citing Brady) case, which the trial judge and the prosecutor say they were relying on, contains no caveat that would allow the Iowa Court of Appeals to conclude, "don't turn it over," because it doesn't demonstrate Mark was incapable of making the prints. The Iowa Appeals Court goes on to say, "Accordingly, the information would not have had an impact on the trial, especially in light of the other characteristics of the prints that tend to identify Mark as the person who made them." Id. Think about that. It is true that this particular violation of Brady would not be of such a great importance as to automatically cause any reviewing court to sustain the writ for the petitioner. However, it is another piece of suppressed evidence to be considered, cumulatively, under Kyles as discussed on pages 182 to 187 of this ruling. The Court must

conclude that Exhibits 29, 31, and 71 were wrongfully suppressed.

## G. Bullet evidence

Next, Mark argues that the prosecution knew but withheld information that Winchester Western .38 caliber long colt bullets, like the ones used to murder the Mark family, were available for sale in northeast Iowa.[47] Instead, the prosecution put on evidence that gave the impression that such bullets were not available at all in the vicinity of the murders. (See P.C.R. Exh. 28). The chief prosecutor started his closing argument saying, ". . .I would not mislead you in any way. . ." Tr. 3047. Then he talks about the Winchester Western bullets and emphasizes that "Not one shell was sent to the State of Iowa[48]." Tr. 3072. Mark urges that the discovery

_____

[47]At the trial, there was no evidence presented to contradict the fact found by the jury (see page 10 of this ruling) that Mark had purchased a box of the same bullets that killed the victims in this case.

[48]The Court is aware that Olsen's Boat Yard assistant manager thought the box of 37 Winchester Western .38 long colt bullets was taken as a trade-in on another purchase, as there was no record of Olsen's having ordered or received this ammunition. (Exh. 22 p. 3) While there is a possibility that it is technically true, that the manufacturer did not ("send") distribute any boxes of this ammunition to Iowa, there is no

(continued...)

of just one box in Iowa would be significant, as the prosecution made an impassioned effort to persuade the jury that no such bullets were "sent" to northeast Iowa. Trial Tr. p. 3072. As set out below that telling argument was not deadly accurate.

At trial, the State argued that: the bullets found in the residence and across the road matched, were quite unusual, and were not readily available in Iowa. Exhibit 22 noted that a partially full box of Winchester Western .38 long colt ammunition was found at Olsen's Boathouse in Waterloo within a week of the crime– Mark argues that this report was not disclosed to the defense[49]. The defense was made aware of the existence of this box of bullets. Mark argues that this same Exhibit 22 seems to indicate that there were other boxes of similar ammunition for sale in other parts of Iowa, including

---

[48](...continued)
doubt that the prosecutor misled the jury. The prosecutor knew that some of this ammunition <u>was</u> found in Iowa. Thus, all the jury knew was that Mark bought the same type of bullets in California, and "not one shell was <u>sent</u> to Iowa." Trial Tr. p. 3072.

[49]However, there is a note about this box in the defense's pre-trial discovery notes, and Mr. Sandre also testified at the P.C.R. hearing that he did see a partial box of bullets. (P.C.R. Tr. p. 1075)

Chuck's Sport Shop in Williamsburg, Iowa[50]. Exhibit 28, not disclosed to the defense, shows that on November 4, 1975, the prosecution learned that a resident of Waverly, Iowa had purchased a box of .38 caliber Colt long bullets from Olsen's Boat House in Cedar Falls. (Exh. 28, App. Vol. II, p. 191). In cross-checking this exhibit with exhibit 22, however, it becomes clear that this box of ammunition was another brand.

The State says that the defense knew of the partial box of bullets from Olsen's Boat House long before trial, and that this information was not helpful to the defense because 13 bullets were missing from the box, but 14 had been used at the crime scene and two had been "lost" at the scene. (P.C.R. 101-102, P.C.R. 1161-64, App. 1345-48). Mark's trial attorney, Mr. Sandre, at the P.C.R. hearing, testified that he had examined a box of bullets, he just did not know if it was the one found at Olsen's. (P.C.R. Tr. p. 1076-80, App. 1332-36). Mr. Sandre did question Agent Lang about this partial box

---

[50]Exhibit 22 is a lengthy report about all licensed gun dealers and shops in Iowa that were checked by the police, to see if they sold Winchester Western .38 long colt ammunition during the relevant time period. The only place that sold Winchester Western .38 long colt ammunition was Olsen's Boat House- all the others had sold Remington .38 long colt ammunition.

while taking his pre-trial deposition on April 19, 1976. (P.C.R. Tr. p. 1162-63) The other boxes of bullets that had been mentioned in exhibit 22 were Remington, not the Winchester Western brand that Mark bought in California which was the same brand used to kill the family. Thus, the fact that the other bullets were not the same brand, except for the box with only 13 bullets missing, was not relevant. The State contends that none of this was exculpatory.

The Court is persuaded that the ammunition evidence, as to the Winchester Western bullets, was not wrongfully suppressed. The rest of the evidence, about Remington bullets, was suppressed. However, that suppressed evidence was not favorable to the defense, because it was a different brand than was used to kill the family. This evidence was not material to Mark's guilt. This Court did not include the bullet evidence as a plus in its "cumulative" assessment of all the Brady violations in granting this Writ of Habeas Corpus.

**VIII. HOW THE IOWA COURT OF APPEALS SHOULD HAVE CONSIDERED THE LAW AS TO BRADY REQUIREMENTS AND THE DUTIES OF THE PROSECUTION**

In 1995, the United States Supreme Court clarified several issues in <u>Brady</u> and <u>Bagley</u> and brought <u>Brady</u> law "up to date" by its opinion in <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).[51] Mark's Iowa Court of Appeals denial of habeas relief happened April 30, 1997, some twenty-four (24) months after the <u>Kyles</u> ruling which then was new, up to date <u>Brady</u> law. <u>Kyles</u> (citing <u>Bagley</u>) mandated that all reviewing courts [including the Iowa Court of Appeals] must determine whether the cumulative effect of all such evidence suppressed by the government resulted in a situation where favorable evidence could put the whole case in such a different light as to undermine confidence in the verdict. <u>Kyles</u>, 514 U.S. at 437. (Emphasis added). The Iowa Court of Appeals as the reviewing court, of course, must also "consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case[;]" plus the abandonment of lines of

---

[51]In respondent's brief in response to petitioner's amended and substituted pro se brief at page 7, the respondent argued that <u>Kyles</u> was handed down a few months <u>after</u> Mark's P.C.R. trial court ruling. The fact is that the Iowa Court of Appeals' ruling affirmed the trial court ruling on April 30, 1997, some twenty-four (24) months after the <u>Kyles</u> decision of April 19, 1995.

independent investigation, defenses or trial strategies that the defense might otherwise have pursued (had they known) should be considered in view of the prosecution's incomplete or misleading disclosures.  Bagley, 473 U.S. at 683.

Of the many issues decided by the Kyles court, some apply directly to the Mark case.  This Court is persuaded that some of these portions of the Kyles opinion must be included here to make it clear what the Iowa Court of Appeals, after the date of the Kyles opinion, April 19, 1995, must consider as up-to-date federal law.

> On the habeas review, we follow the established rule that the state's obligation under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government, and we hold that the prosecutor remains responsible for gauging that effect regardless of any failure by the police to bring favorable evidence to the prosecutor's attention.

Kyles, 514 U.S. at 437.

> Because the State withheld evidence, its case was much stronger, and the defense case much weaker, than the full facts would have suggested.

Id. at 429.

In the third prominent case on the way to
current Brady law, United States v. Bagley,
473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d
481 (1985), the Court disavowed any
difference between exculpatory and
impeachment evidence for Brady purposes[.]

Id. at 433.

One does not show a Brady violation by
demonstrating that some of the inculpatory
evidence should have been excluded, but by
showing that the favorable evidence could
reasonably be taken to put the whole case
in such a different light as to undermine
confidence in the verdict.

Id. at 435.

"The prosecutor in a criminal case shall. .
. make timely disclosure to the defense of
all evidence or information known to the
prosecutor that tends to negate the guilt
of the accused or mitigates the offense."

Id. at 437 (quoting ABA MODEL RULE OF PROFESSIONAL CONDUCT 3.8(d)
(1984)).

We evaluate the tendency and force of the
undisclosed evidence item by item; there is
no other way.  We evaluate its cumulative
effect for purposes of materiality
separately. . .

Kyles, 514 U.S. at 437 n. 10.

[T]he prosecution, which alone can know
what is undisclosed, must be assigned the
consequent responsibility to gauge the
likely net effect of all such evidence and
make disclosure when the point of
"reasonable probability" is reached.  This

184

> in turn means that the individual
> prosecutor has a duty to learn of any
> favorable evidence known to the others
> acting on the government's behalf in the
> case, including the police. But whether
> the prosecutor succeeds or fails in meeting
> this obligation (whether, that is, a
> failure to disclose is in good faith or bad
> faith, see Brady, 373 U.S. at 87, 83 S. Ct.
> at 1196-1197), the prosecution's
> responsibility for failing to disclose
> known, favorable evidence rising to a
> material level of importance is
> inescapable.

Id. at 437-38 (Emphasis added).

> The result reached by the Fifth Circuit
> majority [In the Kyles case] is compatible
> with a series of independent materiality
> evaluations, rather than the cumulative
> evaluation required by Bagley. . .

Id. at 441.

In Mark v. State, 568 N.W.2d 820 (Iowa Ct. App. 1997),

from page 823 through 827, the Iowa Court of Appeals does

analyze the Brady situation item by item but does not then

continue on to evaluate the cumulative effect which, as set

out above, is the acceptable way to fully consider the

situation.

In 11 different sections of its ruling, the Iowa Court of

Appeals states a conclusion:

185

> Mark has not shown a reasonable probability
> that the outcome of the trial would have
> been different had any of these reports[52]
> been disclosed.

<u>Id</u>. at 824.

This is while discussing the cigarette butt evidence.

The same or a very similar statement was made as set out on page 824, relating to: witness Warren; witness Shearer, page 825; witnesses Kemp and Stinson, page 825; witness Barbara Smith, page 825; witness McGinnis, page 826; the tennis shoes, page 826; the Olson Boathouse bullets, page 826; the bullets at the crime scene, page 827; the testing bullets, page 827; and the further testing of Olson Boathouse bullets, page 827.

A reading of the Iowa Court of Appeals' <u>Mark</u> opinion as discussed above, clearly shows a series of independent materiality evaluations of "suppressed" evidence rather than the cumulative evaluation required by <u>Bagley</u>. <u>See</u> <u>Kyles</u>, 514 U.S. at 437, 441. Here, the prosecutor gave much of the evidence to the trial judge to review, in three separate "batches", thus eliminating any review of the effect the

---

[52]On page 1 of the P.C.R. judge's ruling, he makes the exact same statement.

information may have had when considered cumulatively. <u>Kyles</u>, 514 U.S. at 421, 441. Therefore, as the U.S. Supreme Court found in <u>Kyles</u>, this Court finds that the Iowa Court of Appeals evaluated the significance of the undisclosed evidence in Mark under the wrong standard. <u>See</u> <u>Id</u>.

In the Iowa Appeals Court opinion, the requirement to evaluate the cumulative effect of all of the suppressed evidence was not even addressed by that Court. This is an obvious error violating <u>Brady</u>, <u>Bagley</u>, and <u>Kyles</u>, and <u>Liggins</u>.

As mentioned, in June of 1974, the Supreme Court of Iowa issued its opinion in <u>State v. Peterson</u>, 219 N.W.2d 665 (Iowa 1974) (citing <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)), setting out in precise detail exactly who had the duty and just how the Iowa courts were to handle <u>Brady</u> matters. The reader is referred to page 23 of this order where this Court sets out a precise portion of the Iowa Supreme Court decision in <u>Peterson</u>.

The prosecution, at the original trial, and the trial court failed to comply with the Iowa Supreme Court's <u>Peterson</u> mandate found five (5) years earlier in the following particulars:

1.   The prosecution did not exercise its responsibility not to suppress important evidence.

2.   The prosecution and the trial judge concluded that rebutting evidence in the nature of an alibi and a claim of hearsay made the evidence non-exculpatory.  The Iowa Supreme Court in <u>Peterson</u> had clearly concluded these arguments were not to be followed.  (<u>See</u>, <u>Peterson</u>, 219 N.W.2d at 674).

3.   The prosecution did not give the defense the exculpatory evidence which they were entitled to in order to investigate it and to use it both in trial preparation and at the trial itself.

4.   The failure to provide the exculpatory evidence requires a new trial and to deny one is reversible error. <u>Peterson</u>, 219 N.W.2d at 674.

The P.C.R. judge's "corrected" decision dated February 28, 1995, attempts to, without success in this Court's opinion, distinguish the "heavily relied" on <u>Peterson</u> case by concluding it was "an entirely different situation."  That court concludes, "There was no holding that the undisclosed evidence would have constituted potential alibi evidence for

the defendant as is claimed in this (Mark) case." (P.C.R. Ruling, February 28, 1995, p. 19).

This reviewing Court concludes that the "facts" are not identical but the very clear mandates as to how exculpatory evidence should be handled as set out in <u>Peterson</u> at page 674 which was the law of Iowa as to exculpatory evidence when the P.C.R. judge and the Court of Appeals decided the P.C.R. case. The facts in <u>Peterson</u> are set out in this Order on page 22.

This Court has repeatedly referred to the <u>Peterson</u> case because its decisions as to procedure, in Iowa, as to <u>Brady</u> matters are sound. It was a new Iowa case that the trial judge and the prosecution were well aware of. The mandates of <u>Peterson</u> relying on <u>Brady</u> were all but ignored in this <u>Mark</u> case. (P.C.R. Trial Tr. p. 947-48 and 1376).

If by some ruling it is determined that somehow <u>Peterson</u> is not controlling as to the duties of the prosecution and the court in such matters, it would not change this Court's ruling since what <u>Peterson</u> says is precisely what the controlling <u>Brady</u> and it progeny have clearly established as Federal law as determined by the Supreme Court of the United States. This Court is persuaded that neither the trial judge nor the

prosecution carried out the mandates of <u>Brady</u>, <u>Bagley</u>, and <u>Kyles</u> as set out in <u>Liggins v. Burger</u>, 422 F.3d 642 (8th Cir. 2005).[53] As mentioned, they also did not follow the mandate of <u>Peterson</u>.

**A. The Iowa Supreme Court Made Adjudications Of Claims Which Resulted In A Decision That Was Contrary To And Involved An Unreasonable Application Of Clearly Established Federal Law As Determined By The Supreme Court Of The United States**

This Court is aware that the Supreme Court of Iowa in its opinion in <u>State v. Mark</u>, 286 N.W.2d 396, 402, 403 (1979), discusses the fact that the defendant did not give them the opportunity to determine whether exculpatory evidence was suppressed and they concluded that Mark had waived any error relevant to his amended motion to produce, concluding: "We have nothing further to review in this assignment."[54]

---

[53]<u>Liggins</u>, of course, was decided by the Eighth Circuit Court of Appeal in 2005, as an updated review of the application of <u>Brady</u> matters. This Court is not attempting to hold the P.C.R. judge or the prosecution to the conclusions of <u>Liggins</u>, but the case contains clear background of the evolvement of <u>Brady</u> law as heretofore set out, in pages 18 through 20 in this Order.

[54]This sentence must be interpreted to show that the Iowa Supreme Court was making it clear that up until the date of that ruling, the defense had not given them enough of a record to allow them to decide discovery and suppression of exculpatory issues that arouse at the trial. This Court has
(continued...)

In discussing the trial judge's in camera procedure, the Iowa Supreme Court stated as follows:

> When a discovery demand is made, which is resisted by the State, we have indicated it is proper procedure for the trial court to conduct an in camera inspection of the materials sought. <u>State v. Deanda</u>, 218 N.W.2d 649, 651 (Iowa 1974). Defendant made no objection to this procedure.

The Iowa Supreme Court in the next paragraph did not find that this was a waiver as urged by the state, but decided that since the defense had not made the agent's notes a part of the record on appeal, that the Iowa Supreme Court, as mentioned above, had no way to rule on what they had not seen. A review of the <u>Deanda</u> case reveals that it had to do with an attempt by the Iowa Supreme Court to provide the defense during that trial with a "Jencks Act" right to see reports after the direct testimony of a state witness. The <u>Deanda</u> court ruled that the defense ought to see all exhibits that were germane to the trial. There is nothing in <u>Deanda</u> that allows the <u>Mark</u>

---

no problem with that, but would make it clear that that situation does not bar this Court from fully considering the wrongful suppression of the twenty-four (24) exhibits now before this Court which suppression was unknown to the defense at the time the Iowa Supreme Court issued their opinion.

trial judge to use the procedure he used and there is nothing in <u>Deanda</u> that would cancel the prosecution's "inescapable duty to provide exculpatory evidence." <u>Kyles</u>, 514 U.S. at 437-38.

As it sets out in the last sentence of the above quote, "Defendant made no objection to this procedure." It is true that defense did not object because they thought that the procedure was giving them all exculpatory documents and all the other evidence they were entitled to get was in the <u>Mayhew</u> file. That is why there is not a single instance during the entire trial where the record shows they asked for a statement or report at the close of direct examination of a witness. See a discussion of this situation on page 35 of this ruling.

Error in the suppression of exculpatory evidence arises in a situation where, after trial, it becomes obvious that evidence known to the prosecution during the trial has now been uncovered. That is the situation in this <u>Mark</u> case. There was no way that the <u>Mark</u> defendant in his appeal could tell the Iowa Supreme Court about the ten (10) exhibits that the prosecution had failed to give to the judge or the

fourteen (14) exhibits that the judge had never let them see.

**B.  Prosecutor's Duties**

The quote from <u>Kyles</u> from pages 437-38, set out on pages 182-187 of this ruling, in relation to the responsibilities and duties of the prosecution was not complied with by the prosecution here.  The prosecution alone has the duty of gauging the likely net effect of all such evidence and must make disclosures when the point of reasonable probability is reached which it was here as set out above.  The prosecution in <u>Mark</u> had the duty to learn of <u>any</u> evidence favorable to the defendant.  This Court is persuaded that said prosecution did so learn of and failed to disclose material evidence to the defense, whether it was done in good faith or bad faith is immaterial.  The prosecutor's responsibility for failing to disclose favorable evidence that rises to a material level of importance is <u>inescapable</u>.  <u>Kyles</u>, 514 U.S. at 437-38 (Emphasis added).

**1.  Result of the failure of the prosecution to follow their duty**

Here, a review of the suppressed reports and statements and the exhibits regarding many of the witnesses, reveals that

their disclosure would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense. <u>Kyles</u>, 514 U.S. at 503.

This Court has considered the record as a whole and concluded that the Iowa Supreme Court and the Iowa Court of Appellate Court's factual and legal determinations are not fairly supported by the record.

As set out in <u>Sumner v. Mata</u>, "a writ issued at behest of a petition under 28 U.S.C. § 2255 is in effect overturning either the factual or legal conclusions reached by the state court system under the judgment of which the petitioner stands convicted, and friction is a likely result." <u>Sumner v. Mata</u>, 449 U.S. 539, 550, 101 S. Ct. 764, 770 (1981).

This Court's overturning involves legal conclusions as to exculpatory evidence as governed by <u>Brady</u> and its progeny. The petitioner has also shown that the state court system made factual conclusions that were erroneous because the Iowa Supreme Court did not see twenty-four (24) exhibits they should have seen. Ten (10) of those exhibits were not seen in direct violation of a court order. The Iowa Court of Appeals

did not follow well-established legal precedents all as set out herein.

As to the factual errors, the petitioner has shown by clear and convincing evidence that the burden of rebutting the presumption of correctness has been met.  <u>See</u> Title 28 U.S.C. § 2254(e)(1).  However, this Court is persuaded that the writ here should properly issue even if this Court did not include the factual errors as a cause.

The ruling in <u>Sumner v. Mata</u> was entered in 1981 and its effect certainly has been altered to a degree by the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 which it has been agreed is the law this case is being reviewed under.  However, <u>Sumner v. Mata</u> is still regularly cited by appellate courts.  This Court was persuaded that it should be considered here and it has been so considered.

The Iowa Supreme Court in <u>State v. Mark</u>, 286 N.W.2d 386 (Iowa 1979), never got to see ten (10) important exhibits that the prosecution never showed to the trial judge and the fourteen (14) other important exhibits the trial judge never let the defense see.  (See list, page iii et seq. of this Order).  Their decision did not include consideration of what

195

the full record should have been had these exhibits not been suppressed.

The Iowa Court of Appeals' findings, <u>Mark v. Iowa</u>, 568 N.W.2d 820 (Iowa Ct. App. 1997), while affirming the P.C.R. judge, are not fairly supported by the record for all the reasons set out herein. The Iowa Court of Appeals' ruling, affirming the decision of the P.C.R. court, was unreasonable when it determined that the prosecution and the court did not commit any <u>Brady</u> violations.

As set out in quotes from <u>Kyles</u> on pages 182-187 of this ruling, this Court has followed the established rule that the state obligation, under <u>Brady</u>, turns on the cumulative effect of all such evidence suppressed by the Government and this Court must hold the prosecution responsible. <u>Kyles</u>, 514 U.S. at 437, 441.

## IX. WHERE DOES ALL THIS LEAVE US?

The Supreme Court of the United States, over the years, has used some closely related, but sometimes different words in setting out what the rule is in order to entitle a petitioner to a writ of habeas corpus.

In a recent case of <u>United States v. Vieth</u>, 397 F.3d 615 (8th Cir. 2005), involving the Northern District of Iowa, the Eighth Circuit Court of Appeals stated as follows:

> Violations under <u>Brady</u> are cause for reversal "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." [Citations omitted]. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome" of the trial.

<u>Id</u>. at 619.

A short review of some of the Supreme Court cases is in order. In <u>United States v. Bagely</u>, 473 U.S. 667 (1985), the court said:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

<u>U.S. v. Bagley</u>, 473 U.S. 667, 682 (1985).

In <u>Schlup v. Delo</u>, 513 U.S. 298, 328 (F.N. 46), 115 S. Ct. 851, 868-69, 130 L. Ed. 2d 808 (1995), the Supreme Court said:

> The reviewing court must objectively evaluate all the evidence. . . and the evidence tenably claimed to have been wrongfully excluded and determine how the

absence of the evidence might have affected
        the outcome of the case.

Id. at 328 F.N. 46.

    In United States v. Agurs, 427 U.S. 97, 104, 96 S. Ct.

2392, 2398, 49 L. Ed. 2d 342 (1976), the Court said:

        A fair analysis of the holding in Brady
        indicates that implicit in the requirement
        of materiality is a concern that the
        suppressed evidence might have affected the
        outcome of the trial.

Id. at 105. (emphasis added).

    In Agurs the court further said:

        On the one hand, the fact that such
        evidence was available to the prosecutor
        and not submitted to the defense places it
        in a different category than if it had
        simply been discovered from a neutral
        source after trial. For that reason, the
        defendant should not have to satisfy the
        severe burden of demonstrating that newly
        discovered evidence probably would have
        resulted in acquittal. If the standard
        applied to the usual motion for a new trial
        based on newly discovered evidence, were
        the same when the evidence was in the
        state's possession as when it was found in
        a neutral source, there would be no special
        significance that a prosecutor's obligation
        to serve the cause of justice.

Id. at 111.

    In Kyles v. Whitley, the Supreme Court said:

> A defendant need not demonstrate that after
> discounting the inculpatory evidence in
> light of the undisclosed evidence, there
> would not have been enough left to convict.
> The possibility of an acquittal on a
> criminal charge does not imply an
> insufficient evidentiary basis to convict.
> One does not show a <u>Brady</u> violation by
> demonstrating that some of the inculpatory
> evidence should have been excluded but by
> showing that the favorable evidence could
> reasonably be taken to put the whole case
> in such a different light as to undermine
> confidence in the verdict.

<u>Kyles</u>, 514 U.S. 419, 434-35, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

For all of the reasons set out herein, this Court is persuaded that there is a reasonable probability sufficient to undermine confidence in the outcome of the <u>Mark</u> trial. As you can see from the above, the key words involve "the result of the proceeding would have been different." They also involve the words, "does not have to result in defendant's acquittal." Whether the key words are "the result would have been different" and/or "does not require an acquittal" it gets down to saying almost the same thing.

This Court is therefore persuaded that if the necessary words are that "the result would have been different" this Court is so persuaded and finds that this petitioner did not

receive a fair trial which this Court understands is a trial resulting in a verdict not worthy of confidence, where the result of the trial would have been different if the prosecution had not hid from the judge ten (10) material exhibits involving twenty-one (21) pages and the trial court had not ruled that fourteen (14) more material exhibits involving thirty-two (32) pages should not be given to the defense.

The cumulative effect of all the <u>Brady</u> evidence discussed above, which this Court is persuaded was material and favorable, wrongfully deprived the defendant of a fair trial and requires this Court to grant the writ for habeas corpus.

**A. Standard for Proving Suggestive Photo**

This Court will now discuss the second issue of Mark's petition for a writ of habeas corpus.

There are several out-of-court identifications that Mark argues violated his due process rights in that the investigators used an "unduly and impermissibly suggestive identification procedure" to obtain the identifications.

Specifically, the investigators used a single photo of Mark[55], rather than a "photo pack[56]" of similar looking individuals; they also showed a single photograph of his motorcycle.

Everyone of the "along the route identification witnesses" saw "one picture" early on; yet each described Mark's clothes, appearance, and size quite differently.    See discussion of this evidence on page 159 of this ruling.    Petitioner argues they really identified him with that single, first picture in their mind, even at the lineup they later were involved in.

The Supreme Court, in Simmons v. United States, 390 U.S. 377, 383, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968) said that the ".  .  . danger [of misidentification] will be increased if the police display to the witness only the picture of a single individual. . ."    The showing of only a

---

[55]For a few days after the murders, a single photo of Mark's brother, the deceased Leslie Mark, was mistakenly shown to some witnesses for identification purposes.  See discussion of witness Jean Doyle, at page 108.  Prosecutor Dutton stated, "We had a picture of Leslie Mark that they were showing to people.  It was shown to Jane Doyle.  We made a mistake, we finally got a picture of Jerry Mark." (P.C.R. Tr. p. 1380-81).

[56]A photo pack is typically a group of photos of persons all similar looking to the target, including a photo of the target suspect.

single photo is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." <u>Id</u>. at 384. Each identification must be considered in the context of the totality of the circumstances. <u>Neil v. Biggers</u>, 409 U.S. 188, 196, 93 S.Ct. 375, 380, 34 L. Ed.2d 401 (1972).

<u>Manson v. Brathwaite</u>, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253, 53 L. Ed. 2d 140 (1977), adopting the factors in <u>Biggers</u>, states that the focus of the inquiry into the totality of the circumstances is on reliability, and the following factors are to be considered:

> 1) the opportunity of the witness to view the criminal at the time of the crime;
> 2) the witness' degree of attention;
> 3) the accuracy of the prior description of the criminal;
> 4) the level of certainty demonstrated at the confrontation, and;
> 5) the time elapsed between the crime and the confrontation.

The Court must then weigh the reliability of the identification circumstances against the "corrupting effect of the suggestive identification itself." <u>Williams v. Lockhart</u>, 736 F.2d 1264, 1267 (8th Cir. 1984) (citing <u>Brathwaite</u>, 432 U.S. at 114).

Despite existing case law from the highest court in the land, the officers in this case chose to use a single photo while traveling along I-80 trying to find witnesses.

Mark argues that he had already been arrested prior to officers making their trip across Iowa and Nebraska in search of witnesses[57]. This is not entirely true. Several witnesses were interviewed before November 10, when Mark was arrested. Mark argues this is compelling evidence that there is no exigency that normally allows for a single photo to be shown. Mark's theory is that the State "recruited" witnesses through the use of this unconstitutional method. It is important to remember that 6 of the "recruited" witnesses later picked Mark out of a line-up. (See Ex. 85).

Next, Mark points out that none of these witnesses had a particular reason to remember him as they all worked at gas stations and/or restaurants right off of the interstate, where hundreds of patrons pass through in a day. Thus, State agents "maximized their odds by showing a single photograph." This

---

[57]Mark was interviewed by officers on November 3, in California (Tr. 2579-80, App. 1234-35); he was interviewed in Iowa on November 7 (Tr. 2069, App. 1059), and on November 10, 1975, Mark was arrested and an information was filed charging him with the murders.

method did not ensure the fair and reliable identification that Mark is entitled to.

The Iowa Supreme Court rejected Marks arguments citing to the rigorous cross examination his counsel engaged in at trial. Thus, the Iowa Supreme Court stated that the use of this type of single photo identification was something for the jury to weigh. State v. Mark, 286 N.W.2d 396, 407 (Iowa 1979). Of course, at the time the Court said that, they were unaware of the numerous documents exposed at the P.C.R. hearings, many years later, which would have supplied the defense with more adequate material to be used in cross examination.

The State, as mentioned, argues that most of the use of the single photo occurred prior to Mark being arrested. "Where a serious felony had been committed, the perpetrators were still at large and the inconclusive clues that law enforcement officials possessed led to the individuals displayed in the photographs." Id. at 404 (citing Simmons v. United States, 390 U.S. 377, 384-85, 88 S.Ct. 967, 19 L. Ed. 2d 1247, 1253 (1968)).

This Court is persuaded that there was not a due process violation by use of the single photo showing. While Mark does have a good point that these witnesses were all employed by businesses that were just off of the interstate, and therefore probably saw hundreds of people in a day, some of the Manson factors (see page 202) weigh in favor of approving the use of the single photo. While Mark was targeted early on in the investigation as the prime suspect, he was not arrested until November 10, 1975, nine days after the murders. Some of the witnesses, who identified Mark, were shown the photo within days of the crime being committed, and at least three days prior to Mark being arrested. As mentioned, most, if not all of these identification witnesses later picked Mark out of a lineup after they had first identified him by the single photo picture. Some of the witnesses recounted interactions and/or conversations with Mark, and also gave somewhat similar descriptions of his clothing and motorcycle. This Court cannot conclude that the Iowa Courts were wrong when they determined that the officers had not violated Mark's due process right in relation to the single photo issue. This is true despite the strong ruling in Simmons, 390 U.S. at 383,

where that Court said that use of a single photo raises the likelihood of "irreparable misidentification." See also Williams v. Lockhart, 736 F.2d 1264, 1267 (8th Cir. 1984). This Court has concluded that the respondent's argument that while it is true that the use of the single photo was inherently suggestive, it was not impermissibly suggestive.

### B. Comments by the Court

This Court spent fourteen years as a prosecutor trying some very important cases over the years and has now been a judge for some twenty-eight years and does not remember, either while he was a prosecutor or since he has been a judge, where any prosecutor turned over possible Brady evidence to the judge for him to review it in camera well before a trial started, without any input from the defense, and then have the judge rule that the defense could or could not see it. This is especially true where the trial judge said that what he was looking for in his in camera inspection was something that would show the defendant could not have committed the crime. (P.C.R. Tr. p. 957). Please refer to a discussion of this situation on page 29 of this ruling and F.N. 8 on that page.

It should be remembered that the trial court in summing up his "inspection," said, "I didn't see my in camera inspection fo those documents to be <u>thorough</u> or <u>intensive</u>. (P.C.R. Tr. p. 954). (emphasis added).

This Court is not forgetting that there was a court order telling the prosecution that it must happen as set out above. Despite that order, <u>Brady</u> its progeny and <u>Peterson</u> do not permit a court to bypass the precedents and make such an order and does not relieve the prosecution of its duty to turn over material evidence. This responsibility of the prosecutor is <u>inescapable</u>. <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38 (1995). (emphasis added).

This Court has very carefully read hundreds of pages of the record in this <u>Mark</u> case and is still at a loss how any judge, prior to trial, would have the necessary knowledge of the case to look at "possible" <u>Brady</u> material, in camera, without any input from the defense, and then rule that it should not be seen by the defense. The primary reason for making that statement is that the prosecution lawyers spent many, many hours on the case, using 20 or 30 different investigators, to learn all the ramifications of the case. No

judge who spent even one month, exclusively, getting ready for such a trial, without any input from the defendant, could have any solid idea as to what the testimony was really going to be and for example why four (4) exhibits (77, 82, 85, and 97), all talking about Hurd and his co-workers, would not be material and should not be turned over to the defense. (See discussion commencing on page 145-148). It is just not logical that the bottom-line answer, by the P.C.R. judge, is that the defense took Hurd's deposition and they should have found out about these various things. A lawyer cannot ask about what he does not know or have any idea about.

This Court recognizes that there was no objection to the Brady exculpatory turnover procedure and that an argument setting out that such a procedure could be fair might give a reviewing court a closer question to decide but where the defense contends that the prosecution did not follow the ordered procedure and "hid" ten (10) exhibits and the trial court did not follow Brady-Peterson mandates as to fourteen (14) more exhibits, totaling 53 pages of material evidence, all credence of the procedure evaporates. Since the good

faith or bad faith of a violation makes no difference, it is not an issue this Court has to decide.

## X. CONCLUSION

Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." <u>Williams v. Taylor</u>, 529 U.S. 362, 404-05, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)[58] (quoting 28 U.S.C. § 2254(d)(1)). This Court, for all the reasons set out herein, is persuaded that the Iowa Supreme Court did not have the suppression issue of twenty-four (24) exhibits before it and therefore made decisions concerning witnesses and categories at issue, i.e., shoes where they did not have the full record they should have had; and that the Iowa Court of Appeals, as set out herein, made decisions in the <u>Mark</u> cases

---

[58]Mark discussed at length, in his supporting brief, the various reasons that <u>Williams v. Taylor</u> should apply to his case. The State, in their reply brief, agreed, therefore, this Court finds the <u>Williams</u> case does apply to this case.

that were in violation of both of the above provisions and their application thereof was also objectively unreasonable.

The central question is whether the conviction and sentence are consistent with the dictates of the Constitution. Odem v. Hopkins, 192 F.3d 772, 774 (8th Cir. 1999)(citing Smith v. Armontrout, 888 F.2d 530, 539 (8th Cir. 1989)). Only those constitutional errors that have a substantial and injurious effect or influence in determining a jury's verdict warrant relief under a 28 U.S.C. § 2254 petition. See Brecht v. Abrahamson, 507 U.S. 619, 637, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993). Also, "[a] court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Long v. Humphrey, 184 F.3d 758, 760 (8th Cir. 1999) (citation omitted).

This Court is aware that Supreme Court decisions and decisions of the Eighth Circuit Court of Appeals are controlling in this district. However, it will not hurt to cite a 3rd Circuit case which sets out the scope of the problem quite well.

> [T]here is never a real "Brady violation"
> unless the nondisclosure was so serious
> that there is a reasonable probability that
> the suppressed evidence would have produced
> a different verdict.   There are three
> components of a true Brady violation:  the
> evidence at issue must be favorable to the
> accused, either because it is exculpatory,
> or because it is impeaching; that evidence
> must have been suppressed by the State,
> either  willfully  or  inadvertently;  and
> prejudice must have ensued.

Smith v. Holtz, 210 F.3d 186, 196 (3d Cir. 2000).

This Court concluded that all three components set out above did ensue in this case.

The Court is aware that the thrust of Kyles, is whether the nondisclosure of information, considered cumulatively, prejudiced the defense.   "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, *but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.*" Kyles, 514 U.S. at 434.

> [A]n  incomplete  response  to  a
> specific request not only deprives
> the defense of certain evidence,
> but  also  has  the  effect  of
> representing to the defense that
> the evidence does not exist.   In
> reliance  on  this  misleading
> representation, the defense might
> abandon  lines  of  independent

> investigation, defenses, or trial
> strategies that it otherwise would
> have pursued. . .[T]he reviewing
> court may consider directly any
> adverse effect that the
> prosecutor's failure to respond
> might have had on the preparation
> or presentation of the defendant's
> case.

United States v. Bagley, 473 U.S. 667, 683 (1985).

This Court is not ruling that Mark is not guilty of the crimes, only that in a careful detailed review of the cumulative effect of all the evidence that was not disclosed, Mark did not receive a fair trial. The trial defense could not be as prepared as they would have been if the prosecutor had turned over to the trial judge for his consideration ten (10) exhibits (twenty-one (21) pages) the judge never even saw and fourteen (14) more exhibits (thirty-two (32) pages) which the judge saw but, in this Court's opinion, wrongfully ruled not to give them to the defense. This totals twenty-four (24) exhibits (fifty-three (53) pages) of material evidence required to be turned over to the defense for their consideration under Brady and its cases and the Peterson case. Again, it can be argued that the "suppression" was not really suppression because the prosecution "turned over everything"

but, as set out just above they did not do this. This also ignores <u>Brady's</u> clear words that due process is violated irrespective of the good faith or bad faith of the prosecution. <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). For all the reasons set out herein, this Court does not have confidence in the outcome of the trial. <u>See</u> <u>Kyles</u>, 514 U.S. at 435; <u>Liggins v. Burger</u>, 422 F.3d 642 (8th Cir. 2005).

The Iowa Court of Appeals erroneously applied precedent by their failure to consider the cumulative effect of all of the non-disclosures to the Judge and the failure of the prosecution to exercise its real duties not to suppress and the trial judge's failure to correctly apply "Brady law" that defendant have the right to see and consider prior to trial all exculpatory evidence at the earliest opportunity. <u>Kyles</u>, 514 U.S. at 437.

This Court is persuaded, for all the reasons set out above, that the Supreme Court of Iowa and the Iowa Court of Appeals made adjudications of the claims "resulted in a decision that was contrary to, <u>or (and)</u> involved an unreasonable application of, clearly established Federal law,

213

as determined by the Supreme Court of the United States" all as set out in 28 U.S.C. § 2254(D)(1)(1994 ed., supp. III). <u>Williams (Terry) v. Taylor</u>, 120 S. Ct. 1495, 1516 (2000).

### A. Lead Control Analysis

Years after this petition first came before the Court, the petitioner requested that the Court in effect expand the scope of the petition to include a "lead control analysis" of the bullets involved. At the hearing before the Court on the 17th day of March, 2005, Mark withdrew any and all claims in relation to his earlier request for a "lead control analysis."

### B. DNA Testing

At the same hearing, Mark withdrew his late request to expand the breadth of his petition to consider DNA testing of condoms found at the crime scene.

This Court has not addressed either of these issues since they were formally withdrawn.

### XI. ORDER

**IT IS THEREFORE HEREBY ORDERED** that the DNA results, as discussed on pages 67-71 of this order, were not considered in the decision made here because they do not involve erroneously

applied legal precedent by the court and prosecution to suppress material, <u>Brady</u>-type (exculpatory evidence).

**IT IS FURTHER HEREBY ORDERED** the writ of habeas corpus (Docket No. 2) is granted.  The petitioner may file for fees.

**IT IS FURTHER HEREBY ORDERED** that a writ of habeas corpus shall issue, requiring the State of Iowa to take one of the following steps:

1.   Commence proceedings to retry the petitioner; or

2.   Release the petitioner from custody.

The State of Iowa shall have 60 days from the date of this Order to take the step it chooses, except that if the State of Iowa appeals this ruling, the time for taking the step chosen is extended to 60 days after mandamus issues in the event of an affirmance or dismissal of the appeal.

**IT IS SO ORDERED** this 31st day of August, 2006.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa